IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION

CASE NO.: 2019-016152-CA-32

WESTCHESTER GENERAL HOSPITAL, INC.,

    *Plaintiff,*

v.

EVANSTON INSURANCE COMPANY,

    *Defendant.*

_____/

**WAIVER OF SERVICE OF PROCESS**

**TO:**    Devang Desai, Esq.
        Gaebe, Mullen, Antonellil & DiMatteo
        420 South Dixie Highway, 3rd Floor
        Coral Gables, FL 33146
        ddesai@gaebemullen.com

I acknowledge receipt of your request that I waive service of process in the lawsuit of *Westchester General Hospital, Inc. v. Evanston Insurance Company* in the Circuit Court in Miami-Dade County. I have also received a copy of the complaint, two copies of this waiver, and a means by which I can return the signed waiver to you without cost to me.

I agree to save the cost of service process and an additional copy of the complaint in this lawsuit by not requiring that I, (or the entity on whose behalf I am acting), be served with judicial process in the manner provided by Fla. R. Civ. P. 1.070.

If I am not the defendant to whom the notice of lawsuit and waiver of service of process was sent, I declare that my relationship to the entity or person to whom the notice was sent and my authority to accept service on behalf of such person or entity is as follows:

Devang Desai, Esq. of Gaebe, Mullen, Antonellil & DiMatteo is counsel for Evanston Insurance Company.

I, (or the entity on whose behalf I am acting), will retain all defense or objections to the lawsuit or to the jurisdiction or venue of the court except for any objections based on a defect in the summons or in the service of the summons.

I understand that a judgment may be entered against me, (or the party on whose behalf I am acting), if a written response is not served upon you within 60 days from June 20, 2019, the date I received the notice of lawsuit and request for waiver of service of process.

Dated: ____6-21-19_____

_____
Devang Desai, Esq.
Gaebe, Mullen, Antonellil & DiMatteo
420 South Dixie Highway, 3rd Floor
Coral Gables, FL 33146
305-667-0223
305-284-9844 *facsimile*
ddesai@gaebemullen.com

### AMERICANS WITH DISABILITIES ACT OF 1990
### ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 N.W. 1st Ave., Suite 2702, Miami, FL 33128, Telephone (305) 349-7175; TDD (305) 349-7174, Fax (305) 349-7355 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."**



May 29, 2019

**VIA E-MAIL ONLY**
ddesai@gaebemullen.com

Devang Desai, Esq.
Gaebe, Mullen, Antonellil & DiMatteo
420 South Dixie Highway, 3rd Floor
Coral Gables, FL 33146

      Re:    **Westchester General Hospital, Inc. v. Evanston Ins. Co.**
              **Your File No.: 1753.41151**
              **Our Matter No.: W063.100**

Dear Mr. Desai:

    We are Westchester General Hospital's coverage counsel. We disagree with Evanston's application of the facts to its policies' language. Enclosed please find a copy of the Complaint seeking declaratory relief that was filed today. Please let us know if you will accept service on Evanston's behalf.

    Thank you.

                         Sincerely,

                         Stephen A. Marino, Jr.

Enclosure

cc:    Marlene Rabinovich
       James J. Nosich, Esq.

268635

Case 1:19-cv-22931-KMW Document 1-1 Entered on FLSD Docket 07/10/2019 Page 4 of 149

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION

CASE NO.:

WESTCHESTER GENERAL HOSPITAL, INC.,

     *Plaintiff,*

v.

EVANSTON INSURANCE COMPANY,

     *Defendant.*

_____/

## COMPLAINT

Westchester General Hospital, Inc. ("Westchester") sues Evanston Insurance Company ("Evanston"), seeking a declaration as to coverage available to Westchester under certain insurance policies issued by Evanston, as follows:

## NATURE OF ACTION, JURISDICTION AND VENUE

1.     This is an action seeking declaratory relief pursuant to Chapter 86, Florida Statutes.

2.     This Court has jurisdiction over this action because the amount in controversy is more than $15,000.00, exclusive of costs, interests, and attorney's fees.

3.     Venue is proper in this circuit as the acts giving rise to this action occurred in Miami-Dade County, Florida. Evanston issued the subject insurance policy for delivery to Westchester in Miami-Dade County, Florida, and the subject claim occurred in Miami-Dade County, Florida.

## THE PARTIES

4.      Westchester is a Florida for-profit corporation with its principal place of business in Miami, Florida.

5.      Evanston is a foreign corporation with its principal place of business in Deerfield, Illinois. Evanston is licensed to engage in and actively engages in the business of selling insurance in the State of Florida.

## GENERAL ALLEGATIONS

6.      On December 31, 2018, Jane Doe was a mental health patient at Westchester and was allegedly injured by Fernado Felix Ramos-Garcia, an employee in Westchester's mental health department.

7.      Jane Doe filed a complaint against Westchester and Ramos-Garcia in Miami-Dade County Circuit Court, Case No. 19-001417 CA 06 (the "Underlying Litigation"). The Complaint in the Underlying Litigation is attached as Exhibit A.

8.      The Underlying Litigation alleges negligence against Westchester for its failure to investigate, train, supervise and adequately staff its mental health department.

9.      Evanston issued a Specified Medical Professions Insurance Policy to Westchester, bearing policy number SM925939, with effective dates of May 23, 2018 to May 23, 2019. Policy No. SM925939 is attached as Exhibit B.

10.      Policy No. SM925939 contains several coverage parts, including General Liability Insurance Coverage (the "GL Coverage") and Professional Liability Insurance Coverage (the "PL Coverage").

11.      Evanston also issued an umbrella liability policy to Westchester (the "Umbrella Policy"), bearing policy number UM800928, with effective dates of May 23, 2018 to May 23,

2

2019, providing excess indemnity over the GL and PL Coverages. The Umbrella Policy is attached as Exhibit C.

      12.     Westchester gave Evanston timely notice of the Underlying Litigation.

      13.     On April 2, 2019, Evanston issued a reservation of rights letter to Westchester, stating that it would provide a defense to Westchester in the Underlying Litigation under the PL Coverage but would not indemnify Westchester for any damages that may be entered against it. Evanston denied coverage under both the GL Coverage and the Umbrella Policy for the claims against Westchester and denied coverage under all policies with regard to the claims against Ramos-Garcia.

## THE POLICIES

      14.     Part A of Policy No. SM925939 provides Professional Liability Insurance on a claims-made basis with limits of $1 million per claim and $3 million aggregate.

      15.     The PL Coverage provides, in pertinent part:

**INSURING AGREEMENT**

**A. Professional Liability and Claims Made Clause:** The Company shall pay on behalf of the Insured all sums in excess of the Deductible amount stated in the Declarations, which the Insured shall become legally obligated to pay as Damages as a result of a Claim first made against the Insured during the Policy Period or during the Extended Reporting Period, if exercised, and reported to the Company pursuant to Section CLAIMS A., Claim Reporting Provision for Professional Personal Injury:

    **1.** By reason of any act, error or omission in Professional Services arising out of the conduct of the Insured's Professional Services, rendered or that should have been rendered by an Insured; or

    **2.** By reason of any act, error or omission in Professional Services arising out of the conduct of the Insured's Professional Services, rendered or that should have been rendered by a natural person, who is not and shall not be an Insured hereunder, and through whose acts the Insured controls the provider-patient relationship as of the time of such act, error or omission; provided:

    **a.**  The act, error or omission happens during the Policy Period . . .; and

    **b.**  Prior to the effective date of this policy the Insured had no knowledge of such act, error or omission or any fact, circumstance, situation or incident which may lead a reasonable person in the Insured's position to conclude that a Claim was likely.

16.    Part B of Policy No. SM925939 provides General Liability Insurance on a claims-made basis with limits of $1 million per occurrence and $3 million aggregate.

17.    The GL Coverage provides, in pertinent part:

**INSURING AGREEMENTS**

**A. Coverage A. – Bodily Injury and Property Damage Liability**: The Company shall pay on behalf of the Insured all sums in excess of the Deductible amount stated in the Declarations, which the Insured shall become legally obligated to pay as Damages as a result of a Claim first made against the Insured during the Policy Period or during the Extended Reporting Period, if exercised, and reported to the Company pursuant to Section Claims A., Claim Reporting Provision, for Bodily Injury or Property Damage caused by an Occurrence; provided
**. . .**

    **2.**  Such Bodily injury or Property Damage and Occurrence arise out of only those Specified Products, Goods, Operations or Premises stated in the Declarations;

18.    The Declarations of Policy No. SM925939 provides, in pertinent part:

**4.**    **PROFESSIONAL SERVICES AND SPECIFIED PRODUCTS, GOODS, OPERATIONS OR PREMISES**:

    A.  Professional Services: General Acute Care Hospital

    B.  Specified Products, Goods, Operations or Premises: Hospital; all related premises and operations of the Insured.

19.    The Umbrella Policy's Schedule of Underlying Insurance incorporates both the GL Coverage and the PL Coverage with a $5 million limit of insurance.

20.    The Umbrella Policy provides, in pertinent part:

**INSURING AGREEMENTS**

**A. Coverage A – "Bodily Injury" and "Property Damage" Liability Insuring Agreement**

   **1.** We will pay on behalf of the insured for that portion of "ultimate net loss" in excess of the "underling limit" because of "bodily injury" or "property damage" to which this insurance applies, but only up to the Limits of Insurance stated in the Declarations.  No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Section Defense And Supplementary Payments Coverages A And B.

21.     All conditions precedent to bringing this action have been performed, waived, or have otherwise occurred, specifically including all actions necessary to trigger a defense and indemnity under Policy No. SM925939.

22.     Westchester engaged the undersigned counsel to represent it in this action and has agreed to pay a reasonable fee for services rendered.

## COUNT I – DECLARATORY RELIEF – GL COVERAGE

23.     Westchester re-alleges the allegations contained in paragraphs 1-22.

24.     Policy No. SM925939 constitutes an enforceable contract under Florida law.

25.     There is a bona fide dispute between the parties and an actual, present and practical need for a declaration regarding Evanston's duties under the GL Coverage.

26.     Westchester requests a declaration that:

   a.   Evanston has a duty to defend Westchester in the Underlying Litigation under the GL Coverage; and

   b.   Evanston's duty to indemnify Westchester under the GL Coverage cannot be determined until there is a judgment or approved settlement in the Underlying Litigation.

5

WHEREFORE, Westchester respectfully requests a declaration as set forth herein, an award of Westchester's attorney's fees and costs incurred in bringing this action, and any further relief this Court deems equitable, just, and proper.

### COUNT II – DECLARATORY RELIEF – UMBRELLA POLICY

27.     Westchester re-alleges the allegations contained in paragraphs 1-22.

28.     The Umbrella Policy constitutes an enforceable contract under Florida law.

29.     There is a bona fide dispute between the parties and an actual, present and practical need for a declaration regarding Evanston's duties under the Umbrella Policy.

30.     Westchester requests a declaration that Evanston's duty to indemnify Westchester under the Umbrella Policy cannot be determined until there is a judgment or approved settlement in the Underlying Litigation.

WHEREFORE, Westchester respectfully requests a declaration as set forth herein, an award of Westchester's attorney's fees and costs incurred in bringing this action, and any further relief this Court deems equitable, just, and proper.

### COUNT III – DECLARATORY RELIEF – PL COVERAGE

31.     Westchester re-alleges the allegations contained in paragraphs 1-22.

32.     Policy No. SM925939 constitutes an enforceable contract under Florida law.

33.     There is a bona fide dispute between the parties and an actual, present and practical need for a declaration regarding Evanston's duties under the PL Coverage.

34.     Specifically, if the Court determines that Evanston has no duty to defend and/or no duty to indemnify Westchester under the GL Coverage, Westchester requests a declaration that:

a. Evanston has a duty to defend Westchester in the Underlying Litigation under the PL Coverage; and

b. Evanston's duty to indemnify Westchester under the PL Coverage cannot be determined until there is a judgment or approved settlement in the Underlying Litigation.

WHEREFORE, Westchester respectfully requests a declaration as set forth herein, an award of Westchester's attorney's fees and costs incurred in bringing this action, and any further relief this Court deems equitable, just, and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff, Westchester General Hospital, Inc., requests trial by jury of all issues so triable.

Dated: May 29, 2019

Respectfully Submitted,

VER PLOEG & MARINO, P.A.
100 S.E. Second Street, 30th Floor
Miami, FL 33131
305-577-3996
305-577-3558 *facsimile*

/s/ Stephen A. Marino, Jr.
**Stephen A. Marino, Jr.**
Florida Bar No. 79170
smarino@vpm-legal.com
smcgee@vpm-legal.com
**S. Alice Weeks**
Florida Bar No. 1002667
sweeks@vpm-legal.com
*Counsel for Westchester General Hospital, Inc.*

7

# EXHIBIT A

**EXHIBIT A**

Filing # 83408690 E-Filed 01/16/2019 07:50:53 AM

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.:
FLORIDA BAR NO.: 283886

JANE DOE and JOHN DOE, her husband,

    Plaintiffs,

vs.

WESTCHESTER GENERAL HOSPITAL,
INC., a Florida, For Profit, Corporation,
and FERNANDO FELIX RAMOS-GARCIA,

    Defendants.

_____/

### COMPLAINT

Plaintiffs, JANE DOE and JOHN DOE, sue WESTCHESTER GENERAL HOSPITAL, INC.,

a Florida, for profit corporation, and FERNANDO FELIX RAMOS-GARCIA and allege:

### AS TO ALL COUNTS

1.  At all times material hereto, the Defendant, WESTCHESTER GENERAL HOSPITAL,

    INC., (hereinafter referred to as "WESTCHESTER"), was a Florida, for profit

    corporation, authorized and doing business in Miami-Dade County, Florida,

    which  had an office for the transaction of its customary business in Miami-

    Dade County and which owned, operated and controlled a mental health

    facility at its hospital. WESTCHESTER'S mental health facility receives and treats

    patients for mental illness.

2.  At all times material hereto, the Plaintiff, JANE DOE, was admitted to

    WESTCHESTER for treatment, was a patient in the mental health

1

CASE NO.:

facility/mental health ward of the hospital and was an invitee in

WESTCHESTER's hospital.

3. At all times material hereto, the Defendant, FERNANDO FELIX RAMOS-GARCIA

(hereinafter referred to as "RAMOS-GARCIA"), was an employee or agent of

WESTCHESTER who was working and acting under the hospital's

actual/apparent direction, supervision and control within the mental health

facility/mental health ward.

4. On New Year's eve, December 31, 2018:

    a)  during the night shift;

    b)  after JANE DOE was medicated for her mental illness by

       WESTCHESTER, and while she was asleep;

    c)  RAMOS-GARCIA entered JANE DOE'S room, and forced her to

       perform fellatio on him;

    d)  RAMOS-GARCIA then walked past the doorway of JANE DOE'S

       room into the exterior hallway and confirmed that no other hospital

       staff were present or in the vicinity thereby assuring that he was

       uncontrolled and unsupervised by WESTCHESTER;

    e)  RAMOS-GARCIA then re-entered JANE DOE'S room, covered her

       mouth, forced penile/vaginal penetration and intercourse and

       raped her;

    f)  JANE DOE advised her family of the sexual assault and rape. DOE,

       not WESTCHESTER, called the police to report the crimes so that

       they could be investigated, and so that RAMOS-GARCIA could be

       criminally prosecuted.

2

CASE NO.:

5.  JANE DOE did not consent to the sexual activity and sexual crimes committed upon her as described herein.

6.  JANE DOE could not have given informed consent to the sexual activity and sexual crimes committed upon her as described herein.

7.  JANE DOE is not guilty of any comparative negligence in this lawsuit.

8.  At all times material hereto, JANE DOE was a resident of Miami-Dade County and a citizen of the state of Florida.

9.  At all times material hereto, RAMOS-GARCIA was a resident of Miami-Dade County and a citizen of the state of Florida.

10. At all times material hereto, WESTCHESTER was a citizen of the state of Florida, and has an office for the transaction of its customary business in Miami-Dade County.

11. This Court has jurisdiction in that the amount sought in damages is in excess of the jurisdictional limits of this Court and is in excess of $50 million dollars.

12. Venue is proper in Miami-Dade County. §§47.011, 47,051, Fla. Stat. (2017).

### COUNT I

### NEGLIGENCE CLAIM AGAINST WESTCHESTER GENERAL HOSPITAL, INC.

13. All allegations in Paragraphs 1-12 are realleged, and incorporated by reference.

14. On December 31, 2018, WESTCHESTER had a non-delegable statutory, administrative and/or common law duty to exercise reasonable care for JANE DOE's safety and to prevent:

   a) the creation of a zone of danger for mental health patients, including JANE DOE, to be exposed to the foreseeable risk of injury

3

CASE NO.:

      or harm by uncontrolled and unsupervised hospital staff, including RAMOS-GARCIA,

b) the unauthorized, unlicensed, improperly licensed and improperly trained hospital staff, including RAMOS-GARCIA, from accessing and entering the mental health facility/mental health ward,

c) the unauthorized, unlicensed, improperly licensed and improperly trained hospital staff, including RAMOS-GARCIA, from accessing and entering JANE DOE's room,

d) the unsupervised hospital staff, including RAMOS-GARCIA, from injuring, harming and sexually assaulting mental health patients, including JANE DOE, and

e) the creation of a hospital mental health ward environment that posed a foreseeable and unreasonable risk of harm to mental health patients, including JANE DOE, to the uncontrolled, untrained, unlicensed and unsupervised actions of its hospital staff, including RAMOS-GARCIA.

15. WESTCHESTER knew of the need to exercise such training, supervision and control of its hospital staff, including RAMOS-GARCIA, because of the vulnerability of the female mental health patients entrusted to its care and safekeeping.

16. On December 31, 2018, a special relationship existed between WESTCHESTER and the mental health patients entrusted to its care, including JANE DOE. WESTCHESTER'S duties included, but were not limited to, the following:

4

CASE NO.:

a) adequately and reasonably investigating the backgrounds, training, qualifications and experience of the people it hired to work in its hospital and its mental health facility/mental health ward.

b) adequately and reasonably hiring qualified, trained people to provide care and treatment to the sick and infirmed patients who populated its hospital and its mental health facility/mental health ward;

c) adequately and reasonably providing on-going in-service training to the hospital staff who provided care and treatment to the sick and infirmed patients who populated its hospital and its mental health facility/mental health ward;

d) adequately and reasonably controlling and supervising the hospital staff who provided care and treatment to the sick and infirmed patients who populated its hospital and its mental health facility/mental health ward;

e) adequately and reasonably staffing the mental health department/mental health ward so that there was appropriate control and supervision of the department and the mental health floor itself;

f) adequately and reasonably preventing unauthorized, unlicensed, improperly licensed and untrained hospital staff, including RAMOS-GARCIA, from gaining access to the mental health facility/mental health ward;

5

CASE NO.:

g) adequately and reasonably preventing unauthorized, unlicensed, improperly licensed and untrained hospital staff, including RAMOS-GARCIA, from gaining access to female mental health patients, especially those vulnerable patients who are female, who are suffering from mental illness, who are mentally/pharmacologically infirm, who are medicated and/or who are asleep at night;

h) adequately and reasonably preventing male personnel from having uncontrolled and unsupervised access to female mental health patients;

i) adequately and reasonably adopting, implementing, and enforcing policies and procedures so that male employees would not be alone in patient rooms with female patients uncontrolled/unsupervised, or having uncontrolled/unsupervised access to female patients;

j) abiding by industry administrative rules and regulations regarding keeping mental health patients safe and secure;

k) abiding by its own policies and procedures regarding keeping mental health patients safe and secure;

l) adopting and implementing policies and procedures so that sexual assaults were immediately reported to hospital administration and to the police;

m) having and implementing appropriate safeguards to prevent creating a zone of danger, whereby male hospital staff have uncontrolled/unsupervised access to female patients placed in

6

CASE NO.:

WESTCHESTER'S care, especially when the vulnerable patients are female, are suffering from mental illness, are mentally/pharmacologically infirm, are medicated and/or are asleep at night;

n) keeping its premises in a reasonably safe condition and free of hazards and dangerous conditions, and;

o) adequate and timely warning of the aforesaid hazards and dangerous conditions.

17. At that time and place, the Defendant, WESTCHESTER, its agents, and/or its employees breached the duties described above in that WESTCHESTER failed to:

a) adequately and reasonably vet/investigate the backgrounds, training, qualifications and experience of the people it hired to work in its hospital and its mental health facility/mental health ward.

b) adequately and reasonably hiring qualified, trained people to provide care and treatment to the sick and infirmed patients who populated its hospital and its mental health facility/mental health ward;

c) adequately and reasonably providing on-going in-service training to the hospital staff who provided care and treatment to the sick and infirmed patients who populated its hospital and its mental health facility/mental health ward;

7

CASE NO.:

d)  adequately and reasonably controlling and supervising the hospital staff who provided care and treatment to the sick and infirmed patients who populated its hospital and its mental health facility/mental health ward;

e)  adequately and reasonably staffing the mental health department/mental health ward so that there was appropriate control and supervision of the department and the mental health floor itself;

f)  adequately and reasonably preventing unauthorized, unlicensed, improperly licensed and untrained hospital staff, including RAMOS-GARCIA, from gaining access to the mental health facility/mental health ward;

g)  adequately and reasonably preventing unauthorized, unlicensed, improperly licensed and untrained hospital staff, including RAMOS-GARCIA, from gaining access to female mental health patients, especially those vulnerable patients who are female, are suffering from mental illness, are mentally/pharmacologically infirm, are medicated and/or are asleep at night;

h)  adequately and reasonably preventing male personnel from having uncontrolled and unsupervised access to female mental health patients;

i)  adequately and reasonably adopting, implementing, and enforcing policies and procedures so that male employees would not be alone in patient rooms with female patients

8

CASE NO.:

uncontrolled/unsupervised, or having uncontrolled/unsupervised access to female patients;

j) abiding by industry administrative rules and regulations regarding keeping mental health patients safe and secure;

k) abiding by its own policies and procedures regarding keeping mental health patients safe and secure;

l) adopting and implementing policies and procedures so that sexual assaults were immediately reported to hospital administration and to the police;

m) having and implementing appropriate safeguards to prevent creating a zone of danger, whereby male hospital staff have uncontrolled/unsupervised access to female patients placed in WESTCHESTER'S care, especially when the patients are female, are in a room, are suffering from mental illness, are mentally infirmed, are medicated and/or are asleep at night;

n) keeping its premises in a reasonably safe condition and free of hazards and dangerous conditions, and;

o) adequate and timely warning of the aforesaid hazards and dangerous conditions.

18. The hazards and dangerous conditions described above were created by WESTCHESTER, were known to WESTCHESTER and/or in the exercise of reasonable diligence and by reasonable training, supervision, control, maintenance, inspection and/or warning, should have been known to WESTCHESTER.

9

CASE NO.:

19. As a direct, proximate and reasonably foreseeable result of the negligence described above, the Plaintiff, JANE DOE, was injured in and about her body and extremities, suffered great emotional distress, aggravated a pre-existing medical condition, suffered pain and suffering, disability, mental anguish, loss of capacity for the enjoyment of life, expenses of hospitalization, medical and nursing care treatment in the past and future, loss of earnings in the past and future, loss of ability to earn money in the future. The losses are either permanent or continuing in their nature and the Plaintiff will continue suffering such losses and impairments in the future.

20. The Plaintiff, JOHN DOE, lost the comfort companionship, consortium and services of his wife, JANE DOE, in the past and will suffer such losses in the future.

WHEREFORE, the Plaintiffs, JANE DOE and JOHN DOE, demand judgment against the Defendants, WESTCHESTER, for compensatory damages, costs, and other such further relief as this Honorable Court deems just and proper, and demands a trial by jury on all issues so triable as of right by a jury.

**COUNT II**

**BATTERY CLAIM AGAINST FERNANDO FELIX RAMOS-GARCIA**

21. All allegations contained in Paragraphs 1-12 are realleged.

22. As a direct, proximate and reasonably foreseeable result of the battery described above, the Plaintiff, JANE DOE, was injured in and about her body and extremities, suffered great emotional distress, aggravated a pre-existing medical condition, suffered pain and suffering, disability,

10

CASE NO.:

mental anguish, loss of capacity for the enjoyment of life, expenses of hospitalization, medical and nursing care treatment in the past and future, loss of earnings in the past and future, loss of ability to earn money in the future.  The losses are either permanent or continuing in their nature and the Plaintiff will continue suffering such losses and impairments in the future.

23. The Plaintiff, JOHN DOE, lost the comfort companionship, consortium and services of his wife, JANE DOE, in the past and will suffer such losses in the future.

WHEREFORE, the Plaintiffs, JANE DOE and JOHN DOE, demand judgment against the Defendants, RAMOS-GARCIA, for compensatory damages, costs, and other such further relief as this Honorable Court deems just and proper, and demands a trial by jury on all issues so triable as of right by a jury.

## COUNT III

### ASSAULT CLAIM AGAINST FERNANDO FELIX RAMOS-GARCIA

24. All allegations contained in Paragraphs 1-12 are realleged.

25. On December 31, 2018, RAMOS-GARCIA unlawfully directed force towards JANE DOE, under circumstances which created a fear of imminent peril, coupled with the apparent present ability to effectuate the attempt.

26. As a direct, proximate and reasonably foreseeable result of the assault described above, the Plaintiff, JANE DOE, was injured in and about her body and extremities, suffered great emotional distress, aggravated a pre-existing medical condition, suffered pain and suffering, disability,

11

CASE NO.:

mental anguish, loss of capacity for the enjoyment of life, expenses of
hospitalization, medical and nursing care treatment in the past and future,
loss of earnings in the past and future, loss of ability to earn money in the
future.  The losses are either permanent or continuing in their nature and
the Plaintiff will continue suffering such losses and impairments in the
future.

27. The Plaintiff, JOHN DOE, lost the comfort companionship, consortium and
services of his wife, JANE DOE, in the past and will suffer such losses in the
future.

WHEREFORE, the Plaintiffs, JANE DOE and JOHN DOE, demand judgment against
the Defendants, RAMOS-GARCIA, for compensatory damages, costs, and other such
further relief as this Honorable Court deems just and proper, and demands a trial by jury
on all issues so triable as of right by a jury.

FRIEDMAN & FRIEDMAN, P.A.
2600 Douglas Road
Suite 1011
Bank of America Building
Coral Gables, FL 33134
(305) 446-6485
f:  (305) 448-7636
gary@friedmantriallawyers.com
susy@friedmantriallawyers.com
By:/s/Gary Alan Friedman, Esq.
    GARY ALAN FRIEDMAN

12

EXHIBIT B

**EXHIBIT B**

**A STOCK COMPANY**



# EVANSTON INSURANCE COMPANY

Ten Parkway North
Deerfield, IL 60015

**INSURANCE POLICY**

**Coverage afforded by this policy is provided by the Company (Insurer) and named in the Declarations.**

In **Witness Whereof**, the company (insurer) has caused this policy to be executed and attested and countersigned by a duly authorized representative of the company (insurer) identified in the Declarations.

**Secretary**                                    **President**

MJIL 1000 06 10                                    Page 1 of 1

INTERLINE



# EVANSTON INSURANCE COMPANY

## FLORIDA POLICYHOLDER NOTICE

"THIS INSURANCE IS ISSUED PURSUANT TO THE FLORIDA SURPLUS LINES LAW.  PERSONS INSURED BY SURPLUS LINES CARRIERS DO NOT HAVE THE PROTECTION OF THE FLORIDA INSURANCE GUARANTY ACT TO THE EXTENT OF ANY RIGHT OF RECOVERY FOR THE OBLIGATION OF AN INSOLVENT UNLICENSED INSURER."

**"SURPLUS LINES INSURERS' POLICY RATES AND FORMS ARE NOT APPROVED BY ANY FLORIDA REGULATORY AGENCY."**

INTERLINE



# PRIVACY NOTICE

We are committed to safeguarding your privacy. We understand your concerns regarding the privacy of your nonpublic personal information. No nonpublic personal information is required to be collected when you visit our websites; however, this information may be requested in order to provide the products and services described. We do not sell nonpublic personal information to non-affiliated third parties for marketing or other purposes. We only use and share this type of information with non-affiliated third parties for the purposes of underwriting insurance, administering your policy or claim and other purposes as permitted by law, such as disclosures to insurance regulatory authorities or in response to legal process. Notwithstanding the foregoing, we may use this information for the purpose of marketing our own products and services to you.

We collect nonpublic personal information about you from the following sources:

- Information we receive from you on applications or other forms;
- Information about your transactions with us, our affiliates, or others; and/or
- Information we receive from consumer reporting agencies and inspection reports.

We do not disclose any nonpublic personal information about our customers/claimants or former customers/claimants to anyone, except as permitted by law.

We may disclose nonpublic personal information about you to the following types of third parties:

- Service providers, such as insurance agents and/ or brokers and claims adjusters; and/or
- Other non-affiliated third parties as permitted by law.

We restrict access to nonpublic personal information about our customers/claimants to those individuals who need to know that information to provide products and services to our customers/claimants or as permitted by law. We maintain physical, electronic, and procedural safeguards to guard your nonpublic personal information.

*Residents of California:*

You may request to review and make corrections to recorded non-public personal information contained in our files. A more detailed description of your rights and practices regarding such information is available upon request. Please contact your agent/broker for instructions on how to submit a request to us.



# EVANSTON  INSURANCE  COMPANY

## U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.



**POLICYHOLDER DISCLOSURE NOTICE OF TERRORISM INSURANCE COVERAGE**

RE:   Policy Number: SM925939
      Insured:  WESTCHESTER GENERAL HOSPITAL, INC.; HEALTH EXCELLENCE, LLC; SOUTHERN WINDS
               HOSPITAL
      Insurer:  EVANSTON INSURANCE COMPANY

You are hereby notified that under the Terrorism Risk Insurance Act as amended in 2015 the definition of terrorism has changed. As *defined in Section 102(1) of the Act*: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury—in consultation with the Secretary of Homeland Security, and the Attorney General of the United States—to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Under the Act, any losses resulting from certified acts of terrorism may be partially reimbursed by the United States Government under a formula established by the Terrorism Risk Insurance Act as amended. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. The Act requires Evanston Insurance Company to also notify you that Terrorism Coverage required to be offered by the Act for losses caused by certified acts of terrorism is partially reimbursed by the United States Government under a formula established by federal law. Under this formula, the United States Government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019 and 80% beginning on January 1, 2020 of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage.

The Terrorism Risk Insurance Act as amended, contains a $100 billion cap that limits United States Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

Nothing in this notice affects or modifies your coverage except and only to the extent specifically required by the Act.

Certified Acts of Terrorism coverage is provided for no additional premium.



# EVANSTON INSURANCE COMPANY

## DECLARATIONS – SPECIFIED MEDICAL PROFESSIONS INSURANCE POLICY

**Claims Made:** Under certain Coverage Parts of this policy, the coverage afforded is limited to liability for only those Claims that are first made against the Insured during the Policy Period or the Extended Reporting Period, if exercised, and reported to the Company pursuant to the terms herein. Refer to each Coverage Part's opening page to determine if that Coverage Part is Claims Made.

**Notice:** All Coverage Part of this policy contain provisions that reduce the limits of liability stated in the policy by the costs of legal defense and permit legal defense costs to be applied against the deductible, unless otherwise endorsed. Please read the policy carefully.

POLICY NUMBER:  SM925939                    RENEWAL OF POLICY:  SM920017

1. **NAMED INSURED:**      WESTCHESTER GENERAL HOSPITAL, INC.; HEALTH EXCELLENCE, LLC; SOUTHERN WINDS HOSPITAL

2. **BUSINESS ADDRESS:**    2500 SW 75TH AVENUE
MIAMI, FL  33155

3. **POLICY PERIOD:**        From  05/23/2018 to 05/23/2019
12:01 A.M. Standard Time at address of Insured stated above

4. **PROFESSIONAL SERVICES AND SPECIFIED PRODUCTS, GOODS, OPERATIONS OR PREMISES:**

   A.   Professional Services:    General Acute Care Hospital

   B.   Specified Products, Goods, Operations or Premises:  Hospital; all related premises and operations of the Insured

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, THE COMPANY AGREES WITH THE NAMED INSURED TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

| Producer Number, Name and Address |
| --- |
| 74630<br>RPS Healthcare<br>550 W. Van Buren Suite 1200<br>Chicago, IL  60607 |

**5.    COVERAGE SCHEDULE:**

This policy includes only those Coverage Parts designated below by "X" as purchased. If a Coverage Part is not expressly designated as purchased, this policy does not include such Coverage Part.

| Coverage Part | Coverage Part Purchased | Coverage Part Limits of Liability | Coverage Part Deductible | Coverage Part Retroactive Date |
|---|---|---|---|---|
| **A.** Specified Medical Professions Professional Liability Insurance Coverage Part – Claims Made Coverage | Yes _X_ | $1,000,000 Each Claim $3,000,000 Aggregate | $250,000 Each Claim | April 1, 1988 |
| **B.** Specified Medical Professions General Liability Insurance Coverage Part – Claims Made Coverage | Yes _X_ No _____ | $1,000,000 Coverage A. Each Occurrence $100,000 Damage to Premises - Any One Premises $1,000,000 Coverage B. Each Person or Organization $5,000 Coverage C. Each Injured Person $3,000,000 Aggregate - All Coverages | $10,000 Coverage A. Each Occurrence $10,000 Coverage B. Each Person or Organization | July 1, 2001 |
| **C.** Specified Medical Professions General Liability Insurance Coverage Part – Occurrence Coverage | Yes _____ No _X_ | $Not Purchased Coverage A. Each Occurrence $Not Purchased Damage to Premises - Any One Premises $Not Purchased Coverage B. Each Person or Organization $Not Purchased Coverage C. Each Injured Person $Not Purchased Aggregate - All Coverages | $Not Purchased Coverage A. Each Occurrence $Not Purchased Coverage B. Each Person or Organization | |

**6.     PREMIUM FOR POLICY PERIOD:**

Minimum                                                   $    335,000.00
Deposit                                                    $    335,000.00

**7.     RATE:**    Flat

**PREMIUM BASE:**    Flat

**8.     PREMIUM FOR EXTENDED REPORTING PERIOD:** 150% for 12 months; 175% for 24 months; or 200% for 36 months

**9.** The Insured is not a proprietor, superintendent, executive officer, director, partner, trustee or employee of any hospital, sanitarium, clinic with bed-and-board facilities, laboratory, or any business enterprise not named in Item 1. hereinabove, except as follows:

    None

**10.** **ENDORSEMENTS ATTACHED AT POLICY INCEPTION:**
    See MDIL 1001 08 10 attached.

**11.** **NOTICES**:

Notices required to be provided to the Company under this policy shall be by email, fax or mail addressed to:

| **CLAIM OR DISCOVERY CLAUSE NOTICES:** | **ALL OTHER NOTICES:** |
|---|---|
| Claims Service Center<br>MARKEL SERVICE, INCORPORATED<br>Ten Parkway North<br>Deerfield, Illinois 60015 | Markel Midwest Region, a division of Markel Service, Incorporated<br>222 South Riverside Plaza Suite 2250<br>Chicago, IL 60606<br>Telephone: (847)-572-6000<br>Fax: |
| E-mail: newclaims@markelcorp.com<br>Fax: (855) 662-7535 | |

**These declarations, together with the Common Policy Conditions, Coverage Part(s), any Endorsement(s) and any application(s) complete the above numbered policy.**

| Countersigned: 7/27/2018 | By: |
|---|---|
| (Date) | AUTHORIZED REPRESENTATIVE |



# Markel's Designed Protection®
# Risk Management Resources Allied Health Care
# (Specified Medical) Professionals,

<u>Welcome</u> to Markel's Designed Protection® leading edge Risk Management Resources.

The following risk management resources are available exclusively to our policyholders at our website www.markelcorp.com/riskmanagement at *no additional cost*.

**HOW TO QUICKLY ACCESS RISK MANAGEMENT RESOURCES:**

<u>Step 1.</u>   Go onto our website, www.markelcorp.com/riskmanagement.

<u>Step 2</u>.   Select the Designed Protection services that apply to your policy, to get to the Login screen.

<u>Step 3</u>.   Review the disclaimer, enter your current policy number and click on the button below to access. Your policy number is SM925939.

If you need technical assistance during the log in process, call (866) 932-2433, x113719.

**Available Risk Management Resource:**

- **Designed Protection® Risk Management Telephone Hotlines for:**

  This confidential telephone hotline is staffed by health care professional defense attorneys that are available to answer general risk management questions.



INTERLINE
**POLICY NUMBER:** SM925939

# EVANSTON INSURANCE COMPANY

## FORMS SCHEDULE

| FORM NUMBER | FORM NAME |
|---|---|
| MJIL 1000 06 10 | Policy Jacket |
| MPIL 1006-FL 01 10 | Florida Policyholder Notice |
| MPIL 1007 03 14 | Privacy Notice |
| MPIL 1083 04 15 | US Treasury Dept's Office Of Foreign Assets Control ("OFAC") Policyholder Notice |
| ZZ-50000 01 15 | Policyholder Disclosure of Terrorism Insurance Cov |
| MDSM 5013 GL 08 15 | Dec Spec Med Professions Insurance Policy |
| MDIL 1001 08 10 | Forms Schedule |
| MESM 5100 02 16 | Common Policy Conditions |
| MESM 5010 08 15 | Spec Medical Professions Profes Liab Ins Cov Part |
| MESM 5011 08 15 | General Liab Ins Cov Part - Claims Made |
| EIC 4638 01 15 | Certified Acts of Terrorism Endorsement |
| EIC 832-01 10 02 | Asbestos Exclusion |
| IL 12 01 11 85 A | Policy Changes (Additional Named Insured) |
| MANUSCRIPT-1 | Deductible Aggregate Endorsement |
| MANUSCRIPT-1 | Emergency Department Coverage Endorsement |
| MANUSCRIPT-1 | Amendment of Coverage - Newly Acquired Organizations |
| MANUSCRIPT-1 | Schedule of Premium Payments |
| MEEO 5232 11 14 | Addt Insd End for Landlords, Spons or Lessors (CM) |
| MEIL 5200-25% 07 04 | Minimum Earned Premium Endorsement |
| MEIL 5229 09 10 | Longer Duratn Extended Report Period Availability |
| MESM 1001 08 15 | Addt Insd End - Bod Inj/Prop Dam (Blanket)(CM) |
| MESM 1006 08 15 | Additional Insured Endorsement - General Liability |
| MESM 2004 10 12 | Claim Exp in Add to Each Claim Limit of Liab |
| MESM 2014 10 12 | Amendment of Cancellation |
| MESM 2015 08 15 | Amendment of Definition D.1. |
| MESM 2029 10 12 | Amendment of the Insured - Addt of Independ Contr |
| MESM 2034 08 15 | DataBreach Coverage Parts Endorsement |
| MESM 2054 08 15 | Claim Exp in Add Each Occ/Each Per Org LOL (CM) |
| MESM 2055 02 13 | Risk Management Services Expense Reimbursement |
| MESM 2071 08 15 | Employee Benefits Liability Coverage |
| MESM 2074-FL 11 12 | Consent to Settlement - Florida |
| MESM 2083 01 11 | HIPAA - Civil Monetary Penalty Endorsement |
| MESM 2093 01 14 | Crisis Management Emergency Response Exp Reim Cov |
| MESM 2095 08 15 | Hospital Amendatory End - Aggregate Policy Limit |
| MESM 2097 12 13 | Evacuation Expense Reimbursement Coverage |
| MESM 3015 08 15 | Exclusion - Unmanned Aircraft |
| ZZ-44002-01 | Mold Exclusion |

**INTERLINE**



# EVANSTON INSURANCE COMPANY

## COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

Throughout this policy, the term Company refers to the insurance company providing this insurance.

### A.  CANCELLATION

This policy may be cancelled by the Named Insured on behalf of all Insureds by mailing to the Company written notice as stated in the Notices item of the Declarations stating when thereafter such cancellation shall be effective. If cancelled by the Named Insured, the Company shall retain the customary short rate proportion of the premium. Payment or tender of unearned premium shall not be a condition precedent to the effectiveness of cancellation, but such payment shall be made as soon as practicable.

This policy may be cancelled by the Company by mailing to the Named Insured, at the address stated in the Declarations written notice stating when, not less than thirty (30) days thereafter, such cancellation shall be effective. However, if the Company cancels the policy because the Named Insured has failed to pay a premium or Deductible when due, including premium and deductible(s) due on any other policy(ies) issued by the Company or any of its affiliated companies in an uninterrupted series of policies for which this policy is a renewal or replacement, this policy may be cancelled by the Company by mailing a written notice of cancellation to the Named Insured stating when, not less than ten (10) days thereafter, such cancellation shall be effective. The mailing of notice as aforementioned shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the Policy Period. Such notice shall be conclusive on all Insureds. Delivery of such written notice by the Named Insured or the Company shall be equivalent to mailing. If cancelled by the Company, earned premium shall be computed pro rata. Premium adjustment may be made at the time cancellation is effected or as soon as practicable thereafter.

### B.  CHANGE IN CONTROL OF NAMED INSURED

If after the inception date of the policy:

**1.**  The Named Insured is merged into or consolidated with another organization such that it is not the surviving organization, or sells all or substantially all of its assets to another organization or person or group of organizations and/or persons acting in concert;

**2.**  Another organization or person or group of organizations and/or persons acting in concert shall acquire an amount of the voting interest representing more than fifty percent (50%) of the voting rights for the election or appointment of directors or trustees of the Named Insured, or acquires the voting rights of such an amount of such interest; or

**3.**  A receiver, liquidator, conservator, trustee or similar official is appointed with respect to the Named Insured;

no coverage shall be afforded under this policy unless:

**a.**  Written notice of such transaction or event is given to the Company by the Named Insured as soon as practicable, but in no event later than thirty (30) days after such transaction or event, including complete details of the nature of such transaction or event and the other organization, person, group of organizations, persons acting in concert, receiver, liquidator, conservator, trustee and/or similar official appointed with respect to the Named Insured;

**b.**  The Named Insured submits such additional information in connection therewith as the Company may deem necessary;

**c.**  The Company, at its sole discretion, agrees to continue coverage by written endorsement to the policy; and

**d.**  The Named Insured agrees to accept any special terms, conditions, exclusions or additional premium charge as may be required by the Company.

**INTERLINE**

**C. REPRESENTATIONS**

By acceptance of this policy, the Insureds agree as follows:

**1.** That the information and statements contained in the application(s) are the basis of this policy and are to be considered as incorporated into and constituting a part of this policy; and

**2.** That the information and statements contained in the application(s) are their representations, that they shall be deemed material to the acceptance of the risk or hazard assumed by the Company under this policy, and that this policy is issued in reliance upon the truth of such representations.

**D. ENTIRE AGREEMENT**

The Declarations, Common Policy Conditions, Coverage Part(s), the application(s) and any written endorsements attached hereto shall be deemed to be a single unitary contract.

**E. OTHER INSURANCE**

This insurance shall be in excess of the applicable Deductible stated in the Declarations and any other insurance available to the Insured whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as a specific excess insurance over the Limits of Liability provided in this policy.

If any Claim under this policy is also covered by one or more policies issued by the Company or any of its affiliated companies affording coverage to the Named Insured or to any organization or person who controls, is controlled by, or is affiliated by common control with the Named Insured unless such other insurance is written only as specific excess insurance or umbrella insurance over the Limits of Liability provided in this policy, then with respect to such Claim:

**1.** The Limit of Liability available under this policy will be equal to the percentage that this policy's available Limit of Liability bears to the total combined Limits of Liability available under all applicable policies; and

**2.** The total Limit of Liability available for such Claim shall not exceed the greater/est available Limit of Liability remaining on all such policies and its payment shall extinguish the Company's and its affiliated companies' liability on all such policies for such Claim.

**F. CHANGES**

Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Company shall not effect a waiver or a change in any part of this policy and shall not estop the Company from asserting any right under the terms of the policy. The terms of this policy shall not be waived or changed, except by written endorsement issued to form a part of this policy, and this policy embodies all agreements existing between the Insureds and the Company or any of its agents relating to this insurance.

**G. ASSIGNMENT OF INTEREST**

Assignment of interest under this policy shall not bind the Company unless its consent is endorsed hereon.

**H. SUBROGATION**

In the event of any payment under this policy, the Company shall be subrogated to the right of recovery of all Insureds to the extent of such payment. The Insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The Insured shall do nothing after the Claim to prejudice such rights.

The Company shall not exercise any such rights against any person or organization included in the definition of Insured. Notwithstanding the foregoing, however, the Company reserves the right to exercise any rights of subrogation against an Insured in respect of any Claim brought about or contributed to by an intentional, willful, dishonest, fraudulent act or omission of such Insured or by an act or omission of such Insured that constitutes a willful violation of any statute or regulation.

Any amount so recovered, whether effected by the Company or by the Insured, shall first be used for the repayment of expenses incurred toward subrogation; second, for any Damages and Claim Expenses payment by the Insured which is in excess of the amount of the Limit of Liability under this policy and which is excess of any amount paid by any insurer under any other policy; third, for any damages and claims expenses payment by any excess insurer on

**INTERLINE**

behalf of the Insured; fourth, for any damages and claim expenses payment by any primary insurer on behalf of the Insured; and, last, for repayment of the Insured's Deductible.

## I.   ASSISTANCE AND COOPERATION OF THE INSURED

The Insured shall cooperate with the Company and upon the Company's request, the Insured shall:

**1.**   Submit to examination and interview by a representative of the Company, under oath if required;

**2.**   Attend hearings, depositions and trials;

**3.**   Assist in effecting settlement, securing and giving evidence, obtaining the attendance of witnesses in the conduct of suits;

**4.**   Give a written statement or statements to the Company's representatives and meet with such representatives for the purpose of determining coverage and investigating and/or defending any Claim; and

**5.**   Provide any information required to comply with federal or state reporting regulations;

All without cost to the Company. The Insured shall further cooperate with the Company and do whatever is necessary to secure and effect any right of indemnity, contribution or apportionment which the Insured may have. The Insured shall not, except at his/her own cost, make any payment, admit any liability, settle any Claims, assume any obligation or incur any expense without the prior written consent of the Company.

## J.   FALSE OR FRAUDULENT CLAIMS

If any Insured shall commit fraud in proffering any Claim, this insurance shall become void as to such Insured from the date such fraudulent Claim is proffered.

## K.   PREMIUM AND AUDIT

Upon expiration of this policy, the Named Insured shall furnish to the Company a statement of the Named Insured's actual total premium base as stated in the Declarations for the Policy Period. The actual earned premium shall be computed thereon at the premium rate stated in the Declarations. If the actual earned premium is more than the deposit premium stated in the Declarations, the Named Insured shall pay the difference to the Company; if less, the Company shall refund the difference to the Named Insured except that the Company shall be entitled to the minimum premium as stated in the Declarations. The Company shall have the right to require of the Named Insured, at any time within the said Policy Period or one year thereafter, a sworn statement of the entire amount (or number) of such premium base during the whole or any specified part of the said period, and the Named Insured shall furnish said statement within ten (10) days after request. The statement referred to shall be subject to verification and audit by a duly authorized representative of the Company, who shall have the right and opportunity to examine the books and records of the Named Insured as respects such premium base, and such examination may be made at any time during the said period and within three (3) years thereafter. The rendering of any estimate or statement or the making of any previous settlement shall not bar the examination herein provided for, nor the Company's right to additional premium.

## L.   INSPECTION

The Company shall be permitted but not obligated to inspect the Insured's operations at any time. Neither the Company's right to make inspections, nor the making thereof, nor any report thereon shall constitute an undertaking on behalf of or for the benefit of the Insured or others, to determine or warrant that such operations are safe or healthful, or are in compliance with any law, rule or regulation.

## M.   ACTION AGAINST THE COMPANY

No action shall lie against the Company unless, as a condition precedent thereto, the Insured shall have fully complied with all of the terms and conditions of this policy, nor until the amount of the Insured's obligation to pay shall have been fully and finally determined either by judgment against the Insured after actual trial or by written agreement of the Insured, the claimant and the Company.

Nothing contained in this policy shall give any person or organization any right to join the Company as a co-defendant in any action against the Insured to determine the Insured's liability. Bankruptcy or insolvency of the Insured or of the Insured's estate shall not relieve the Company of any of its obligations hereunder.

**INTERLINE**

**N. AUTHORIZATION**

By acceptance of this policy, the first person or organization stated in Item 1. of the Declarations shall act on behalf of all Insureds with respect to the giving and receiving of all notices to and from the Company as provided herein: the exercising of the Extended Reporting Period, if available; the cancellation of this policy in whole or part; the payment of premiums and Deductibles when due; the receiving of any return premiums that may become due under this policy; and the Insureds agree that such person or organization shall act on their behalf.

**O. POLICY EXTENDED REPORTING PERIOD – ALL CLAIMS MADE COVERAGES**

The Named Insured's right to exercise the Extended Reporting Period under any Coverage Part shall exist solely if the Named Insured also exercises its right to purchase the Extended Reporting Period under all Coverage Parts that provide coverage on a claims made basis.

**P. TERMS AND CONDITIONS**

This policy is comprised of these Common Policy Conditions, the Declarations, various Coverage Parts and endorsements, if applicable, and the application. Although various Coverage Parts may be referenced in this policy, a Coverage Part is included within this policy only if that Coverage Part is stated as being purchased in the Coverage Schedule in Item 5. of the Declarations.

Except for these Common Policy Conditions or unless stated to the contrary in any Coverage Part or endorsement, the terms and conditions of each Coverage Part of this policy apply only to that Coverage Part and shall not apply to any other Coverage Part of this policy. Any defined term referenced in the Common Policy Conditions but defined in a Coverage Part shall, for purposes of coverage under that Coverage Part, have the meaning set forth in that Coverage Part. If any provision in the Common Policy Conditions is inconsistent or in conflict with the terms and conditions of any Coverage Part, the terms and conditions of such Coverage Part shall control for purposes of that Coverage Part.

**Q. SERVICE OF SUIT**

Except with respect to any policy issued in any state in which the Company is licensed as an admitted insurer to transact business, it is agreed that in the event of the failure of the Company to pay any amount claimed to be due hereunder, the Company, at the request of the Named Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such court. Nothing in this clause constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon Secretary, Legal Department, Markel Service, Incorporated, Ten Parkway North, Deerfield, Illinois 60015 and that in any suit instituted against the Company upon this policy, the Company will abide by the final decision of such court or of any appellate court in the event of an appeal.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner, or Director of Insurance or other official specified for that purpose in the statute, or his/her successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Named Insured or any beneficiary hereunder arising out of this policy, and hereby designates the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

**R. NUCLEAR ENERGY LIABILITY EXCLUSION (Broad Form)**

The insurance does not apply:

**1.** Under any Liability Coverage, to Bodily Injury or Property Damage:

    **a.** With respect to which an Insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

    **b.** Resulting from the Hazardous Properties of Nuclear Material and with respect to which **(1)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law

amendatory thereof, or **(2)** the Insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

**2.** Under any Medical Payments coverage, or any Supplementary Payments provision relating to first aid, to expenses incurred with respect to Bodily Injury resulting from the Hazardous Properties of Nuclear Material and arising out of the operation of a Nuclear Facility by any person or organization.

**3.** Under any Liability Coverage, to Bodily Injury or Property Damage resulting from Hazardous Properties of Nuclear Material, if:

**a.** The Nuclear Material **(1)** is at any Nuclear Facility owned by, or operated by or on behalf of, an Insured or **(2)** has been discharged or dispersed therefrom;

**b.** The Nuclear Material is contained in Spent Fuel or Waste at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an Insured; or

**c.** The Bodily Injury or Property Damage arises out of the furnishing by an Insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any Nuclear Facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion c. applies only to Property Damage to such Nuclear Facility and any property thereat.

**4.** As used in this exclusion:

Hazardous Properties includes radioactive, toxic or explosive properties.

Nuclear Material means Source Material, Special Nuclear Material or By-Product Material.

Source Material, Special Nuclear Material, and By-Product Material have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

Spent Fuel means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a Nuclear Reactor.

Waste means any waste material **(1)** containing By-Product Material other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its Source Material content, and **(2)** resulting from the operation by any person or organization of any Nuclear Facility included under the first two paragraphs of the definition of Nuclear Facility.

Nuclear Facility means:

**a.** Any Nuclear Reactor;

**b.** Any equipment or device designed or used for **(1)** separating the isotopes of uranium or plutonium, **(2)** processing or utilizing Spent Fuel, or **(3)** handling, processing or packaging Waste;

**c.** Any equipment or device used for the processing, fabricating or alloying of Special Nuclear Material if at any time the total amount of such material in the custody of the Insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

**d.** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of Waste;

And includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

Nuclear Reactor means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

Property Damage includes all forms of radioactive contamination of property.

**INTERLINE**



# EVANSTON INSURANCE COMPANY

# SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART

THIS IS A CLAIMS MADE COVERAGE PART. PLEASE READ IT CAREFULLY.

THE INSURED .................................................................................................................................. 2

INSURING AGREEMENT .................................................................................................................. 2

DEFINITIONS..................................................................................................................................... 3

THE EXCLUSIONS ............................................................................................................................ 4

TERRITORY ....................................................................................................................................... 6

LIMITS OF LIABILITY ....................................................................................................................... 6

DEFENSE AND CLAIM EXPENSES ................................................................................................. 7

CLAIMS............................................................................................................................................... 7

EXTENDED REPORTING PERIOD................................................................................................... 8

# SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART

THIS IS A CLAIMS MADE COVERAGE PART. PLEASE READ IT CAREFULLY.

In consideration of the premium paid, the undertaking of the Named Insured to pay the Deductible as described herein and in the amount stated in the Declarations, in reliance upon the statements in the application attached hereto and made a part hereof and the underwriting information submitted on behalf of the Insured, and subject to all the terms, conditions and limitations of this policy, the Company and the Insured agree as follows:

## THE INSURED

The unqualified word "Insured," either in the singular or plural, means:

**A.**   The Named Insured which is herein defined as the person(s) or organization(s) stated in Item 1. of the Declarations;

**B.**   Any past or current principal, partner, officer, director, Employee or Volunteer Worker of the Named Insured solely while acting on behalf of the Named Insured and within the scope of their duties as such; provided, however, this insurance shall not apply to any Claim made against any Insured who is a physician, surgeon, dentist or podiatrist arising out of the rendering of or failure to render Professional Services in his/her capacity as a physician, surgeon, dentist or podiatrist;

**C.**   If the Named Insured is a limited liability company, any past or current manager thereof, solely while acting on behalf of the Named Insured and within the scope of their duties as manager of such limited liability company and any past or current member thereof, solely while acting on behalf of the Named Insured and within the scope of their duties as a member of such limited liability company;

**D.**   Any medical director solely while acting on behalf of the Named Insured and solely within the scope of his/her Administrative Duties as such; provided, however, this insurance shall not apply to any Claim made against any medical director who is a physician, surgeon, dentist or podiatrist arising out of the rendering of or failure to render Professional Services in his/her capacity as a physician, surgeon, dentist or podiatrist;

**E.**   Any student enrolled in a training program in connection with the Named Insured's Professional Services solely while acting within the scope of his/her duties as such and at the Named Insured's direction;

**F.**   The heirs, executors, administrators, assigns and legal representatives of each Insured above in the event of death, incapacity or bankruptcy of such Insured, but only for each such Insured's liability as is otherwise covered herein.

## INSURING AGREEMENT

**A.**   **Professional Liability and Claims Made Clause:**   The Company shall pay on behalf of the Insured all sums in excess of the Deductible amount stated in the Declarations, which the Insured shall become legally obligated to pay as Damages as a result of a Claim first made against the Insured during the Policy Period or during the Extended Reporting Period, if exercised, and reported to the Company pursuant to Section CLAIMS A., Claim Reporting Provision, for Professional Personal Injury:

   **1.**   By reason of any act, error or omission in Professional Services arising out of the conduct of the Insured's Professional Services rendered or that should have been rendered by an Insured; or

   **2.**   By reason of any act, error or omission in Professional Services arising out of the conduct of the Insured's Professional Services rendered or that should have been rendered by a natural person, who is not and shall not be an Insured hereunder, and through whose acts the Insured controls the provider-patient relationship as of the time of such act, error or omission;

   provided:

   **a.**   The act, error or omission happens during the Policy Period or on or after the Retroactive Date stated in the Declarations and before the end of the Policy Period; and

   **b.**   Prior to the effective date of this policy the Insured had no knowledge of such act, error or omission or any fact, circumstance, situation or incident which may lead a reasonable person in the Insured's position to conclude that a Claim was likely.

## DEFINITIONS

**A.**   **Administrative Duties** means establishing medical protocol, serving on a standards review, peer review, or credentialing committee or similar professional board or committee of the Named Insured; provided, however, Administrative Duties shall not include:

    **1.**   Rendering or failure to render Professional Services by a medical director which results in Professional Personal Injury; or

    **2.**   Rendering or failure to render specific medical direction for a natural person receiving Professional Services via telecommunications to other healthcare professionals.

**B.**   **Claim** means the Insured's receipt of:

    **1.**   A written demand for Damages or Professional Services; or

    **2.**   The service of suit or institution of arbitration proceedings against the Insured seeking Damages.

**C.**   **Claim Expenses** means reasonable and necessary amounts incurred by the Company or by the Insured with the prior written consent of the Company in the defense of that portion of any Claim for which coverage is afforded under this Coverage Part, including costs of investigation, court costs, costs of bonds to release attachments and similar bonds, but without any obligation of the Company to apply for or furnish any such bonds, and costs of appeals; provided, however, Claim Expenses shall not include:

    **1.**   Salary, wages, overhead, or benefit expenses of or associated with Employees or officials of the Named Insured or employees or officials of the Company; or

    **2.**   Salary, wages, administration, overhead, benefit expenses, or charges of any kind attributable to any in-house counsel or captive out-of-house counsel for the Named Insured or the Company.

**D.**   **Damages** means the monetary portion of any judgment, award or settlement; provided, however, Damages shall not include:

    **1.**   Punitive or exemplary damages or multiplied portions of damages in excess of actual damages, including trebling of damages;

    **2.**   Taxes, criminal or civil fines, or attorneys' fees of a party other than an Insured or other penalties imposed by law;

    **3.**   Sanctions;

    **4.**   Matters which are uninsurable under the law pursuant to which this Coverage Part shall be construed;

    **5.**   The return, withdrawal, reduction or restitution or payment of fees, profits or charges for services or consideration and/or any expenses paid to the Insured; or

    **6.**   The cost of complying with an award or order for declaratory, equitable or injunctive relief or remedy.

**E.**   **Employee** means any natural person while in the regular service of the Named Insured in the ordinary course of the Named Insured's business and whom the Named Insured compensates by salary, wages or commissions and has the right to govern and direct the performance of such service. Employee includes a Leased Worker but does not include any Temporary Worker or independent contractor.

**F.**   **Leased Worker** means any natural person leased to the Named Insured by a labor leasing organization, under an agreement between the Named Insured and the labor leasing organization, to perform duties related to the conduct of the Named Insured's business and which are at the Insured's direction. Leased Worker does not include a Temporary Worker.

**G.**   **Policy Period** means the period form the inception date of this policy to the policy expiration date stated in Item 3. of the Declarations, or the effective date of any earlier cancellation or termination.

**H.**   **Professional Personal Injury** means:

    **1.**   Any bodily injury, mental injury, sickness, disease, emotional distress or mental anguish, including death resulting therefrom of any natural person receiving Professional Services arising out of an act, error or omission in Professional Services rendered or that should have been rendered;

**INTERLINE**

2. False arrest, detention or imprisonment, or malicious prosecution of any natural person receiving Professional Services, except when inflicted by, at the direction of, or with the consent or acquiescence of the Insured who has predetermined to commit such act, or allowed such act to have been committed; or

3. The publication or utterance of a libel or slander concerning a natural person receiving Professional Services or a publication or an utterance in violation of such person's right to professional confidence, except when published or uttered by, at the direction of, or with the consent or acquiescence of the Insured who has predetermined to commit such act, or allowed such act to have been committed.

**I.** **Professional Services** means those services stated in Item 4. of the Declarations.

**J.** **Temporary Worker** means any natural person who is furnished to the Named Insured to substitute for a permanent Employee on leave or to meet seasonal or short-term work load requirements.

**K.** **Volunteer Worker** means any natural person who is not an Employee of the Named Insured and who donates his/her work at the direction of and within the scope of duties determined by the Named Insured and is not paid a fee, salary or other compensation by the Named Insured or by anyone else for such work performed for the Named Insured.

## THE EXCLUSIONS

This Coverage Part does not apply to:

**A.** Any act, error or omission in Professional Services rendered or that should have been rendered or Professional Personal Injury committed in violation of any law or ordinance;

**B.** Any Claim based upon or arising out of any dishonest, fraudulent, criminal, malicious, knowingly wrongful, deliberate, or intentional acts, errors or omissions committed by or at the direction of the Insured;

**C.** Any administrative or judicial hearings pertaining to Medicare/Medicaid fraud or any other hearing initiated against an Insured by the United States Department of Health & Human Services (HHS) or by an utilization or quality review organization under contract with HHS; provided, however, this exclusion shall not apply to HHS proceedings that allege the violation of the Emergency Medical Treatment and Labor Act;

**D.** Any Claim based upon or arising out of the invasion, infringement or interference of the right of privacy arising from the use, visitation of, posting or browsing of any blog, bulletin board services, chat room, web site or other internet form or URL;

**E.** Any Claim based upon or arising out of the gathering, use or dissemination of personal information in any form including but not limited to any violation of the Health Insurance Portability and Accountability Act of 1996 (HIPAA);

**F.** Any Claim based upon or arising out of any unlawful discrimination by any Insured;

**G.** Any Claim based upon or arising out of any act, error or omission committed or alleged to have been committed by the Insured that in any manner relates to or arises out of the actual, alleged or threatened discharge, dispersal, release, escape or existence of pollutants, hazardous substances, toxic substances or substances which in any manner impair or allegedly impair the environment or which result in bodily injury or property damage;

**H.** Any liability arising out of the Insured's activities in his/her capacity as proprietor, superintendent, executive officer, director, partner, trustee or employee of any hospital, sanitarium, clinic with bed-and-board facilities, laboratory or business enterprise, or any governmental body, sub-division or agency not named as an Insured under this policy unless such activities are disclosed in the application and covered by endorsement to this policy;

**I.** Any Claim based upon or arising out of any liability of others assumed by the Insured under any contract or agreement; unless such liability would have attached to the Insured even in the absence of the contract or agreement;

**J.** Any Claim arising out of general liability, or goods or products manufactured, sold, handled or distributed by the Insured or by others trading under an Insured's name;

**K.** Any liability arising out of the ownership, maintenance, operation, use, loading or unloading of any vehicle, watercraft or aircraft;

**L.** Any Claim based upon or arising out of any sexual act, including without limitation sexual intimacy (even if consensual), sexual contact, sexual advances, requests for sexual favors, sexual molestation, sexual assault, sexual abuse, sexual harassment, sexual exploitation or other verbal or physical conduct of a sexual nature;

provided, however, the Company agrees to defend the Named Insured for such a Claim for the strictly vicarious liability of the Named Insured, unless a manager, supervisor, officer, director, trustee or partner of the Named Insured:

**1.** Knew or should have known about the sexual act allegedly committed by the Insured but failed to prevent or stop it; or

**2.** Knew or should have known that the Insured who allegedly committed the sexual act had a prior history of such sexual misconduct act;

The Company shall not pay Damages on behalf of the Named Insured for such a Claim.

**M.** Injury arising out of the performance of a criminal act or caused by an Insured while under the influence of intoxicants or narcotics;

**N.** Any Claim based upon, arising out of, or in any way involving:

**1.** The employment relationship or the nature, terms or conditions of employment or any workplace tort brought by or on behalf of any Employee, former Employee, prospective employee, independent contractor or consultant of the Insured or to Professional Personal Injury to, or sickness, disease or death of any Employee of the Insured arising out of, and in the course of his/her employment by the Insured;

**2.** Any obligation of the Insured under any workers' compensation, unemployment compensation or disability benefits law or under any similar law; or

**3.** Any actual or alleged violation of the Employee Retirement Income Security Act of 1974, or any other similar federal, state or common law or any amendments thereto;

**O.** Any Claim based upon or arising out of:

**1.** The dispensing of or the use of any drug or device whose approval for use was withdrawn by the U.S. Food and Drug Administration (FDA) at the time such drug or device was used or dispensed;

**2.** Use, administration or prescription of any drug, pharmaceutical, medical device or procedure which has not received final approval by the FDA for treatment of humans or which is not used, administered or prescribed as part of an FDA approved study;

**P.** Any Claim based upon or arising out of a warranty or guarantee of cure or success of treatment which is alleged to have arisen out of an advertisement;

**Q.** Any Claim based upon or arising out of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C., Section 1961, et seq.;

**R.** Any Claim based upon or arising out of the disarming or disabling of any alarms or monitoring devices of medical equipment;

**S.** Any Claim based upon or arising out of:

**1.** The failure to maintain medical records in their original condition;

**2.** Creating, altering, amending or modifying medical records;

**3.** Improperly disposing of medical records;

**4.** The failure to maintain the privacy and security of medical records or private personal information;

**T.** Any Claim made against the Insured:

**1.** By any person or organization or its subrogee, assignee, contractor, subcontractor, or parent company, subsidiary, division or affiliated company which was or is operated, managed, owned or otherwise controlled, whether directly or indirectly, or in whole or in part, by an Insured or parent company or any subsidiary, division or affiliated organization; or

**2.** By or on behalf of any Insured under this policy; provided, however, this exclusion shall not apply to any Claim made against any Insured arising out of the rendering of or failure to render Professional Services by the Insured or by any person for whose acts, errors or omissions the Insured is legally responsible, if such Insured is a natural person receiving Professional Services;

**U.** Any Claim based upon or arising out of:

**INTERLINE**

    1. Any allegations of price fixing, unfair competition or trade practices;

    2. A dispute over fees, income or revenue;

    3. The inducement to enter into, the interference with or the dissolution or termination of any business or economic relationship; or

    4. Violations of any federal, state or local law (including but not limited to Title 15 of the United States Code or any similar state statute) that prohibits the unlawful restraint of trade, business or profession;

**V.** Any Claim based upon or arising out of any violation of:

    1. The Telephone Consumer Protection Act of 1991 (TCPA) and amendments thereto or any similar or related federal, state or local statute, law, rule, ordinance or regulation;

    2. The CAN-SPAM Act of 2003 and amendments thereto or any similar or related federal or state statute, law, rule, ordinance or regulation;

    3. The Fair Credit Reporting Act (FCRA) and amendments thereto or any similar or related federal, state or local statute, law, rule, ordinance or regulation, including the Fair and Accurate Credit Transactions Act of 2003 (FACTA); or

    4. Any other statute, law, rule, ordinance or regulation that addresses, prohibits or limits the dissemination, sending, transmitting, communication, printing, disposal, collection, recording or distribution of information or other material;

**W.** Any Claim based upon or arising out of:

    1. Any disciplinary proceeding against the Insured conducted by any regulatory body, disciplinary board or governmental agency; or

    2. Any federal or state inquiry or review involving an Insured's professional licensure; or

**X.** Any Claim brought under any other Coverage Part of this policy.

## TERRITORY

The insurance afforded applies worldwide, provided the Claim is made in the United States of America, its territories or possessions or Puerto Rico.

## LIMITS OF LIABILITY

**A.**   **Limit of Liability-Each Claim:** For Professional Liability, the total liability of the Company for the combined total of Damages and Claim Expenses for each Claim first made against the Insured during the Policy Period or the Extended Reporting Period, if exercised, shall not exceed the Limit of Liability stated in the Declarations as applicable to Each Claim.

**B.**   **Limit of Liability-Coverage Part Aggregate:** Subject to the above Section LIMITS OF LIABILITY A., for Professional Liability, the total liability of the Company shall not exceed the Coverage Part Aggregate Limit of Liability as stated in the Declarations for all Damages and Claim Expenses arising out of all Claims first made against the Insured during the Policy Period and the Extended Reporting Period, if exercised.

**C.**   **Limit of Liability-Reduction for Refusal to Settle:** The Company shall not settle any Claim without the consent of the Insured. If, however, the Insured is a partnership, professional association, professional corporation or limited liability company, the written consent of an Insured who was formerly but is no longer a member of the partnership, professional association or limited liability company or director, officer, stockholder or employee of a professional corporation will not be required, provided the written consent of the corporate directors, officers, stockholders or employees of a professional corporation, or their duly appointed representatives, has been obtained. If, however, the Insured shall refuse to consent to any settlement recommended by the Company and shall elect to contest the Claim or continue any legal proceedings in connection with such Claim, then the Company's liability for the Claim shall not exceed the amount for which the Claim could have been so settled including Claim Expenses incurred up to the date of such refusal. Such amounts are subject to the provisions of the above Limits of Liability A. and B.

**D.**   **Deductible:** For Professional Liability, the Deductible amount stated in the Declarations shall be paid by the Named Insured and shall be applicable to each Claim and shall include Damages and Claim Expenses, whether or not Damages payments are made.

Such amounts shall, upon written demand by the Company, be paid by the Named Insured within ten (10) days. The total payments requested from the Named Insured in respect of each Claim shall not exceed the Deductible amount stated in the Declarations.

The determination of the Company as to the reasonableness of the Claim Expenses shall be conclusive on the Named Insured.

**E.    Multiple Insureds, Claims and Claimants:**  The inclusion herein of more than one Insured in any Claim or the making of Claims by more than one person or organization shall not operate to increase the Limits of Liability stated in the Declarations. More than one Claim arising out of a single act, error or omission or a series of related acts, errors or omissions shall be considered a single Claim. All such Claims, whenever made, shall be deemed to be first made on the date on which the earliest Claim arising out of such act, error or omission is made, or with regard to written notice given to and accepted by the Company pursuant to Section CLAIMS B., Discovery Clause, on the date within the Policy Period on which such written notice of potential Claim is first received by the Company.

## DEFENSE AND CLAIM EXPENSES

**A.    Defense and Investigation of Claims:**  The Company shall have the right and duty to defend and investigate any Claim to which coverage under this Coverage Part applies pursuant to the following provisions:

1.  Claim Expenses incurred in defending and investigating such Claim shall be a part of and shall not be in addition to the Professional Liability Limits of Liability stated in the Declarations. Such Claim Expenses shall reduce the Limits of Liability and shall be applied against the Deductible. The Company shall have no obligation to pay any Damages or to defend or continue to defend any Claim or to pay Claim Expenses after the Professional Liability Limits of Liability stated in the Declarations have been exhausted by payment(s) of Damages and/or Claim Expenses.

2.  The Company shall select defense counsel; provided, however, that if the law of the state of the Named Insured's domicile, stated in Item 2. of the Declarations, allows the Insured to control the selection of defense counsel where a conflict of interest has arisen between the Insured and the Company, the Company will provide a list of attorneys or law firms from which the Insured may designate defense counsel who shall act solely in the interest of the Insured, and the Insured shall direct such defense counsel to cooperate with the Company. Such cooperation shall include:

    **a.**  Providing on a regular basis, but not less frequently than every three (3) months, written reports on claimed Damages**,** potential liability, progress of any litigation, any settlement demands, or any investigation developments that materially affect the Claim;

    **b.**  Providing any other reasonable information requested;

    **c.**  Providing fully itemized billing on a periodic basis; and

    **d.**  Cooperating with the Company and the Insured in resolving any discrepancies;

    and the fees and costs incurred by such defense counsel, including those fees and costs generated by defense counsel's cooperation with the Company, as stated above, shall be included in Claim Expenses. Such Claim Expenses shall be a part of and shall not be in addition to the Professional Liability Limits of Liability stated in the Declarations. Such Claim Expenses shall reduce the Limits of Liability and shall be applied against the Deductible.

## CLAIMS

**A.    Claim Reporting Provision:**  It is a condition precedent to coverage afforded by this Coverage Part that the Insured shall give to the Company written notice as stated in the Notices item of the Declarations as soon as practicable of any Claim first made against the Insured during the Policy Period or the Extended Reporting Period, if exercised.

In the event suit is brought against the Insured, the Insured shall immediately forward to Markel Service, Incorporated, Ten Parkway North, Deerfield, Illinois, 60015, on behalf of the Company, every demand, notice, summons or other process received by him/her or by his/her representatives.

**B.    Discovery Clause:**  If during the Policy Period, the Insured first becomes aware of a specific act, error or omission in Professional Services which is reasonably expected to result in a Claim within the scope of coverage of this Coverage Part, then the Insured may provide written notice as stated in the Declarations to the Company containing

the information listed below. If such written notice is received by the Company during the Policy Period, then any Claim subsequently made against the Insured arising out of such act, error or omission in Professional Services shall be deemed for the purpose of this insurance to have been first made on the date on which such written notice is received by the Company.

It is a condition precedent to the coverage afforded by this Discovery Clause that written notice be given to the Company containing the following information:

1. The description of the specific act, error or omission in Professional Services;

2. The date on which such act, error or omission in Professional Services took place;

3. The injury or damage which has or may result from such act, error or omission in Professional Services;

4. The identity of any injured persons; and

5. The circumstances by which the Insured first became aware of such act, error or omission in Professional Services.

Subject to the paragraph hereinabove, if during the Policy Period the Insured provides such written notice of a specific act, error or omission in Professional Services which is reasonably expected to result in a Claim within the scope of coverage of this Coverage Part, the Company at its sole option, may investigate such specific act, error or omission in Professional Services. Such matter shall be subject to all terms, conditions and provisions in this Coverage Part as applicable to a Claim.

## EXTENDED REPORTING PERIOD

A. The Named Insured's right to exercise the Extended Reporting Period under this Coverage Part shall exist solely if the Named Insured also exercises its right to purchase the Extended Reporting Period under all Insuring Agreements in the policy for which an Extended Reporting Period is available.

B. If the Named Insured nonrenews this policy in its entirety or cancels this policy in its entirety pursuant to Common Policy Conditions Section A., Cancellation, or if the Company nonrenews this policy in its entirety or cancels this policy in its entirety pursuant to Common Policy Conditions A., Cancellation, for reasons other than nonpayment of premium, Deductible or non-compliance with the terms and conditions of this policy, then the Named Insured shall have the right upon payment of an additional premium calculated at the percentage stated in the Declarations of the adjusted annual premium for the Policy Period, subject to adjustment as per Common Policy Conditions K., Premium and Audit, but in no event less than the percentage stated in the Declarations of the annual minimum premium for the policy, to extend the coverage granted under this Coverage Part, for the period of months stated in the Declarations, as elected by the Named Insured to apply to Claims first made against the Insured during the period of months as elected and reported to the Company pursuant to, Section CLAIMS A., Claim Reporting Provision, following immediately upon the effective date of such cancellation or nonrenewal, for any act, error or omission in Professional Services which happened on or after the applicable Retroactive Date stated in the Declarations and prior to the effective date of such cancellation or nonrenewal and which is otherwise covered by this Coverage Part.

This extended period of coverage months as elected by the Named Insured and described in this paragraph shall be referred to in this policy as the Extended Reporting Period.

If, however, this Coverage Part is immediately succeeded by claims made insurance coverage on which the Professional Liability Retroactive Date is the same as or earlier than that stated in the Declarations of this policy, the succeeding insurance shall be deemed to be a renewal hereof and, in consequence, the Named Insured shall have no right to purchase an Extended Reporting Period.

The quotation of a different premium and/or deductible and/or limit of liability for renewal does not constitute a cancellation or refusal to renew for the purpose of this provision.

This Extended Reporting Period shall not be available when any Insured's license or right to practice his/her profession is revoked, suspended or surrendered.

C. As a condition precedent to the right to purchase the Extended Reporting Period, the Named Insured must have paid:

1. All Deductibles when due;

2. All premiums due for the Policy Period; and

**INTERLINE**

   **3.**   All premium and deductible(s), if any, due on any other policy(ies) issued by the Company or any of its affiliated companies in an uninterrupted series of policies of which this policy is a renewal or replacement.

The right to purchase the Extended Reporting Period shall terminate unless a written request for the Extended Reporting Period is received by the Company within thirty (30) days after the effective date of cancellation or nonrenewal together with payment of the additional deposit premium for the Extended Reporting Period. If such written request and payment of additional premium for the Extended Reporting Period are not so received by the Company, there shall be no right to purchase the Extended Reporting Period at a later date.

**D.**   The Named Insured shall pay any additional premium that may be due as a result of audit, promptly when due.

**E.**   In the event of the purchase of the Extended Reporting Period the entire premium therefor shall be fully earned at its commencement.

**F.**   The Extended Reporting Period shall not in any way increase the Limits of Liability stated in the Declarations.

INTERLINE



# EVANSTON INSURANCE COMPANY

## SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY INSURANCE COVERAGE PART – CLAIMS MADE COVERAGE

THIS IS A CLAIMS MADE COVERAGE PART. PLEASE READ IT CAREFULLY.

THE INSURED .................................................................................................................................. 2

INSURING AGREEMENTS ............................................................................................................... 3

DEFINITIONS.................................................................................................................................... 4

THE EXCLUSIONS ........................................................................................................................... 9

TERRITORY .....................................................................................................................................13

LIMITS OF LIABILITY ......................................................................................................................13

DEFENSE, SETTLEMENTS AND CLAIM EXPENSES....................................................................14

CLAIMS.............................................................................................................................................14

EXTENDED REPORTING PERIOD...................................................................................................15

OTHER CONDITIONS ......................................................................................................................16

# SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY INSURANCE COVERAGE PART – CLAIMS MADE COVERAGE

THIS IS A CLAIMS MADE COVERAGE PART. PLEASE READ IT CAREFULLY.

In consideration of the premium paid, the undertaking of the Named Insured to pay the Deductible as described herein and in the amount stated in the Declarations, in reliance upon the statements in the application attached hereto and made a part hereof and the underwriting information submitted on behalf of the Insured, and subject to all the terms, conditions and limitations of this policy, the Company and the Insured agree as follows:

## THE INSURED

The unqualified word "Insured," either in the singular or plural, means:

**A.** The Named Insured which is defined herein as the person(s) or organization(s) stated in Item 1. of the Declarations;

**B.** If the Named Insured is an individual, the person so stated and his/her lawful spouse, but only with respect to his/her conduct of business as a sole proprietor;

**C.** If the Named Insured is a partnership or joint venture, the partnership or joint venture so stated and any partner or member thereof and his/her lawful spouse, but only with respect to the conduct of the partnership or joint venture business;

**D.** If the Named Insured is a limited liability company, the limited liability company so stated, any manager thereof, but only with respect to their duties as manager of the limited liability company and any member thereof, but only with respect to the conduct of the business of the limited liability company;

**E.** If the Named Insured is other than an individual, partnership, joint venture or limited liability company, the organization so stated and any executive officer or director thereof, but only with respect to his/her duties as an executive officer or director of such organization;

**F.** Any person other than an Employee, or any organization while acting as real estate manager for the Named Insured;

**G.** Any Employee, other than either the executive officers of the Named Insured if the Named Insured is an organization other than a partnership, joint venture or limited liability company or any manager of the Named Insured if the Named Insured is a limited liability company, solely while acting on behalf of the Named Insured and within the scope of their duties as such;

provided, however, that coverage afforded to such Employee does not apply to:

**1.** Bodily Injury or Personal and Advertising Injury:

    **a.** To the Named Insured, the Named Insured's partners, the Named Insured's members or to a co-Employee while in the course of their employment or performing duties related to the conduct of the Named Insured's business;

    **b.** To the spouse, child, parent, brother or sister of that co-Employee as a consequence of subparagraph 1.a. hereinabove;

    **c.** For which there is any obligation to share Damages with or repay someone else who must pay Damages because of the injury described in subparagraphs 1.a. and b. hereinabove; or

    **d.** Arising out of his/her providing or failure to provide professional health care services, if the Named Insured is engaged in the business or occupation of providing professional health care services;

**2.** Property Damage to property:

    **a.** Owned, occupied or used by; or

    **b.** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by;

the Named Insured or any Volunteer Worker or Employee or any partner or member of the Named Insured;

**H.**   Any organization which is acquired or formed by the Named Insured, other than a partnership, joint venture or limited liability company, and over which the Named Insured maintains majority ownership, will qualify as a Named Insured if there is no other similar insurance available to that organization;

provided, however, that:

**1.**   Coverage under this provision is afforded only for ninety (90) days from the date the Named Insured acquires or forms such organization, or the end of the Policy Period, whichever is earlier;

**2.**   Coverage A. does not apply to Bodily Injury or Property Damage that occurred before the Named Insured acquired or formed the organization; and

**3.**   Coverage B. does not apply to Personal and Advertising Injury arising out of an offense committed before the Named Insured acquired or formed the organization;

**I.**   Any supervisor, administrator, medical director, department head or head of medical staff solely while acting on behalf of the Named Insured and solely within the scope of their duties as such;

**J.**   Any student enrolled in a training program in connection with the Named Insured's Professional Services solely while acting within the scope of his/her duties as such and at the Named Insured's direction;

**K.**   Any Volunteer Worker of the Named Insured, other than a healthcare provider, solely while acting on behalf of the Named Insured and within the scope of his/her duties as such and at the direction of the Named Insured;

**L.**   The heirs, executors, administrators, assigns and legal representatives of each Insured above in the event of death, incapacity or bankruptcy of such Insured, but only for such Insured's liability as is otherwise covered herein;

**M.**   Any member of a board or committee of the Named Insured, solely for conduct arising out of their duties as a board or committee member and any person who executes a decision or directive from a board or committee of the Named Insured solely while in the course and scope of executing such order or directive.

This Coverage Part does not apply to any Bodily Injury, Property Damage, Occurrence, Personal and Advertising Injury or offense arising out of the conduct of any partnership, joint venture or limited liability company which is not stated in the Declarations as a Named Insured.

## INSURING AGREEMENTS

**A.**   **Coverage A. - Bodily Injury and Property Damage Liability:**   The Company shall pay on behalf of the Insured all sums in excess of the Deductible amount stated in the Declarations, which the Insured shall become legally obligated to pay as Damages as a result of a Claim first made against the Insured during the Policy Period or during the Extended Reporting Period, if exercised, and reported to the Company pursuant to Section Claims A., Claim Reporting Provision, for Bodily Injury or Property Damage caused by an Occurrence;

provided:

**1.**   The entirety of the Bodily Injury or Property Damage and Occurrence happens during the Policy Period or on or after the Retroactive Date stated in the Declarations and before the end of the Policy Period;

**2.**   Such Bodily Injury or Property Damage and Occurrence arises out of only those Specified Products, Goods, Operations or Premises stated in the Declarations;

**3.**   Prior to the effective date of this Coverage Part the Insured had no knowledge such Bodily Injury, Property Damage or Occurrence had occurred in whole or in part, and if any Insured knew prior to the Policy Period that the Bodily Injury, Property Damage or Occurrence had occurred, then any continuation, change or resumption of such Bodily Injury, Property Damage or Occurrence during or after the Policy Period will be deemed to have been known prior to the Policy Period; and

**4.**   Such Bodily Injury or Property Damage, which occurs during the Policy Period and was not, prior to the Policy Period known to have occurred by any Insured, includes any continuation, change or resumption of that Bodily Injury or Property Damage after the end of the Policy Period.

**B.**   **Coverage B. - Personal and Advertising Injury Liability:**   The Company shall pay on behalf of the Insured all sums in excess of the Deductible amount stated in the Declarations, which the Insured shall become legally obligated to pay as Damages as a result of a Claim first made against the Insured during the Policy Period or during

the Extended Reporting Period, if exercised, and reported to the Company pursuant to Section Claims A., Claim Reporting Provision, for Personal and Advertising Injury caused by an offense;

provided:

1.  The entirety of the Personal and Advertising Injury and offense happens during the Policy Period or on or after the Retroactive Date stated in the Declarations and before the end of the Policy Period; and

2.  Such Personal and Advertising Injury and offense arises out of only those Specified Products, Goods, Operations or Premises stated in the Declarations.

**C.   Coverage C. – Medical Payments**

The Company will pay medical expenses for Bodily Injury caused by an accident:

1.  On premises the Named Insured owns or rents;

2.  On ways next to premises the Named Insured owns or rents; or

3.  Because of the Named Insured's operations;

provided that:

a.  The accident takes place in the United States of America, its territories or possessions or Puerto Rico and during the Policy Period;

b.  The expenses are incurred and reported to the Company within one (1) year of the date of the accident; and

c.  The injured person submits to examination, at the Company's expense, by physicians of the Company's choice as often as the Company reasonably requires.

The Company will make these payments regardless of fault. The Company will pay reasonable expenses for:

(i)   First aid administered at the time of an accident;

(ii)  Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(iii) Necessary ambulance, hospital, professional nursing and funeral services.

The Named Insured shall report such expenses to Markel Service, Incorporated, Ten Parkway North, Deerfield, Illinois, 60015, on behalf of the Company.

# DEFINITIONS

A.  **Advertisement** means a commercial communication, including communications that are published material placed on the Internet or on similar electronic means of communication, that is broadcast or published about the Named Insured's Specified Products, Goods or Operations stated in the Declarations for the purpose of promoting the sale or use of such Specified Products, Goods or Operations; provided, however, only that part of a website that is about the Named Insured's Specified Products, Goods or Operations stated in the Declarations for the purposes of promoting such Specified Products, Goods or Operations is considered an Advertisement.

B.  **Aircraft Products** means any aircraft whether or not heavier than air, including spacecraft and missiles, and any ground support, guidance, control or communications equipment used in connection therewith, and also includes parts, supplies, or equipment installed in or on or used in connection with aircraft, including tools, training aids, instructions, manuals, blueprints and other data, engineering and other advice, services and labor used in the operation, maintenance or manufacture of Aircraft Products.

C.  **Auto** means:

1.  A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; provided, however, it does not include Mobile Equipment; or

2.  Any other land motor vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged;

provided, however, Auto does not include Mobile Equipment.

**D.** **Bodily Injury** means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

**E.** **Claim** means a written notice received by the Insured of:

    **1.** An intention to hold the Insured responsible for:

        **a.** A Bodily Injury;

        **b.** A Property Damage;

        **c.** A Personal and Advertising Injury;

        **d.** An Occurrence; or

        **e.** An offense resulting in a Personal and Advertising Injury;

    involving this Coverage Part; or

    **2.** The service of suit or institution of arbitration proceedings against the Insured.

**F.** **Claim Expenses** means reasonable and necessary amounts incurred by the Company, or by the Insured with the prior written consent of the Company, in the defense of that portion of any Claim for which coverage is afforded under this Coverage Part, including costs of investigation, court costs, costs of bonds to release attachments and similar bonds, but without any obligation of the Company to apply for or furnish any such bonds, and costs of appeals; provided, however, Claim Expenses shall not include:

    **1.** Salary, wages, overhead, or benefit expenses of or associated with Employees or officials of the Named Insured or employees or officials of the Company; or

    **2.** Salary, wages, administration, overhead, benefit expenses, or charges of any kind attributable to any in-house counsel or captive out-of-house counsel for the Named Insured or the Company.

Solely for the purposes of liability assumed in an Insured Contract, Claim Expenses incurred by or for a party other than an Insured are deemed to be Damages because of Bodily Injury or Property Damage; provided, however, that:

    **a.** Liability to such party for, or the cost of, that party's defense has also been assumed in the same Insured Contract; and

    **b.** Such Claim Expenses are for the defense of that party against a civil or alternative dispute resolution proceeding in which Damages to which this insurance applies are alleged.

**G.** **Damages** means the monetary portion of any judgment, award or settlement; provided, however, Damages shall not include:

    **1.** Punitive or exemplary damages or multiplied portions of damages in excess of actual damages, including trebling of damages;

    **2.** Taxes, criminal or civil fines, or attorneys' fees of a party other than an Insured or other penalties imposed by law;

    **3.** Sanctions;

    **4.** Matters which are uninsurable under the law pursuant to which this Coverage Part shall be construed; or

    **5.** The return, withdrawal, reduction or restitution or payment of any fees, profits or charges for services or consideration and/or any expenses paid to the Insured for services, products or goods.

    **6.** The cost of complying with an award or order for declaratory, equitable or injunctive relief or remedy.

**H.** **Electronic Data** means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**I.** **Employee** means any natural person while in the regular service of the Named Insured in the ordinary course of the Named Insured's business and whom the Named Insured compensates by salary, wages or commissions and has the right to govern and direct the performance of such service. Employee includes a Leased Worker but does not include any Temporary Worker or independent contractor.

**J.** **Grounding** means the withdrawal of one or more aircraft from flight operations or the imposition of speed, passenger or load restrictions on such aircraft because of the existence of or alleged existence of a defect, fault or condition in any Aircraft Products.

**K.** **Insured Contract** means:

**1.** A contract for lease of premises; provided, however, that the portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to the Named Insured or temporarily occupied by the Named Insured with the permission of the owner shall not be an Insured Contract;

**2.** Any easement or license, except in connection with construction or demolition operations on or within fifty (50) feet of a railroad;

**3.** An obligation, as required by municipal ordinance, to indemnify a municipality, except in connection with work for the municipality;

**4.** A sidetrack agreement;

**5.** An elevator maintenance agreement; or

**6.** That part of any other contract or agreement pertaining to the Named Insured's business under which the Named Insured assumes the tort liability of another party to pay for Bodily Injury or Property Damage to a third party, provided such Bodily Injury or Property Damages is caused, in whole or in part, by the Insured or by any person or organization acting on behalf of the Named Insured; provided, however, Insured Contract shall not include that part of any contract or agreement:

**a.** That indemnifies a railroad for Bodily Injury or Property Damage arising out of construction or demolition operations, within fifty (50) feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

**b.** That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

**(i)** Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or designs or specifications; or

**(ii)** Supervision, inspection, failure to supervise or inspect architectural, engineering or surveying services; or

**c.** Under which the Insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the Insured's rendering or failure to render services of a professional nature, including those listed in subparagraph 6.b. hereinabove or any supervision, inspection, failure to supervise or inspect architectural, engineering or survey services.

**L.** **Leased Worker** means a person leased to the Named Insured by a labor leasing organization, under an agreement between the Named Insured and the labor leasing organization, to perform duties related to the conduct of the Named Insured's business and which are at the Insured's direction. Leased Worker does not include a Temporary Worker.

**M.** **Mobile Equipment** means any of the following types of land vehicles, including any attached machinery or equipment:

**1.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**2.** Vehicles maintained for use solely on or next to premises the Named Insured owns or rents;

**3.** Vehicles that travel on crawler treads;

**4.** Vehicles, whether self-propelled or not, on which are permanently mounted:

**a.** Power cranes, shovels, loaders, diggers, or drills; or

**b.** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**5.** Vehicles not described in 1., 2., 3., or 4. herein above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

**a.** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

   **b.** Cherry pickers and similar devices used to raise or lower workers;

**6.** Vehicles not described in 1., 2., 3., or 4. herein above maintained primarily for purposes other than the transportation of persons or cargo; provided, however, that self-propelled vehicles with the following types of permanently attached equipment are not Mobile Equipment but will be considered Autos:

   **a.** Equipment designed primarily for:

     **(i)** Snow removal;

     **(ii)** Road maintenance, but not construction or resurfacing; or

     **(iii)** Street cleaning;

   **b.** Cherry pickers and similar devices mounted on Auto or truck chassis and used to raise or lower workers; and

   **c.** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment;

provided, however, Mobile Equipment does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered Autos.

**N.** **Named Insured's Products or Goods** means Specified Products or Goods stated in the Declarations, other than real property, that are manufactured, sold, handled or distributed by the Named Insured or by others trading under the Named Insured's name, including any container thereof, other than a vehicle.

Named Insured's Products or Goods includes:

**1.** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of the Named Insured's Products or Goods; and

**2.** The providing or failure to provide warnings or instructions.

Named Insured's Products or Goods does not include a vending machine or any other property rented to or located for use of others but not sold.

**O.** **Named Insured's Work** means:

**1.** Work or operations performed by or on behalf of the Named Insured for those Specified Operations stated in the Declarations; and

**2.** Materials, parts or equipment furnished in connection such work or operations.

Named Insured's Work includes:

**a.** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of the Named Insured's Work; and

**b.** The providing or failure to provide warnings or instructions.

**P.** **Occurrence** means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**Q.** **Personal and Advertising Injury** means injury, including consequential Bodily Injury, caused by one or more of the following offenses:

**1.** False arrest, detention or imprisonment;

**2.** Malicious prosecution;

**3.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord, or lessor;

**4.** Oral or written publication, in the course of the Named Insured's Advertisement, of material that slanders or libels a person or organization or disparages a person's or organization's products, goods, operations or services;

5.  Oral or written publication, in the course of the Named Insured's Advertisement, of material that violates a person's right of privacy;

6.  The use of another's advertising idea in the course of the Named Insured's Advertisement; or

7.  Infringing upon another's copyright, trade dress or slogan in the course of the Named Insured's Advertisement.

R.  **Policy Period** means the period from the inception date of this policy to the policy expiration date stated in Item 3. of the Declarations, or the effective date of any earlier cancellation or termination.

S.  **Pollutants** means any solid, liquid, gaseous, fuel, lubricant, thermal, acoustic, electric, or magnetic irritants or contaminants, including, smoke, vapor, soot, fumes, fibers, radiation, acid, alkalis, petroleums, chemicals, or waste. Waste includes medical waste and all other materials to be disposed of, recycled, stored, reconditioned or reclaimed.

T.  **Products-Completed Operations Hazard** includes Bodily Injury and Property Damage occurring away from premises owned by or rented to the Named Insured and arising out of the Named Insured's Products or Goods or the Named Insured's Work.

1.  Products-Completed Operations Hazard does not include:

    a.  Products or goods that are still in the Named Insured's physical possession; or

    b.  Work that has not yet been completed or abandoned.

2.  The Named Insured's Work shall be deemed completed at the earliest of the following times:

    a.  When all of the work called for under a contract with the Named Insured has been completed;

    b.  When all of the work to be performed at the job site has been completed if the contract with the Named Insured calls for work at more than one job site; or

    c.  When the portion of the work out of which the Bodily Injury, Property Damage or Occurrence arises has been put to its intended use by any person or organization other than another contractor or sub-contractor working on the same project.

3.  Work or operations which may require service, maintenance, correction, repair or replacement, but which are otherwise complete, shall be deemed completed.

4.  The Products-Completed Operations Hazard does not include any Bodily Injury, Property Damage or Occurrence arising out of:

    a.  The transportation of property, unless the Bodily Injury, Property Damage or Occurrence arises out of a condition in or on a vehicle not owned or operated by the Named Insured created by the loading or unloading thereof; or

    b.  The existence of tools, uninstalled equipment or abandoned or unused materials.

U.  **Professional Services** means those services stated in Item 4. of the Declarations.

V.  **Property Damage** means:

1.  Physical injury to or destruction of tangible property, including consequential loss of use thereof; or

2.  Loss of use of tangible property which has not been physically injured or destroyed;

provided, however, any such loss of use is caused by an Occurrence;

Tangible property shall not include Electronic Data.

W.  **Temporary Worker** means any person who is furnished to the Named Insured to substitute for a permanent Employee on leave or to meet seasonal or short-term work load requirements.

X.  **Volunteer Worker** means any person who is not an Employee of the Named Insured and who donates his/her work at the direction of and within the scope of duties determined by the Named Insured and is not paid a fee, salary or other compensation by the Named Insured or by anyone else for such work performed for the Named Insured.

## THE EXCLUSIONS

**A.**   With respect to all Coverages, this Coverage Part does not apply to any Claim:

    **1.**   Based upon or arising out of:

        **a.**   The actual, alleged or threatened discharge, disposal, migration, dispersal, seepage, release or escape of Pollutants; provided, however, this subparagraph shall not apply with respect to:

            **(1)**   The Products-Completed Operations Hazard;

            **(2)**   Damage, arising out of heat, smoke or fumes from hostile fire at or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to any Insured;

        **b.**   Bodily Injury or Property Damage arising out of the actual, alleged or threatened discharge, disposal, migration, dispersal, seepage, release or escape of Pollutants:

            **(1)**   At or from any premises, site or location which is or was at any time used by or for any Insured or others for the handling, storage, disposal, processing or treatment of waste;

            **(2)**   Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any Insured or any person or organization for whom the Insured may be legally responsible; or

        **c.**   Any demand, request, direction, order or statutory or regulatory requirement to test for, monitor, remediate, clean up, remove, contain, treat, detoxify or neutralize Pollutants, or in any way respond to or assess the effects of Pollutants or to pay for or contribute to the costs of undertaking such actions; provided, however, this subparagraph shall not apply to liability for Damages because of Property Damage that the Insured would have in the absence of such demand, request, direction, order or statutory or regulatory requirement;

    **2.**   Based upon, arising out of, or in any way involving an act, error or omission in the performance of services of a professional nature rendered or that should have been rendered by the Insured or by any person or organization for whose acts, errors or omissions the Insured is legally responsible;

    **3.**   Based upon or arising out of the Insured's activities as a fiduciary under the Employee Retirement Income Security Act of 1974 (ERISA) and its amendments or any regulation or order issued pursuant thereto;

    **4.**   Based upon or arising out of any unlawful discrimination by any Insured;

    **5.**   Based upon or arising out of any Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate Electronic Data;

    **6.**   Based upon or arising out of any violation of:

        **a.**   The Telephone Consumer Protection Act of 1991 (TCPA) and amendments thereto or any similar or related federal, state or local statute, law, rule, ordinance or regulation;

        **b.**   The CAN-SPAM Act of 2003 and amendments thereto or any similar or related federal, state or local statute, law, rule, ordinance or regulation;

        **c.**   The Fair Credit Reporting Act (FCRA) and amendments thereto or any similar or related federal, state or local statute, law, rule, ordinance or regulation, including the Fair and Accurate Credit Transactions Act of 2003 (FACTA); or

        **d.**   Any other federal, state or local statute, law, rule, ordinance or regulation that addresses, prohibits or limits the dissemination, sending, transmitting, communicating, printing, disposal, collecting, recording or distribution of information or other material;

    **7.**   Based upon or arising out of Bodily Injury or Property Damage arising directly or indirectly out of:

        **a.**   War, whether or not declared;

        **b.**   Civil war, insurrection, rebellion, revolution or usurped power or action taken by governmental authority in hindering or defending against any of the foregoing; or

        **c.**   Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents;

8. Based upon or arising out of the termination of employment, coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, refusal to employ, or other practices or policies related to employment or professional privileges; or

9. Brought under any other Coverage Part of this policy.

Exclusions A.1. and A.7. shall not apply to Property Damage by fire to premises while rented by the Named Insured or temporarily occupied by the Named Insured with the permission of the owner of the premises. A Limit of Liability applies to this coverage as described in Section Limits of Liability, Coverage A. - Limit of Liability – Fire Damage.

**B.** With respect to Coverage A., this Coverage Part does not apply to any Claim:

1. Based upon or arising out of Bodily Injury or Property Damage expected or intended from the standpoint of the Insured; provided, however, this exclusion does not apply to Bodily Injury resulting from the use of reasonable force to protect persons or property;

2. Based upon or arising out of Bodily Injury or Property Damage for which the Insured is obligated to pay Damages because of the assumption of liability in any contract or agreement; provided, however, this exclusion shall not apply to liability for damages:

   **a.** That the Insured would have in the absence of the contract or agreement; or

   **b.** Assumed in a contract or agreement that is an Insured Contract; provided, the Bodily Injury and Property Damage occurs subsequent to the execution of the Insured Contract;

3. Based upon or arising out of loss of use of tangible property which has not been physically injured or destroyed resulting from:

   **a.** A delay in or lack of performance by or on behalf of the Named Insured of any contract or agreement; or

   **b.** A defect, deficiency, inadequacy or dangerous condition in the Named Insured's Products or Goods or the Named Insured's Work;

   provided, however, this exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the Named Insured's Products or Goods or the Named Insured's Work after such products, goods or work have been put to use by any person or organization other than an Insured, provided such products, goods or work are included in the Specified Products, Goods or Operations stated in the Declarations;

4. Based upon or arising out of Property Damage to:

   **a.** The Named Insured's Products or Goods; or

   **b.** The Named Insured's Work included in the Products-Completed Operations Hazard, arising out of it or any part of it, or for the cost of inspecting, repairing or replacing any defective or allegedly defective product or work or part thereof or for loss of use of any defective or allegedly defective product or work;

5. For Damages for any loss, cost or expense incurred by the Named Insured or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of the Named Insured's Products or Goods or the Named Insured's Work or of any property of which such products, goods or work form a part, if such products, goods, work or property are withdrawn from the market or from use because of any known or suspected defect, deficiency, inadequacy or dangerous condition therein;

6. Based upon or arising out of Bodily Injury or Property Damage arising out of ownership, maintenance, operation, use or entrustment to others or loading or unloading of:

   **a.** Any Auto, aircraft or watercraft owned or operated by or rented or loaned to any Insured; or

   **b.** Any other Auto, aircraft or watercraft operated by any person in the course of their employment or activities on behalf of the Named Insured;

   provided, however, this exclusion shall not apply to:

   **(1)** The parking of an Auto on premises owned by, rented to or controlled by the Named Insured or on ways next to such premises, if such Auto is not owned by or rented or loaned to any Insured;

   **(2)** A watercraft while ashore on premises owned by, rented to or controlled by the Named Insured; or

(3) A watercraft that is less than twenty-six (26) feet in length, that is not owned by the Named Insured and that is not being used to carry persons or property for a charge;

7. Based upon or arising out of Bodily Injury or Property Damage arising out of:

   a. The ownership, maintenance, operation, use, loading or unloading of any Mobile Equipment while being used in any prearranged or organized racing, speed or demolition contest or in any stunting activity or in practice or preparation for such contest or activity; or

   b. The operation or use of any snowmobile, moped or motorized bicycle, or trailer designed for use therewith;

8. Based upon or arising out of Bodily Injury or Property Damage arising out of the transportation of Mobile Equipment by an Auto owned or operated by or rented or loaned to any Insured;

9. Based upon or arising out of Property Damage to:

   a. Property owned, occupied or rented to the Insured;

   b. Property loaned to the Insured;

   c. Personal property in the care, custody or control of the Insured;

   d. That particular part of any property,

      (1) Upon which operations are being performed by or on behalf of the Named Insured if the Property Damage arises out of those operations; or

      (2) The restoration, repair or replacement of which has been made or is necessary because of faulty workmanship thereon by or on behalf of the Insured; provided, however, this subparagraph shall not apply with respect to Property Damage included in the Products-Completed Operations Hazard;

   e. Premises that the Named Insured sells, gives away or abandons, if the Property Damage arises out of any part of those premises; provided, however, this subparagraph shall not apply if the premises are included in the Products-Completed Operations Hazard and were never occupied, rented or held for rental by the Named Insured; or

   f. To work performed by the Insured arising out of such work or any portion thereof, or out of such materials, parts or equipment furnished in connection therewith with respect to the Products-Completed Operations Hazard;

   provided, however, Items b., c., and d. of this exclusion shall not apply with respect to liability under a written sidetrack agreement;

10. Based upon or arising out of any obligation of the Insured under any workers' compensation, unemployment compensation or disability benefits law or under any similar law;

11. Based upon or arising out of Bodily Injury to any employee of the Insured arising out of and in the course of employment by the Insured or performing duties related to conduct of the Insured's business or any such Claim brought by or on behalf of the spouse, child, parent, brother, sister or partner of the employee;

   this exclusion shall apply:

   a. Whether the Insured may be liable as an employer or in any other capacity; and

   b. To any obligation to share damages with or repay someone else who must pay damages because of injury;

   provided, however, that this exclusion shall not apply with respect to liability assumed by the Insured under an Insured Contract;

12. Based upon or arising out of Bodily Injury or Property Damage for which the Insured may be held liable because of:

   a. Causing or contributing to the intoxication of any person;

   b. The furnishing of alcoholic beverages to a person under legal drinking age or under the influence of alcohol; or

   c. Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages;

provided, however, this exclusion shall apply only if the Named Insured:

   **(1)** Manufactures or distributes alcoholic beverages;

   **(2)** Serves or furnishes alcoholic beverages for a charge whether or not such activity requires a license, is for financial gain or livelihood; or

   **(3)** Serves or furnishes alcoholic beverages without a charge if a license is required for such activity;

**13.** Based upon or arising out of Aircraft Products including consequential loss of use thereof resulting from Grounding;

**14.** Based upon or arising out of the Named Insured's Products or Goods or the Named Insured's Work in violation of any law, statute, ordinance, or regulation, Federal, State or Municipal government, or agencies thereof;

**15.** For Bodily Injury arising out of Personal and Advertising Injury; or

**16.** Based upon or arising out of Bodily Injury sustained by any patient, person or resident of a facility receiving services of a professional nature or any such Claim brought by or on behalf of the spouse, child, parent, grandparent, brother, sister or partner of such patient, person or resident of a facility.

Exclusions B.3. through B.12. shall not apply to Property Damage by fire to premises while rented by the Named Insured or temporarily occupied by the Named Insured with the permission of the owner of the premises. A Limit of Liability applies to this coverage as described in Section Limits of Liability, Coverage A. - Limit of Liability – Fire Damage.

**C.** With respect to Coverage B., this Coverage Part does not apply to any Claim:

**1.** Based upon or arising out of Personal and Advertising Injury caused by or at the direction of the Insured with the knowledge that the act would violate the rights of another and would inflict Personal and Advertising Injury;

**2.** Based upon or arising out of Personal and Advertising Injury arising out of the oral or written publication, in any manner, of material, if done by or at the direction of the Insured with the knowledge of its falsity;

**3.** Based upon or arising out of Personal and Adverting Injury arising out of oral or written publication, in any manner, of material whose first publication took place before the  Retroactive Date stated in the Declarations;

**4.** Based upon or arising out of Personal and Advertising Injury arising out of any criminal act committed by or at the direction of the Insured;

**5.** Based upon or arising out of Personal and Advertising Injury arising out of a mistake in advertised price or incorrect description of any product, good or operation;

**6.** Based upon or arising out of any liability assumed by the Insured in a contract or agreement; provided, however, this exclusion shall not apply to liability an Insured would have in the absence of the contract or agreement;

**7.** Based upon or arising out of Personal and Advertising Injury arising out of piracy, unfair competition, the infringement of copyright, title, trade dress, slogan, service mark, service name or trademark, trade name, patent, trade secret or other intellectual property right; provided, however, this exclusion shall not apply to Infringing upon another's copyright, trade dress or slogan in the Named Insured's Advertisement;

**8.** Based upon or arising out of Personal and Advertising Injury arising out of piracy, unfair competition, infringement of title, service mark, service name or trademark, trade name, patent, trade secret or other intellectual property right; provided however, under this exclusion other intellectual property right does not include use of another's advertising idea in the Named Insured's Advertisement;

**9.** Based upon or arising out of Personal and Advertising Injury arising out of an electronic chatroom or bulletin board the Insured hosts, owns, or over which the Insured exercises control;

**10.** For any Personal and Advertising Injury committed by any Insured whose business is:

   **a.** Advertising, broadcasting, publishing, or telecasting;

   **b.** Designing or determining content for websites for others; or

   **c.** An Internet access, content, search or service provider;

11. Based upon or arising out of Personal and Advertising Injury arising out of the unauthorized use of another party's name or product in the Named Insured's email address, domain name or metatag, or any similar device to mislead another party's customers or potential customers;

12. Based upon or arising out of a breach of contract; provided, however, this exclusion shall not apply to an implied contract to use another's advertising idea in the Named Insured's Advertisement; or

13. Based upon or arising out of the failure of products, goods or services to conform with any statement of quality or performance made in the Named Insured's Advertisement.

**D.** With respect Coverage C., the Company will not pay any expenses for Bodily Injury:

1. To any Insured;

2. To a person hired to do work for or on behalf of the Insured or a tenant of the Named Insured;

3. To a person injured on that part of premises owned or rented by the Named Insured that the person normally occupies;

4. To a person, whether or not an employee of an Insured, if benefits for the Bodily Injury are payable or must be provided under any workers' compensation or disability benefits law or under any similar law;

5. To a person injured while taking part in athletics;

6. Included in the Products-Completed Operations Hazard;

7. Excluded under Coverage A.; or

8. To any patient, person or resident of a facility receiving services of a professional nature.

## TERRITORY

The insurance afforded by this Coverage Part applies worldwide, provided the Claim is made in the United States of America, its territories or possessions or Puerto Rico.

## LIMITS OF LIABILITY

**A.** **Coverage A. - Limit of Liability-Each Occurrence:** The total liability of the Company for the combined total of Damages and Claim Expenses for all Claims first made against the Insured during the Policy Period or Extended Reporting Period, if exercised, under Coverage A. because of all Bodily Injury or Property Damage sustained by one or more persons or organizations as the result of any one Occurrence shall not exceed the Limit of Liability stated in the Declarations as applicable to Each Occurrence.

**B.** **Coverage A. - Limit of Liability-Fire Damage:** The total liability of the Company for the combined total of Damages and Claim Expenses for all Claims, including those subject to the above provision regarding the Coverage A. - Limit of Liability – Each Occurrence, because of Property Damage to premises, while rented to the Named Insured or temporarily occupied by the Named Insured with the permission of the owner of the premises arising out of any one fire, shall not exceed the Limit of Liability stated in the Declarations as applicable to Fire Damage – Any One Fire.

**C.** **Coverage B. - Limit of Liability-Each Person or Organization:** The total liability of the Company for the combined total of Damages and Claim Expenses for all Claims under Coverage B. because of all Personal and Advertising Injury sustained by any one person or organization shall not exceed the Limit of Liability stated in the Declarations as applicable to Each Person or Organization.

**D.** **Coverage C. – Medical Payments: Limit of Liability–Each Injured Person:** The total liability of the Company for medical expenses under Coverage C. because of Bodily Injury sustained by any one person shall not exceed the Limit of Liability stated in the Declarations as applicable to Each Injured Person.

**E.** **Limit of Liability – Coverage Part Aggregate:** Subject to the above Limits of Liability A., B., C. and D., the total liability of the Company shall not exceed the Coverage Part Aggregate Limit of Liability stated in the Declarations for all Damages and Claim Expenses for Coverage A. and B. arising out of all Claims first made during the Policy Period and the Extended Reporting Period, if exercised and all medical expenses under Coverage C.

**F.** **Deductible:** The applicable Deductible amount stated in the Declarations shall be paid by the Named Insured and shall be applicable to each Occurrence under Coverage A. and to each person or organization under Coverage B. and shall include Damages and Claim Expenses, whether or not Damages payments are made.

Such amounts shall, upon written demand by the Company, be paid by the Named Insured within ten (10) days. The total payments requested from the Named Insured in respect of each Occurrence under Coverage A. or each person or organization under Coverage B. shall not exceed the applicable Deductible amount stated in the Declarations.

The determination of the Company as to the reasonableness of the Claim Expenses shall be conclusive on the Named Insured.

**G.** **Multiple Insureds, Claims and Occurrences:** Under Coverage A. the inclusion herein of more than one Insured in any Claim or the making of Claims by more than one person or organization shall not operate to increase the Limits of Liability applicable to Coverage A. stated in the Declarations. More than one Claim arising out of a single Occurrence or a series of related Occurrences shall be considered a single Claim. All such Claims, whenever made, shall be treated as a single Claim. Such single Claim, whenever made, shall be deemed to be first made on the date on which the earliest Claim arising out of such Occurrence is made or with regard to written notice given to and accepted by the Company pursuant to Section CLAIMS B., Discovery Clause, on the date within the Policy Period on which such written notice of potential Claim is first received by the Company.

## DEFENSE, SETTLEMENTS AND CLAIM EXPENSES

**A.** **Defense, Investigation and Settlement of Claims:** The Company shall have the right and duty to defend and investigate any Claim to which coverage under this Coverage Part applies pursuant to the following provisions:

**1.** Claim Expenses incurred in defending and investigating such Claim shall be a part of and shall not be in addition to the applicable Limits of Liability stated in the Declarations. Such Claim Expenses shall reduce the Limits of Liability and shall be applied against the applicable Deductible. The Company shall have no obligation to pay any Damages or to defend or continue to defend any Claim or to pay Claim Expenses after the applicable Limits of Liability stated in the Declarations have been exhausted by payment(s) of Damages and/or Claim Expenses.

**2.** The Company shall select defense counsel; provided, however, that if the law of the state of the Named Insured's domicile, stated in the Declarations, allows the Insured to control the selection of defense counsel where a conflict of interest has arisen between the Insured and the Company, the Company will provide a list of attorneys or law firms from which the Insured may designate defense counsel who shall act solely in the interest of the Insured, and the Insured shall direct such defense counsel to cooperate with the Company. Such cooperation shall include:

**a.** Providing on a regular basis, but not less frequently than every three (3) months, written reports on claimed Damages, potential liability, progress of any litigation, any settlement demands, or any investigation developments that materially affect the Claim;

**b.** Providing any other reasonable information requested;

**c.** Providing fully itemized billing on a periodic basis; and

**d.** Cooperating with the Company and the Insured in resolving any discrepancies;

And the fees and costs incurred by such defense counsel, including those fees and costs generated by cooperation with the Company, as stated above, shall be included in Claim Expenses. Such Claim Expenses shall be a part of and shall not be in addition to the applicable Limits of Liability stated in the Declarations. Such Claim Expenses shall reduce the Limits of Liability and shall be applied against the Deductible.

**B.** **Consent to Settlement:** The Company may make such investigation and settlement of any Claim as it deems expedient.

## CLAIMS

**A.** **Claim Reporting Provision:** It is a condition precedent to coverage afforded by this Coverage Part that the Insured shall give to the Company written notice as stated in the Notices item of the Declarations as soon as

practicable of any Claim first made against the Insured during the Policy Period or the Extended Reporting Period, if exercised.

In the event suit is brought against the Insured, the Insured shall immediately forward to Markel Service, Incorporated, Ten Parkway North, Deerfield, Illinois, 60015, on behalf of the Company, every demand, notice, summons or other process received by him/her or by his/her representatives.

**B.** **Discovery Clause:** If during the Policy Period, the Insured first becomes aware of a specific Occurrence or offense which is reasonably expected to result in a Claim within the scope of coverage of this Coverage Part, then the Insured may provide written notice as stated in the Notices item of the Declarations to the Company containing the information listed below. If such written notice is received by the Company during the Policy Period, then any Claim subsequently made against the Insured arising out of such Occurrence or offense shall be deemed for the purpose of this insurance to have been made on the date on which such written notice is received by the Company.

It is a condition precedent to the coverage afforded by this Discovery Clause that written notice be given to the Company containing the following information:

**1.** The description of the specific Occurrence or offense;

**2.** The date on which such Occurrence or offense took place;

**3.** The injury or damage which has or may result from such Occurrence or offense;

**4.** The identity of any injured persons; and

**5.** The circumstances by which the Insured first became aware of such Occurrence or offense.

Subject to the paragraph hereinabove, if during the Policy Period the Insured provides such written notice of a specific Occurrence or offense which is reasonably expected to result in a Claim within the scope of coverage of this policy, the Company at its sole option, may investigate such specific Occurrence or offense. Such matter shall be subject to all terms, conditions and provisions in this policy as applicable to a Claim.

## EXTENDED REPORTING PERIOD

**A.** The Named Insured's right to exercise the Extended Reporting Period under this Coverage Part shall exist solely if the Named Insured also exercises its right to purchase the Extended Reporting Period under all Insuring Agreements in the policy for which an Extended Reporting Period is available.

**B.** If the Named Insured nonrenews this policy in its entirety or cancels this policy in its entirety pursuant to Common Policy Conditions A., Cancellation, or if the Company nonrenews this policy in its entirety or cancels this policy in its entirety pursuant to Common Policy Conditions A., Cancellation, for reasons other than nonpayment of premium or Deductible or non-compliance with the terms and conditions of this policy, then the Named Insured shall have the right to exercise the Extended Reporting Period as regards all Coverage Parts included under this policy according to the terms and conditions applicable to the Extended Reporting Period as detailed in the Specified Medical Professions Professional Liability Insurance Coverage Part.

**C.** In the event that the Named Insured exercises the Extended Reporting Period as detailed in Specified Medical Professions Professional Liability Insurance Coverage Part, then such exercise of the Extended Reporting Period shall extend the coverage granted under this Coverage Part to Claims first made against the Insured, during the period of months; as elected by the Named Insured, and reported to the Company pursuant to Section Claims A., Claim Reporting Provision, following immediately upon the effective date of such cancellation or nonrenewal, for:

**1.** Bodily Injury or Property Damage which happened on or after the applicable Retroactive Date stated in the Declarations and prior to the effective date of such cancellation or nonrenewal, caused by an Occurrence which happened on or after the applicable Retroactive Date stated in the Declarations and prior to the effective date of such cancellation or nonrenewal and arising from those Specified Products, Goods, Operations or Premises stated in the Declarations and which is otherwise covered by this Coverage Part; or

**2.** Personal and Advertising Injury which happened on or after the applicable Retroactive Date stated in the Declarations and prior to the effective date of such cancellation or nonrenewal, caused by an offense which

happened on or after the applicable Retroactive Date stated in the Declarations and prior to the effective date of such cancellation or nonrenewal and arising from those Specified Products, Goods, Operations or Premises stated in the Declarations and which is otherwise covered by this Coverage Part.

## OTHER CONDITIONS

**A.**   **Prevention of Loss:**   In the event of an Occurrence or an offense involving the Specified Products, Goods, Operations or Premises stated in the Declarations and covered by this Coverage Part, the Insured shall promptly, at his/her expense, take all reasonable steps to prevent other Bodily Injury, Property Damage or Personal and Advertising Injury from arising out of the same or similar conditions.

**B.**   **Other Insurance:** With respect to Coverage C., Common Policy Conditions E. Other Insurance, shall not apply.

**C.**   **Reporting of Changes in Specified Products, Goods, Operations and Premises:**   The premium charged for this Coverage Part is based on those Specified Products, Goods, Operations and Premises stated in the Declarations and identified in the underwriting information submitted to the Company on behalf of the Insured at the time of policy inception. The Insured shall report promptly to the Company any changes in those Specified Products, Goods, Operations or Premises stated in the Declarations as described below, and the Company shall have the right to adjust the premium and/or Deductible(s) for such changes, based on its sole assessment of the additional exposure(s) presented.

Changes to report:

**1.**   Any changes to manufacturing or servicing premises requiring structural alterations, or acquisition of additional manufacturing or servicing premises;

**2.**   Any changes in manufacturing or servicing operations which is likely to result in an annual increase in payrolls of twenty-five percent (25%) or more;

**3.**   Any change in operations which are not accurately described by the description as stated in the Declarations.

This Coverage Part shall apply to only those Specified Products, Goods, Operations and Premises stated in the Declarations, irrespective of any changes reported.

INTERLINE



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CERTIFIED ACTS OF TERRORISM ENDORSEMENT

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY INSURANCE COVERAGE PART - CLAIMS MADE COVERAGE
SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY (INSURANCE COVERAGE PART – OCCURRENCE COVERAGE
LOCUM TENENS AND CONTRACT STAFFING GENERAL LIABILITY INSURANCE COVERAGE PART - CLAIMS MADE COVERAGE
LOCUM TENENS AND CONTRACT STAFFING GENERAL LIABILITY INSURANCE COVERAGE PART - OCCURRENCE COVERAGE

In consideration of the premium paid, it is hereby understood and agreed that, with respect to any Claim otherwise covered hereunder, this Coverage Part shall not exclude any Claim based upon, arising out of, or in any way involving any Certified Act of Terrorism.

**Certified Act of Terrorism** means an act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance of Act. The federal Terrorism Risk Insurance of Act sets forth the following criteria for a Certified Act of Terrorism:

1. The act resulted in insured losses in excess of $5 million in the aggregate attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a Calendar Year and the Company has met the Company's deductible under the Terrorism Risk Insurance Act, the Company shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such cases insured losses up to that amount are subject to pro rata allocation in accordance with the procedures established by the Secretary of Treasury.

All other terms and conditions remain unchanged.

INTERLINE



# EVANSTON  INSURANCE  COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## ASBESTOS EXCLUSION

In consideration of the premium paid, it is hereby understood and agreed that the insurance provided by this policy shall not apply to any Claim, loss or expense caused by, resulting from or arising out of asbestos, asbestos fibers or any product or material containing asbestos in any form, under any theory of liability whatsoever.

It is further agreed that the Company shall have no duty to defend or to pay or reimburse for any fees, costs or expenses in the investigation or defense of any Claim excluded herein.

All other terms and conditions remain unchanged.

**EIC 832-01 10 02**                                                                                                      **Page 1 of 1**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# POLICY CHANGES

Policy Change
Number A

| POLICY NUMBER<br>SM925939 | POLICY CHANGES<br>EFFECTIVE<br>05/23/2018 | COMPANY<br>Evanston Insurance Company |
|---|---|---|
| NAMED INSURED<br>WESTCHESTER GENERAL HOSPITAL, INC.; HEALTH<br>EXCELLENCE, LLC; SOUTHERN WINDS HOSPITAL | | AUTHORIZED REPRESENTATIVE<br>RPS Healthcare<br>550 W. Van Buren Suite 1200<br>Chicago, IL 60607 |

COVERAGE PARTS AFFECTED

GENERAL LIABILITY INSURANCE (CLAIMS MADE) COVERAGE PART FOR SPECIFIED PROFESSIONS

SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY INSURANCE COVERAGE PART – CLAIMS MADE COVERAGE

CHANGES

**ADDITIONAL NAMED INSURED**

It is understood and agreed that the Named Insured shown in Item #1 of the Declarations is amended to include the following:

WESTCHESTER GENERAL HOSPITAL, INC. (WGH); HEALTH EXCELLENCE, LLC

SOUTHERN WINDS HOSPITAL but only with respects to Professional Services rendered after April 1, 1988 and prior to June 1, 2016 at 6:00PM Eastern Standard Time

All other terms and conditions remain unchanged.

_____
AUTHORIZED REPRESENTATIVE



POLICY NUMBER: SM925939

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## DEDUCTIBLE AGGREGATE

This endorsement modifies insurance provided under the following:

GENERAL LIABILITY INSURANCE (CLAIMS MADE) COVERAGE PART FOR SPECIFIED PROFESSIONS
SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY INSURANCE COVERAGE PART – CLAIMS MADE
    COVERAGE

In Consideration of the premium paid, it is hereby understood and agreed that the Declarations is amended to include the following:

    5. A. Coverage Part Deductible Aggregate:       $850,000

All other terms and conditions remain unchanged.

**Manuscript-1**                               **Page 1 of 1**



POLICY NUMBER: SM925939

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EMERGENCY DEPARTMENT COVERAGE

This endorsement modifies insurance provided under the following:

GENERAL LIABILITY INSURANCE (CLAIMS MADE) COVERAGE PART FOR SPECIFIED PROFESSIONS
SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY INSURANCE COVERAGE PART – CLAIMS MADE
    COVERAGE

In consideration of the premium paid, it is hereby understood and agreed that coverage applies for claims first made arising out of professional services  rendered by physicians working on behalf of the Named Insured in the emergency department of Westchester General Hospital, provided the act, error or omission in Professional Services happens on or after the Retroactive Dates specified below:

1. Prior to March 1, 2000; or
2. On or subsequent to October 1, 2000 but prior to May 1, 2001

All other terms and conditions remain unchanged.

**Manuscript-1**



POLICY NUMBER: SM925939

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMENDMENT OF COVERAGE – NEWLY ACQUIRED ORGANIZATIONS

This endorsement modifies insurance provided under the following:

GENERAL LIABILITY INSURANCE (CLAIMS MADE) COVERAGE PART FOR SPECIFIED PROFESSIONS
SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY INSURANCE COVERAGE PART – CLAIMS MADE
   COVERAGE


In consideration of the premium paid, it is hereby understood and agreed that any organization newly acquired by the Named Insured and over which the Named Insured maintains ownership or majority interest will qualify as an Insured if there is no other similar insurance available.  However, Coverage will only be afforded for 180 days after the organization is acquired.

All other terms and conditions remain unchanged.

**Manuscript-1**                                                                                                                    **Page 1 of 1**



POLICY NUMBER: SM925939

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SCHEDULE OF PREMIUM PAYMENTS

This endorsement modifies insurance provided under the following:

GENERAL LIABILITY INSURANCE (CLAIMS MADE) COVERAGE PART FOR SPECIFIED PROFESSIONS
SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY INSURANCE COVERAGE PART – CLAIMS MADE
   COVERAGE

It is hereby understood and agreed that Item 4.A. of the Declarations shall be paid in eight (8) monthly installments as follows:

| Payment Number | Amount | Due Date |
| --- | --- | --- |
| 1. | $41,875 | May 23, 2018 |
| 2. | $41,875 | June 23, 2018 |
| 3. | $41,875 | July 23, 2018 |
| 4. | $41,875 | August 23, 2018 |
| 5. | $41,875 | September 23, 2018 |
| 6. | $41,875 | October 23, 2018 |
| 7. | $41,875 | November 23, 2018 |
| 8. | $41,875 | December 23, 2018 |

All other terms and conditions remain unchanged.



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED ENDORSEMENT FOR LANDLORDS, SPONSORS OR LESSORS - APPLICABLE TO SPECIFIED GENERAL LIABILITY COVERAGE

This endorsement modifies insurance provided under the following:

GENERAL LIABILITY INSURANCE (CLAIMS MADE) COVERAGE PART FOR SPECIFIED PROFESSIONS
SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY INSURANCE COVERAGE PART – CLAIMS MADE
 COVERAGE

In consideration of the premium paid, it is hereby understood and agreed that:

1. Section THE INSURED, solely as pertains to this Coverage Part, is amended by the addition of the following:

   Whenever used in this Coverage Part, the unqualified word Insured shall also mean Additional Insured.

2. **Additional Insured**, whenever used in this endorsement, shall mean the following:

   Any landlord, owner, or property manager of the Designated Premises; or any tradeshow or convention sponsor or operator; or any lessor of equipment.

3. **Designated Premises**, whenever used in this endorsement, shall mean the following:

   All premises leased or rented to the Named Insured, premises temporarily occupied by the Named Insured for a tradeshow or convention and/or equipment leased to the Named Insured.

4. Coverage provided to any Additional Insured as defined herein shall apply solely:

   **(a)** To Claims first made against the Insured during the Policy Period or any Extended Reporting Period, if purchased, under this Coverage Part;

   **(b)** For Claims arising out of the Named Insured's occupancy of, or failure to maintain, the Designated Premises, but solely with respect to the Specified Products, Goods or Operations of the Named Insured and only if liability for such Claim is determined to be solely the negligence or responsibility of the Named Insured; and

   **(c)** For Occurrences at, on or upon that portion of the Designated Premises which is occupied by the Named Insured and taking place during the term of the Named Insured's lease/occupancy of such Designated Premises.

All other terms and conditions remain unchanged.

**MEEO 5232 11 14**                                                                                                           **Page 1 of 1**



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## MINIMUM EARNED PREMIUM ENDORSEMENT

In the event that this policy is cancelled by the Named Insured who is authorized to act on behalf of all insureds, the policy premium is subject to a minimum earned premium of 25%.

All other terms and conditions remain unchanged.

**MEIL 5200-25% 07 04**　　　　　　　　　　　　　　　　　　　　　　　　　　　　**Page 1 of 1**

**INTERLINE**
POLICY NUMBER: SM925939

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## LONGER DURATION EXTENDED REPORTING PERIOD AVAILABILITY

This endorsement modifies insurance provided under the following:

PHYSICIANS, SURGEONS, DENTISTS AND PODIATRISTS PROFESSIONAL LIABILITY INSURANCE POLICY
SPECIFIED ERRORS AND OMISSIONS LIABILITY INSURANCE COVERAGE PART – CLAIMS MADE
SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE POLICY
SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY COVERAGE PART - CLAIMS MADE COVERAGE
SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART - CLAIMS MADE
    COVERAGE
SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY (INCLUDING PRODUCTS AND COMPLETED
    OPERATIONS LIABILITY) INSURANCE COVERAGE PART - CLAIMS MADE COVERAGE
LOCUM TENENS AND CONTRACT STAFFING PROFESSIONAL LIABILITY INSURANCE COVERAGE PART
LOCUM TENENS AND CONTRACT STAFFING GENERAL LIABILITY INSURANCE (INCLUDING PRODUCTS AND
    COMPLETED OPERATIONS LIABILITY) COVERAGE PART - CLAIMS MADE COVERAGE

In consideration of the premium paid, it is hereby understood and agreed that in addition to the availability of the Extended Reporting Period for the period of months stated in Item 8. of the Declarations, an Extended Reporting Period of the following duration shall also be available:

48 months;
60 months;
72 months; or
84 months.

The Named Insured must make a written request for the longer duration Extended Reporting Period received by the Company within 10 days after the end of the Policy Period. The written request must specify from the options stated above which period of Extended Reporting Period is requested. The Company will determine the additional premium to be charged for such Extended Reporting Period.

The Company will provide to the Named Insured in writing the amount of the additional premium for an Extended Reporting Period of the duration specified within 10 days of receipt of the Named Insured's written request.

All other terms and conditions of the Section Extended Reporting Period shall apply with regard to the Named Insured's exercise of any such longer duration Extended Reporting Period.

All other terms and conditions remain unchanged.



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED ENDORSEMENT – BODILY INJURY/PROPERTY DAMAGE LIABILITY (BLANKET)

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY INSURANCE COVERAGE PART – CLAIMS MADE COVERAGE

| SCHEDULE | |
|---|---|
| Additional Insured (Name of Person or Organization): | any person or organization to whom the Named Insured is obligated by written contract or written agreement to provide coverage as an additional insured to such person or organization |

In consideration of the premium paid, it is hereby understood and agreed that the policy is amended as follows:

1. Section THE INSURED is amended by the addition of the following:

   The unqualified word Insured shall also mean Additional Insured stated in the Schedule, but only with respect to liability for Bodily Injury or Property Damage which arises out of only those Specified Products, Goods, Operations or Premises stated in the Declarations and provided the Named Insured is required to include such Additional Insured as an additional insured on this policy by a written contract or written agreement in effect during this Policy Period and executed prior to the happening of the Bodily Injury, Property Damage and Occurrence.

2. No coverage shall be afforded to the above Additional Insured for Bodily Injury or Property Damage or to any Employee or to any obligation of the Additional Insured to indemnify another because Damages arising out of such injury.

3. Where no coverage shall apply herein for the Named Insured, no coverage or defense shall be afforded to the above Additional Insured.

4. Coverage provided to any Additional Insured as defined herein apply solely to Claims first made against the Insured during the Policy Period or Extended Reporting Period, if purchased.

All other terms and conditions remain unchanged.

**MESM 1001 08 15**                                                                                          **Page 1 of 1**



POLICY NUMBER: SM925939

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## ADDITIONAL INSURED ENDORSEMENT – GENERAL LIABILITY

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY INSURANCE COVERAGE PART – OCCURRENCE
    COVERAGE
SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY INSURANCE COVERAGE PART - CLAIMS MADE
    COVERAGE

In consideration of the premium paid, it is hereby understood and agreed that the policy is amended as follows:

1.    Section The Insured is amended to include as an additional Insured the following:

    any Additional Insured shown in the Schedule below.

2.    Coverage provided to any Additional Insured as scheduled herein shall apply solely with respect to the Specified Products, Goods, Operations and Premises of the Named Insured stated in the Declarations.

3.    No coverage shall be afforded to the Additional Insured for Bodily Injury, Property Damage, Personal and Advertising Injury to any Employee or to any obligation of the Additional Insured to indemnify another because of Damages arising out of such injury.

4.    Where no coverage shall apply herein for the Named Insured, no coverage or defense shall be afforded to the Additional Insured.

**SCHEDULE**

Additional Insured:    M.D. Neocare, Inc.
705 East 26th Street
Hialeah, FL   33013

Full Circle Healthcare, Inc.
1190 NW 95th Street, Suite 306
Miami, FL   33150

Palmetto 103 Properties, LLC
9808 NW 80 Avenue, #10-A
Hialeah Gardens, FL  33016

Universal Development & Investments, Inc.
1757 W 40th Street
Hialeah, GL  33012

General Electrical Capital Corp.

CHG Meridian Finance

All other terms and conditions remain unchanged.

Palmetto Warehouses, LLC
1060 East 33rd Street
Hialeah, FL   33013

All , to whom the Named Insured is obligated by valid written contract to provide coverage as an additional insured to such person or organization



# EVANSTON INSURANCE COMPANY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## CLAIM EXPENSES IN ADDITION TO THE EACH CLAIM LIMIT OF LIABILITY

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART - CLAIMS MADE COVERAGE

In consideration of the premium paid, it is hereby understood and agreed the policy is amended as follows:

1.  Section Limits of Liability A. is deleted and replaced with the following:

    **A. Limit of Liability-Each Claim:**  For Professional Liability, the total liability of the Company for Damages for each Claim first made against the Insured during the Policy Period or the Extended Reporting Period, if exercised, shall not exceed the Limit of Liability stated in the Declarations as applicable to Each Claim.

2.  Section Defense and Claim Expenses is deleted and replaced with the following:

    **DEFENSE AND CLAIM EXPENSES**

    **A. Defense and Investigation of Claims:**  The Company shall have the right and duty to defend and investigate any Claim to which coverage under this Coverage Part applies pursuant to the following provisions:

    1.  Claim Expenses incurred in defending and investigating such Claim shall be in addition to the Professional Liability Each Claim Limits of Liability stated in the Declarations; however, such Claim Expenses incurred in defending and investigating such Claim shall be part of and not in addition to the Professional Liability Coverage Part Aggregate Limit of Liability stated in the Declarations. Such Claim Expenses shall reduce the Coverage Part Aggregate Limit of Liability and shall be applied against the Deductible. The Company shall have no obligation to pay any Damages or to defend or continue to defend any Claim or to pay Claim Expenses after the Professional Liability Limits of Liability stated in the Declarations have been exhausted by payment(s) of Damages and/or Claim Expenses.

    2.  The Company shall select defense counsel; provided, however, that if the law of the state of the Insured's domicile, stated in Item 2. of the Declarations, allows the Insured to control the selection of defense counsel where a conflict of interest has arisen between the Insured and the Company, the Company will provide a list of attorneys or law firms from which the Insured may designate defense counsel who shall act solely in the interest of the Insured, and the Insured shall direct such defense counsel to cooperate with the Company. Such cooperation shall include:

        **a.**  Providing on a regular basis, but not less frequently than every three (3) months, written reports on claimed Damages**,** potential liability, progress of any litigation, any settlement demands, or any investigation developments that materially affect the Claim;

        **b.**  Providing any other reasonable information requested;

        **c.**  Providing fully itemized billing on a periodic basis; and

        **d.**  Cooperating with the Company and the Insured in resolving any discrepancies;

        And the fees and costs incurred by such defense counsel, including those fees and costs generated by cooperation with the Company, as stated above, shall be included in Claim Expenses. Such Claim Expenses shall be in addition to the Professional Each Claim Limit of Liability stated in the Declarations; however, such Claim Expenses shall be part of and shall not be in addition to the Professional Liability Coverage Part Aggregate Limit of Liability stated in the Declarations. Such Claim Expenses shall reduce the Professional Liability Coverage Part Aggregate Limit of Liability and shall be applied against the Deductible.

All other terms and conditions remain unchanged.

**MESM 2004 10 12**                                                                                                      **Page 1 of 1**



POLICY NUMBER: SM925939

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMENDMENT OF CANCELLATION

This endorsement modifies insurance provided under the following:

COMMON POLICY CONDITIONS

In consideration of the premium paid, it is hereby understood and agreed that the second paragraph of Common Policy Conditions A., Cancellation, is deleted and replaced with the following:

This policy may be cancelled by the Company by mailing to the Named Insured, at the address stated in the Declarations written notice stating when, not less than 90 days thereafter, such cancellation shall be effective. However, if the Company cancels the policy because the Named Insured has failed to pay a premium or deductible when due, including premium and deductible(s) due on any other policy(ies) issued by the Company or any of its affiliated companies in an uninterrupted series of policies for which this policy is a renewal or replacement, this policy may be cancelled by the Company by mailing a written notice of cancellation to the Named Insured stating when, not less than ten (10) days thereafter, such cancellation shall be effective. The mailing of notice as aforementioned shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the Policy Period. Such notice shall be conclusive on all Insureds. Delivery of such written notice by the Named Insured or the Company shall be equivalent to mailing. If cancelled by the Company, earned premium shall be computed pro rata. Premium adjustment may be made at the time cancellation is effected or as soon as practicable thereafter.

All other terms and conditions remain unchanged

**MESM 2014 10 12**



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMENDMENT OF DEFINITIONS D.1.

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART - CLAIMS MADE
COVERAGE

In consideration of the premium paid, it is hereby understood and agreed that Section Definitions D.1. is deleted and replaced with the following:

1.    Multiplied portions of damages in excess of actual damages, including trebling of damages;

All other terms and conditions remain unchanged.

**MESM 2015 08 15**                                                                                                   **Page 1 of 1**

POLICY NUMBER: SM925939



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT OF THE INSURED -
# ADDITION OF INDEPENDENT CONTRACTOR

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART - CLAIMS MADE
    COVERAGE

In consideration of the premium paid, it is hereby understood and agreed that Section The Insured is amended by the addition of the following:

**G.** The following independent contracted healthcare professional, solely while acting on behalf of the Named Insured and within the scope of his/her duties on behalf of the Named Insured:

    **1.** For an act, error or omission in Professional Services happening on or after the Retroactive Date stated below as applicable to such independent contracted healthcare professional; and

    **2.** For Claims first made against such independent contracted healthcare professional on or after the Effective Coverage Date and prior to the Expiration Coverage Date, stated below as applicable to such independent contracted healthcare professional, provided that prior to the Effective Coverage Date stated below as applicable to such independent contracted healthcare professional, the independent contracted healthcare professional had no knowledge of such act, error or omission or any fact, circumstance, situation or incident which may result in a Claim under this policy.

| Independent Contracted Healthcare Professional | Independent Contracted Healthcare Professional Retroactive Date: | Effective Coverage Date: | Expiration Coverage Date: |
|---|---|---|---|
| Harry Aguero, MD | 7/1/2014 | 5/23/2016 | End of Policy Period |
| David Agorvor, MD | 8/13/2013 | 5/23/2016 | End of Policy Period |
| Luis Cabrera, MD | 8/1/2013 | 5/23/2016 | 06/30/2017 |
| Imaze Marian Davis, DPM | 4/1/2010 | 5/23/2016 | End of Policy Period |
| Robert Fernandez, DO | 9/17/2014 | | 4/2/2015 |
| Gary Goykhman, DPM | 8/1/2013 | 5/23/2016 | End of Policy Period |
| Ramon Hechavarria, MD | 8/13/2013 | 5/23/2016 | End of Policy Period |
| Clifford O' Connor, DPM | 9/1/2012 | | 2/24/2015 |
| Shlomo Pascal, MD | 8/1/2012 | 5/23/2016 | 06/01/2016 |
| Edgardo Penabad, Jr. MD | 3/1/2012 | 5/23/2016 | End of Policy Period |
| John Ojea, MD | 8/1/2013 | 5/23/2016 | End of Policy Period |
| Fernando Pino, MD | 8/1/2014 | 5/23/2016 | 07/14/2016 |
| Zafar Qureshi, MD | 3/1/2012 | 5/23/2016 | End of Policy Period |
| Ronald Reis, MD | 8/1/2013 | 5/23/2016 | End of Policy Period |

All other terms and conditions remain unchanged.

**MESM 2029 10 12**                                                                    **Page 1 of 2**

| | | | |
|---|---|---|---|
| Juan Salazar, MD | 10/28/2013 | 5/23/2016 | End of Policy Period |
| Mark R. Spence, MD | 8/13/2013 | 5/23/2016 | End of Policy Period |
| Manuel Suarez, MD | 2/1/2013 | 5/23/2016 | End of Policy Period |
| Patricia Streicher Litts, MD | 8/13/2013 | 5/23/2016 | End of Policy Period |
| K.J. Sean Goddard, DO | 12/1/2013 | | 01/01/2015 |
| Felipe Caballero, MD | 3/1/2012 | | 2/28/2014 |
| Oscar Barreto, DPM | 1/17/2017 | | 07/16/2017 |
| Edward Bustamante, DPM | 1/17/2017 | 5/23/2017 | End of Policy Period |
| Sung Ho-Bae, DPM | 1/17/2017 | | 07/06/2017 |
| Elroy Kalme-Lopez, DPM | 1/17/2017 | 5/23/2017 | End of Policy Period |
| Ray Kim, DPM | 1/17/2017 | | 5/8/2017 |
| Francisco Oliva, DPM | 1/17/2017 | | End of Policy Period |

All other terms and conditions remain unchanged.

**MESM 2029 10 12**



POLICY NUMBER: SM925939

# EVANSTON INSURANCE COMPANY

# DATABREACH<sup>SM</sup> COVERAGE PARTS ENDORSEMENT

This endorsement adds to the insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART - CLAIMS MADE COVERAGE

In consideration of the premium paid, it is understood and agreed that the coverages afforded by this Endorsement are subject to the terms, conditions and limitations of this policy, except to the extent that such terms, conditions and limitations are modified herein. Solely with respect to the coverages afforded by this Endorsement, the policy is amended as follows:

**Claims Made and Reported Coverage:** With regard to DataBreach<sup>SM</sup> COVERAGE A. - Data Breach and Privacy Liability Coverage Part, the coverage afforded by this Endorsement is limited to liability for only those Claims that are first made against the Insured during the Policy Period or the Extended Reporting Period, if exercised, and reported to the Company during the Policy Period or the Extended Reporting Period, if exercised, or within sixty (60) days after the expiration of the Policy Period or the Extended Reporting Period, if exercised.

**Notice:** DataBreach<sup>SM</sup> COVERAGE A. - Data Breach and Privacy Liability Coverage Part, of this Endorsement contains provisions that reduce the limits of liability stated in the Endorsement by the costs of legal defense.

The limits of liability applicable to the coverage parts provided under this Endorsement are in addition to, and do not erode the limits of liability provided under the Professional Liability coverage afforded in the policy to which this endorsement attaches.

Please read this Endorsement carefully.

1.   Section THE INSURED is deleted and replaced with the following:

**THE INSURED**

The unqualified word "Insured" wherever used in this endorsement either in the singular or plural, means:

**A.** The Named Insured herein defined as the person(s) or organization(s) stated in Item 1. of the Declarations.

2.   Section INSURING AGREEMENTS is amended by the addition of the following:

**DataBreach<sup>SM</sup> COVERAGE A. - Data Breach and Privacy Liability Coverage Part – Claims Made and Reported Coverage:**

The Company shall pay on behalf of the Insured, all sums which the Insured shall become legally obligated to pay as Damages and Regulatory Fines both of which are a result of a Claim first made against the Insured during the Policy Period or the Extended Reporting Period, if exercised, and reported to the Company during the Policy Period or the Extended Reporting Period, if exercised, or within sixty (60) days after the expiration of the Policy Period or Extended Reporting Period, if exercised, by reason of an Unauthorized Access or a Potential Unauthorized Access, provided:

1.   The entirety of the Unauthorized Access or the discovery of the Potential Unauthorized Access happens during the Policy Period or on or after 05/23/2013 and before the end of the Policy Period; and

2.   Prior to the effective date of this policy the Named Insured or any past or current principal, partner, officer, director, trustee, shareholder, Employee, manager or member of the Named Insured had no knowledge of such Unauthorized Access, Potential Unauthorized Access or any computer security incident, intrusion, breach, compromise, theft, loss or use of the Named Insured's Electronic Communications System which may have led a reasonable person in such party's position to conclude that a Claim was likely.

**DataBreach<sup>SM</sup> COVERAGE B. - Data Breach Loss to Insured Coverage Part – Occurrence Coverage:**

The Company shall indemnify the Named Insured for the amount of Loss which results directly from an Unauthorized Access which occurs during the Policy Period and is reported to the Company pursuant to Section CLAIMS, LOSS AND EXPENSES B., provided:

1. Prior to the effective date of this policy the Named Insured or any past or current principal, partner, officer, director, trustee, shareholder, Employee, manager or member of the Named Insured had no knowledge that such Unauthorized Access had occurred in whole or in part, and if such party knew prior to the Policy Period that the Unauthorized Access had occurred, then any continuation, change or resumption of such Unauthorized Access during or after the Policy Period will be deemed to have been known prior to the Policy Period;

2. Unauthorized Access, which occurs during the Policy Period and was not, prior to the Policy Period known to have occurred by the Named Insured or any past or current principal, partner, officer, director, trustee, shareholder, Employee, manager or member of the Named Insured, includes any continuation, change or resumption of that Unauthorized Access after the end of the Policy Period; and

3. Unauthorized Access will be deemed to have been known to have occurred at the earliest of the Named Insured or any past or current principal, partner, officer, director, trustee, shareholder, Employee, manager or member of the Named Insured:

   (a) Reporting all, or any part, of the Unauthorized Access to the Company, any other insurer or any insurance representative;

   (b) Incurring Loss or Breach Mitigation Expense because of the Unauthorized Access; or

   (c) Becoming aware by any other means that Unauthorized Access has occurred or has begun to occur.

**DataBreach<sup>SM</sup> COVERAGE C. - Breach Mitigation Expense Coverage Part – Occurrence Coverage:** The Company shall, subject to the prior written consent of the Company, reimburse the Named Insured for the reasonable cost actually incurred by the Named Insured for Breach Mitigation Expense which results directly from an Unintentional Data Compromise which occurs during the Policy Period and is reported to the Company pursuant to Section CLAIMS, LOSS AND EXPENSES C., provided:

1. The entirety of the Unintentional Data Compromise occurs during the Policy Period; and

2. Prior to the effective date of this policy the Named Insured or any past or current principal, partner, officer, director, trustee, shareholder, Employee, manager or member of the Named Insured had no knowledge such Unintentional Data Compromise of:

   a. The Named Insured's Electronic Communications System; or

   b. The Electronic Communications System of a third party responsible for storing and securing the data of the Named Insured;

   had occurred in whole or in part, which may have led a reasonable person in such party's position to conclude that incurring such expenses was likely, and if any such party knew prior to the Policy Period that such Unintentional Data Compromise had occurred, then any continuation, change or resumption of such Unintentional Data Compromise during or after the Policy Period will be deemed to have been known prior to the Policy Period; and

3. Unintentional Data Compromise will be deemed to have been known to have occurred at the earliest of any Insured:

   a. Reporting all, or any part, of an Unauthorized Access or Potential Unauthorized Access to the Company, any other insurer or any insurance representative;

   b. Incurring Loss or Breach Mitigation Expense because of an Unauthorized Access or Potential Unauthorized Access; or

   c. Becoming aware by any other means that an Unintentional Data Compromise has occurred or has begun to occur.

The Named Insured must submit to the Company satisfactory written proof of payment of such costs within one (1) year after the expiration or cancellation of this policy.

If such expenses as are reimbursable under this DataBreach<sup>SM</sup> COVERAGE C. - Breach Mitigation Expense Coverage Part become part of a judgment, award or settlement, such expenses shall not be subject to coverage under DataBreach<sup>SM</sup> COVERAGE C. - Breach Mitigation Expense Coverage Part.

**3.**   Section DEFINITIONS is deleted and replaced with the following:

**DEFINITIONS**

**A.**   **Authority** means any agency of:

   **1.**   A federal, state or local government of the United States of America, its territories or possessions or Puerto Rico;

   **2.**   A federal, provincial or local government of Canada;

   **3.**   The government of the European Union (EU) or any member nation; or

   **4.**   The PCI Security Standards Council;

   any of which is charged with the administration or enforcement of laws or regulations relating to the use, transfer or storage of electronic communications or data storage systems.

**B.**   **Bodily Injury** means bodily injury, sickness or disease sustained by a person, including death resulting from any of these; provided, however, Bodily Injury does not include humiliation or the infliction of emotional distress arising solely from an Unauthorized Access or Potential Unauthorized Access.

**C.**   **Breach Mitigation Expense** means expenses incurred by the Insured with the prior written consent of the Company for:

   **1.**   The services of a public relations professional, or other publicity expenses that are recommended by a public relations professional to respond to any actual adverse publicity in the media, that is the result of an Unauthorized Access or Potential Unauthorized Access;

   **2.**   Expenses, including but not limited to patient notification and related legal fees, that are incurred to comply with a Security Breach Notice Law and that are the result of an Unauthorized Access or Potential Unauthorized Access; and

   **3.**   Expenses associated with voluntarily providing credit monitoring services to patients and individuals effected by an Unauthorized Access or Potential Unauthorized Access.

**D.**   **Claim** means the Insured's receipt of:

   **1.**   A written demand for damages;

   **2.**   The service of suit or institution of arbitration proceedings against the Insured; or

   **3.**   A written notice of the institution of a charge against the Insured by any Authority or of any administrative proceeding initiated by an Authority including any investigation, conciliation meeting or hearing;

   all as a result of an Unauthorized Access or Potential Unauthorized Access.

**E.**   **Claim Expenses** means reasonable and necessary amounts incurred by the Company, or by the Insured with the prior written consent of the Company, in the defense of that portion of any Claim for which coverage is afforded under this Endorsement, including costs of investigation, court costs, costs of bonds to release attachments and similar bonds, but without any obligation of the Company to apply for or furnish any such bonds, and costs of appeals; provided, however, that Claim Expenses shall not include:

   **1.**   Salary, wages, overhead, or benefit expenses of or associated with Employees or officials of the Named Insured or employees or officials of the Company; or

   **2.**   Salary, wages, administration, overhead, benefit expenses, or charges of any kind attributable to any in-house counsel or captive out-of-house counsel for the Named Insured or the Company.

**F.**   **Damages** means the monetary portion of any judgment, award or settlement, including punitive damages where insurable; provided, however, Damages shall not include:

   **1.**   Multiplied portions of damages in excess of actual damages, including trebling of damages;

**2.** The cost of any modifications or changes to the Insured's security measures, procedures, software or hardware required or agreed to by the Insured to satisfy a judgment, award or settlement;

**3.** Any cost required to repair, build or modify property to comply with any award by a court, administrative order, arbitration award or any similar judgment;

**4.** Taxes, criminal or civil fines, or attorneys' fees of a party other than an Insured, other penalties imposed by law or Regulatory Fines;

**5.** Sanctions;

**6.** Matters which are uninsurable under the law pursuant to which this Endorsement shall be construed; or

**7.** The return, withdrawal, reduction, restitution or payment of any fees, profits or charges for services or consideration and/or any expenses paid to the Insured.

**G.** **Electronic Communications System** means any wired, wireless, radio, electromagnetic, photo-optical or photo-electronic facility for the transmission of electronic communications; any electronic data processing system, network or related electronic equipment for the storage of such communications; and any computer.

**H.** **Employee** means any natural person while in the regular service of the Named Insured in the ordinary course of the Named Insured's business and whom the Named Insured compensates by salary, wages or commissions and has the right to govern and direct the performance of such service. Employee includes a Leased Worker but does not include any Temporary Worker or independent contractor.

**I.** **Leased Worker** means any natural person leased to the Named Insured by a labor leasing organization, under an agreement between the Named Insured and the labor leasing organization, to perform duties related to the conduct of the Named Insured's business and which are at the Insured's direction. Leased Worker does not include a Temporary Worker.

**J.** **Forensic Expense** means reasonable and necessary costs incurred by the Named Insured to engage the services of a third party computer security expert to determine the existence and cause of any Unauthorized Access.

**K.** **Interrelated Unauthorized Accesses** means Unauthorized Access(es) and/or Potential Unauthorized Access(es) which are logically or causally connected by reason of any common fact, incident, circumstance, situation, or any computer security incident, intrusion, breach, compromise, theft, loss or use of the Named Insured's Electronic Communications System.

**L.** **Loss** means:

**1.** Reasonable and necessary costs incurred by the Named Insured to restore with due diligence and dispatch the Named Insured's Electronic Communications System to the condition that existed prior to an Unauthorized Access, including reconstruction of programs, electronic data and media which form a part of the Named Insured's Electronic Communications System; and

**2.** Forensic Expense;

provided, however, Loss shall not include: (a) any cost or charges associated with building, modifying or upgrading the Named Insured's Electronic Communications System, or any software, security measures or procedures; (b) any cost required to repair, build or modify tangible property to comply with any award or order by a court, an Authority, arbitration or any similar proceeding; (c) any loss of reputation of the Named Insured or loss of customer confidence in the Named Insured or the value imputed to such loss; (d) expenses incurred by the Insured in establishing the amount of any Loss covered under this Endorsement; or (e) loss of business income.

**M.** **Policy Period** means the period stated from the inception date of this policy to the policy expiration date stated in in Item 3. of the Declarations, or the effective date of any earlier cancellation or termination.

**N.** **Potential Unauthorized Access** means the threat or potential threat of an Unauthorized Access arising from a theft or loss of any component of the Named Insured's Electronic Communications System.

**O.** **Pollutants** mean any solid, liquid, gaseous, fuel, lubricant, thermal, acoustic, electrical, or magnetic irritant or contaminant, including but not limited to smoke, vapor, soot, fumes, fibers, radiation, acid, alkalis, petroleums, chemicals or waste. Waste includes medical waste and all other materials to be disposed of, recycled, stored, reconditioned or reclaimed.

**P.** **Private Data** means data containing an individual's:

    **1.** Drivers license or other state-issued identification number; social security number; unpublished telephone number; savings account, checking account, credit card or debit card number each when in combination with the security code, access code, password or pin for such account or card number;

    **2.** "Nonpublic personal information" as defined in the Gramm-Leach Bliley Act of 1999, as amended, and regulations issued pursuant thereto;

    **3.** "Protected healthcare information" as defined in the Health Insurance Portability and Accountability Act of 1996 (HIPAA), as amended, and regulations issued pursuant thereto, and medical and healthcare information;

    **4.** Private personal information as defined under a Security Breach Notice Law; and

    **5.** Private personal information as defined under the law of a country other than the United States, which law is intended to provide for the protection of such private personal information;

not including any lawfully available data accessible by the general public.

**Q.** **Property Damage** means physical injury to tangible property, including all resulting loss of use of that property or loss of use of tangible property that is not physically injured; provided, however, damage to, corruption of or inability to access data, software and computer networks shall not be considered to be loss of use of tangible property.

**R.** **Regulatory Fines** means civil fines and penalties assessed against the Insured by an Authority as a result of a Claim subject to coverage under DataBreach$^{SM}$ COVERAGE A. - Data Breach and Privacy Liability Coverage Part of this Endorsement.

**S.** **Security Breach Notice Law** means any law, statute or regulation within the United States of America, its territories or possessions, Puerto Rico or Canada requiring the Named Insured to notify individuals of the compromise or possible compromise of the security of their confidential information in the Named Insured's care, custody or control and the European Union (EU) Data Protection Act of 1995.

**T.** **Temporary Worker** means any natural person who is furnished to the Named Insured to substitute for a permanent Employee on leave or to meet seasonal or short-term work load requirements.

**U.** **Unauthorized Access** means a breach of the Named Insured's security measures, systems, procedures, or stated privacy policy, or any intentional violation, interception, or use or misuse of the Named Insured's Electronic Communications System, whether or not for profit or gain, by any person, without the permission, knowledge or ratification of the Insured. Unauthorized Access also includes:

    **1.** Access to the Named Insured's Electronic Communications System that is with the Insured's permission where such permission is the result of fraud or deception;

    **2.** Use of the Named Insured's Electronic Communications System by a party authorized by the Insured to use such system, who does so for an unauthorized purpose;

    **3.** The introduction of programs into the Named Insured's Electronic Communications System which contain fraudulent or destructive instructions or code including any inadvertent transmission of such programs to a third party;

    **4.** A credible threat or an extortion demand received by the Named Insured threatening or portending loss, injury or damage to:

        **a.** The Named Insured's Electronic Communications System, including programs, electronic data and media which form a part of the Named Insured's Electronic Communications System; or

        **b.** Money, securities, bonds or similar financial instruments, solely to the extent that record of such is maintained in digital or electronic format on the Named Insured's Electronic Communications System;

    for the purpose of extorting money or other valuable consideration from the Named Insured; and

    **5.** Failure to prevent a denial of service attack on the Named Insured's Electronic Communications System or to prevent the use of the Named Insured's Electronic Communications System by an unauthorized user or code to launch a denial of service attack on a third party;

**6.** Solely with regard to:

    **a.** DataBreach<sup>SM</sup> COVERAGE A. - Data Breach and Privacy Liability Coverage Part; and

    **b.** DataBreach<sup>SM</sup> COVERAGE C. - Breach Mitigation Expense Coverage Part;

    the theft or loss of any paper records; and

**7.** Solely with regard to DataBreach<sup>SM</sup> COVERAGE C. - Breach Mitigation Expense Coverage Part:

The failure of any third party to prevent the unauthorized viewing, copying or distribution of Private Data which the Named Insured has entrusted to such party under a written contract or agreement that specifically requires such party to protect the confidentiality of the Private Data so entrusted.

**V.** **Unintentional Data Compromise** means any computer security incident, intrusion, breach, compromise, theft, loss or misuse of the Private Data of the Named Insured's patient(s) and/or of any past or current principal, partner, officer, director, trustee, shareholder, Employee, manager or member of the Named Insured.

**W.** **Volunteer Worker** means any natural person who is not an Employee of the Named Insured and who donates his/her work at the direction of and within the scope of duties determined by the Named Insured and is not paid a fee, salary or other compensation by the Named Insured or by anyone else for such work performed for the Named Insured.

**4.** Section THE EXCLUSIONS is deleted and replaced with the following:

**THE EXCLUSIONS**

**A.** With respect to all Coverage Parts provided by this Endorsement, this Endorsement does not apply to any Claim, Loss or Breach Mitigation Expense:

**1.** Caused by access to the Named Insured's Electronic Communications System by any government, governmental agency or subagency, or any agents thereof while acting on behalf of such entity;

**2.** Due to riot, civil commotion, war, insurrection or usurped power;

**3.** Based upon or arising out of Bodily Injury or Property Damage;

**4.** Based upon or arising out of liability of others assumed by the Insured under any contract or agreement; provided, however, this exclusion shall not apply to liability an Insured would have in the absence of such contract or agreement;

**5.** Based upon, arising out of, or in any way involving any actual or alleged violation of any law, whether statutory, regulatory or common law, respecting any of the following activities: antitrust, business competition, unfair trade practices or tortious interference in another's business or contractual relationships;

**6.** Based upon, arising out of, or in any way involving conduct of the Insured or at the Insured's direction that is intentional, willful, dishonest, fraudulent or that constitutes a willful violation of any statute or regulation; provided, however, this exclusion shall not apply to: (a) the strictly vicarious liability of any Insured for the intentional, willful, dishonest or fraudulent conduct of another Insured or for the conduct of another Insured that constitutes a willful violation of any statute or regulation; or (b) Claim Expenses incurred until an allegation is adjudicated through a finding by a trier-of-fact to be intentional, willful, dishonest or fraudulent or a willful violation of any statute or regulation;

**7.** Based upon, arising out of, or in any way involving any:

    **a.** Actual, alleged or threatened discharge, disposal, migration, dispersal, release or escape of Pollutants; or

    **b.** Direction, order or request to test for, monitor, remediate, clean up, remove, contain, treat, detoxify or neutralize Pollutants, or to pay for or contribute to the costs of undertaking such actions;

**8.** Brought by or on behalf of any Employee, former Employee or prospective Employee based upon, arising out of, or in any way involving the employment relationship or the nature, terms or conditions of employment or any workplace tort;

9.   Brought by, in the name of, or on behalf of any past or current principal, partner, officer, director, trustee, shareholder, Employee, Volunteer Worker, manager or member of the Named Insured; provided, however, this exclusion shall not apply to any Claim arising out of Unauthorized Access or Potential Unauthorized Access to the personal information of any past or current principal, partner, officer, director, trustee, shareholder, Employee, Volunteer Worker, manger or member of the Named Insured which is in the care, custody or control of the Named Insured;

10.   Based upon, arising out of, or in any way involving the insolvency, receivership, bankruptcy, liquidation of the Named Insured or of any subsidiary thereof whether or not included in the definition of Insured;

11.   Based upon or arising out of any warranties or guarantees, express, implied or otherwise, or any cost estimates;

12.   Based upon or arising out of any conversion, misappropriation, commingling of or defalcation of funds or property;

13.   Based upon or arising out of any inability or failure of any party to pay or collect monies;

14.   Based upon or arising out of infringement or inducement of infringement of patent or trade secret; or

15.   Based upon, arising out of, or in any way involving an act, error or omission in the performance of professional services rendered or that should have been rendered by the Insured or by any person or organization for whose acts, errors or omissions the Insured is legally responsible.

**B.**   With respect to DataBreach$^{SM}$ COVERAGE A. - Data Breach and Privacy Liability Coverage Part this Endorsement does not apply to any Claim:

1.   Made by any person or organization which is operated, managed or owned, in whole or in part, by the Named Insured or any parent organization, subsidiary, division or affiliated organization thereof.

**C.**   With respect to DataBreach$^{SM}$ COVERAGE B. - Data Breach Loss to Insured Coverage Part, this Endorsement does not apply to any Loss:

1.   Caused by theft, physical damage or destruction of the Named Insured's Electronic Communications System or any part thereof; provided, however, this exclusion shall not apply to destruction of programs, electronic data and media caused by an Unauthorized Access;

2.   Based upon or arising out of theft, or alleged theft, of money, securities, bonds, or similar financial instruments with monetary value caused or contributed to by any fraudulent, dishonest or criminal act committed by any person who is a past or current principal, partner, officer, director, trustee, shareholder, Employee, Volunteer Worker, manager or member of the Named Insured at the time of the Unauthorized Access, whether acting alone or in collusion with others; or

3.   Of the value of trade secrets, confidential processing methods or other confidential or proprietary information.

**5.**   Section TERRITORY is deleted and replaced with the following:

**TERRITORY**

The insurance afforded by this Endorsement applies worldwide, provided the Claim is made or the Loss is incurred in the United States of America, its territories or possessions or Puerto Rico.

**6.**   Section LIMITS OF LIABILITY is deleted and replaced with the following:

**LIMITS OF LIABILITY**

**A.   Limit of Liability - DataBreach$^{SM}$ COVERAGE A. - Data Breach and Privacy Liability Coverage Part - Each Claim:** The liability of the Company under DataBreach$^{SM}$ COVERAGE A. - Data Breach and Privacy Liability Coverage Part for the combined total of Damages, Regulatory Fines and Claim Expenses for each Claim first made against the Insured during the Policy Period or Extended Reporting Period, if exercised, and reported to the Company pursuant to Section CLAIMS, LOSS AND EXPENSES A., Claim Reporting Provision, shall not exceed the $50,000.

**B.   Limit of Liability - DataBreach$^{SM}$ COVERAGE B. - Data Breach Loss to Insured Coverage Part - Each Unauthorized Access:**   The liability of the Company under DataBreach$^{SM}$ COVERAGE B. - Data Breach Loss to Insured Coverage Part for all Loss resulting directly from each Unauthorized Access which occurs

during the Policy Period and is reported to the Company pursuant to Section CLAIMS, LOSS AND EXPENSES B., Loss Reporting Provision, shall not exceed $5,000.

**C.**   **Limit of Liability – DataBreach<sup>SM</sup> COVERAGE C. - Breach Mitigation Expense Coverage Part - Each Unintentional Data Compromise:** The liability of the Company under DataBreach<sup>SM</sup> COVERAGE C. - Breach Mitigation Expense Coverage Part for Breach Mitigation Expense for any Unintentional Data Compromise which occurs during the Policy Period and is reported to the Company pursuant to Section CLAIMS, LOSS AND EXPENSES C., shall not exceed $50,000.

**D.**   **Limit of Liability - Aggregate:** Subject to the above Limits of Liability A., B. and C., the combined total liability of the Company for all coverage afforded by all Coverage Parts of this Endorsement shall not exceed $50,000.

**E.**   **Multiple Insureds, Claims, Losses and Claimants:** The inclusion herein of more than one Insured in any Claim or the making of Claims by, or reporting of Loss incurred by, more than one person or organization shall not operate to increase the Limits of Liability stated in this Endorsement.

   **1.**   With regard to DataBreach<sup>SM</sup> COVERAGE A. - Data Breach and Privacy Liability Coverage Part, more than one Claim arising out of a single Unauthorized Access or Interrelated Unauthorized Accesses shall be treated as a single Claim. Such single Claim shall be deemed first made on the date on which the earliest Claim arising out of such Unauthorized Access or Interrelated Unauthorized Accesses is made or with regard to notice given to and accepted by the Company pursuant to Section CLAIMS, LOSS AND EXPENSES D., Discovery Clause, on the date within the Policy Period on which such notice of potential Claim is first received by the Company.

   **2.**   With regard to DataBreach<sup>SM</sup> COVERAGE B. - Data Breach Loss to Insured Coverage Part, more than one Loss arising out of a single Unauthorized Access shall be considered a single Unauthorized Access.

   **3.**   With regard to DataBreach<sup>SM</sup> COVERAGE C. - Breach Mitigation Expense Coverage Part, all Breach Mitigation Expenses arising out of a single Unintentional Data Compromise or a series of related Unintentional Data Compromises, shall be treated as a single Unintentional Data Compromise.

**7.**   Section DEFENSE AND CLAIM EXPENSES is deleted and replaced with the following:

**DEFENSE AND CLAIM EXPENSES**

**A.**   **Defense and Investigation of Claims:** With regard to DataBreach<sup>SM</sup> COVERAGE A. - Data Breach and Privacy Liability Coverage Part, the Company shall have the right and duty to defend the Insured and to investigate any Claim to which coverage afforded by this Endorsement under DataBreach<sup>SM</sup> COVERAGE A. - Data Breach and Privacy Liability Coverage Part applies pursuant to the following provisions:

   **1.**   Claim Expenses incurred in defending and investigating such Claim shall be a part of and shall not be in addition to the applicable Limits of Liability stated in this Endorsement. Such Claim Expenses shall reduce the applicable Limits of Liability. The Company shall have no obligation to pay any Damages or to defend or continue to defend any Claim or to pay Claim Expenses after the applicable Limits of Liability have been exhausted by payment(s) of Damages and/or Claim Expenses.

   **2.**   The Company shall select defense counsel; provided, however, that if the law of the state of the Named Insured's domicile, stated in the Declarations, allows the Insured to control the selection of defense counsel where a conflict of interest has arisen between the Insured and the Company, the Company will provide a list of attorneys or law firms from which the Insured may designate defense counsel who shall act solely in the interest of the Insured, and the Insured shall direct such defense counsel to cooperate with the Company. Such cooperation shall include:

      **a.**   Providing on a regular basis, but not less frequently than every three (3) months, written reports on claimed Damages, potential liability, progress of any litigation, any settlement demands, or any investigation developments that materially affect the Claim;

      **b.**   Providing any other reasonable information requested;

      **c.**   Providing fully itemized billing on a periodic basis; and

      **d.**   Cooperating with the Company and the Insured in resolving any discrepancies;

and the fees and costs incurred by such defense counsel, including those fees and costs generated by cooperation with the Company, as set forth above, shall be included in Claim Expenses. Such Claim Expenses shall be a part of and shall not be in addition to the applicable Limits of Liability stated in this Endorsement. Such Claim Expenses shall reduce the applicable Limits of Liability.

3.    The determination of the Company as to the reasonableness of the Claim Expenses shall be conclusive on the Named Insured.

**B.**    **Claim Settlement:**  The Company may, at its sole discretion, investigate, negotiate and settle any Claim. The Named Insured will abide by the terms of such settlement.

**C.**    **Loss or Breach Mitigation Expense Payment:**  The Company may, at its sole discretion, investigate any Loss, any Breach Mitigation Expense, any Unintentional Data Compromise and any Unauthorized Access or Potential Unauthorized Access. The Company will indemnify the Named Insured within sixty (60) days after it receives the sworn proof of Loss under DataBreach$^{SM}$ COVERAGE B. - Data Breach Loss to Insured Coverage Part or satisfactory written proof of payment of Breach Mitigation Expenses under DataBreach$^{SM}$ COVERAGE C. - Breach Mitigation Expense Coverage Part, provided:

1.    The Insured has complied with all the terms of this Endorsement; and

2.    The Company and the Named Insured have agreed with the items included within and the amounts documented in the Named Insured's sworn proof of Loss and satisfactory written proof of payment of Breach Mitigation Expenses.

**8.**    Section CLAIMS is deleted and replaced with the following:

**CLAIMS, LOSS AND EXPENSES**

**A.**    **Claim Reporting Provision:**  It is a condition precedent to coverage afforded by this Endorsement under DataBreach$^{SM}$ COVERAGE A. - Data Breach and Privacy Liability Coverage Part that the Insured shall give to the Company written notice as stated in the Notices item of the Declarations as soon as practicable of any Claim first made against the Insured during the Policy Period or the Extended Reporting Period, if exercised, and in no event later than sixty (60) days after the end of the Policy Period or the Extended Reporting Period, if exercised.

In the event a suit is brought against the Insured or a charge against the Insured is instituted by any Authority or any administrative action is initiated by an Authority, the Insured shall immediately forward to Markel Service, Incorporated, Ten Parkway North, Deerfield, Illinois, 60015, on behalf of the Company, every demand, notice, summons or other process received by him/her or by his/her representatives.

**B.**    **Loss Reporting Provision:**  It is a condition precedent to coverage afforded by this Endorsement under DataBreach$^{SM}$ COVERAGE B. - Data Breach Loss to Insured Coverage Part that the Named Insured shall give to the Company written notice as stated in the Notices item of the Declarations as soon as practicable and in no event later than sixty (60) days after the end of the Policy Period of any Loss which results directly from an Unauthorized Access which occurs during the Policy Period.

In the event of any Loss, the Insured must:

1.    Notify law enforcement in the event of a theft;

2.    Give the Company prompt notice of the Unauthorized Access;

3.    As soon as practicable, provide a description of how, when and what elements of the Named Insured's Electronic Communications System were impacted by the Unauthorized Access;

4.    Take all reasonable steps to protect the Named Insured's Electronic Communications System from further Unauthorized Access and to reduce Loss;

5.    As often as may be reasonably required, permit the Company to inspect the Named Insured's Electronic Communications System and examine the Insured's books and records related to the Loss incurred; and

6.    Provide, within sixty (60) days of the Company's request, a sworn proof of Loss, signed by the Named Insured, containing the information the Company requests to investigate the Loss.

**C.**    **Breach Mitigation Expense Reporting Provision:** It is a condition precedent to coverage afforded by this Endorsement under DataBreach<sup>SM</sup> COVERAGE C. - Breach Mitigation Expense Coverage Part that the Named Insured shall give to the Company written notice as stated in the Notices item of the Declarations as soon as practicable and in no event later than sixty (60) days after the end of the Policy Period of any Unintentional Data Compromise, Unauthorized Access or Potential Unauthorized Access which occurs during the Policy Period.

The Named Insured must:

**1.**    Submit to the Company satisfactory written proof of payment of such Breach Mitigation Expenses within one (1) year after the expiration or cancellation of this policy;

**2.**    As soon as practicable, provide a description of how, when and what elements, if any, of the Named Insured's or a third party's Electronic Communications System were impacted by the Unintentional Data Compromise, Unauthorized Access or Potential Unauthorized Access;

**3.**    Take all reasonable steps to protect the Named Insured's Electronic Communications System from further Unauthorized Access, if applicable;

**4.**    As often as may be reasonably required, permit the Company to inspect the Named Insured's Electronic Communications System and examine the Insured's books and records related to the Breach Mitigation Expense incurred.

**D.**    **Discovery Clause:** Under DataBreach<sup>SM</sup> COVERAGE A. - Data Breach and Privacy Liability Coverage Part, if during the Policy Period, the Insured first becomes aware of a specific Unauthorized Access or specific Potential Unauthorized Access which is reasonably expected to result in a Claim within the scope of coverage of this DataBreach<sup>SM</sup> COVERAGE A. - Data Breach and Privacy Liability Coverage Part, then the Insured may provide written notice as stated in the Notices item of the Declarations to the Company containing the information listed below. If such written notice is received by the Company during the Policy Period, then any Claim subsequently made against the Insured arising out of such Unauthorized Access or Potential Unauthorized Access shall be deemed for the purpose of this insurance to have been first made on the date on which such written notice is first received by the Company.

It is a condition precedent to the coverage afforded by this Discovery Clause that written notice be given to the Company containing the following information:

**1.**    The description of the specific Unauthorized Access or Potential Unauthorized Access;

**2.**    The date on which such Unauthorized Access or Potential Unauthorized Access took place;

**3.**    The injury or damage which has or may result from such Unauthorized Access or Potential Unauthorized Access;

**4.**    The identity of any injured persons and/or organization subject to such injury or damage; and

**5.**    The circumstances by which the Insured first became aware of such Unauthorized Access or Potential Unauthorized Access.

Subject to the paragraph hereinabove, if during the Policy Period the Insured provides such written notice of a specific Unauthorized Access or Potential Unauthorized Access which is reasonably expected to result in a Claim within the scope of coverage of this DataBreach<sup>SM</sup> COVERAGE A. - Data Breach and Privacy Liability Coverage Part, the Company at its sole option, may investigate such specific Unauthorized Access or Potential Unauthorized Access. Such matter shall be subject to all terms, conditions and provisions in this Endorsement as applicable to a Claim.

**E.**    **Assistance and Cooperation of the Insured:** The Insured shall cooperate with the Company and upon the Company's request, the Insured shall:

**1.**    Submit to examination and interview by a representative of the Company and while not in the presence of any other Insured, under oath if required;

**2.**    Attend hearings, depositions and trials;

**3.** Assist in effecting settlement, securing and giving evidence and obtaining the attendance of witnesses in the conduct of suits; and

**4.** Give a written statement or statements to the Company's representatives and meet with such representatives for the purpose of determining coverage and/or investigating any Claim or Loss and/or defending any Claim;

All without cost to the Company. The Insured shall further cooperate with the Company and do whatever is necessary to secure and effect any right of indemnity, contribution or apportionment which the Insured may have.

The Insured shall not, with respect to any Claim covered under this Endorsement, except at his/her own cost, make any payment, admit any liability, settle any Claims, assume any obligation, agree to arbitration or any similar means of resolution of any dispute, waive any rights or incur Claim Expenses without the Company's prior written consent, such consent not to be unreasonably withheld. Any costs and expenses incurred by the Insured prior to the Insured giving written notice of the Claim to the Company shall be borne by the Insured.

**F.   False or Fraudulent Claims:**  If any Insured shall commit fraud in proffering any Claim or Loss, this insurance shall become void as to such Insured from the date such fraudulent Claim or Loss is proffered.

**9.**    Section EXTENDED REPORTING PERIOD is deleted and replaced with the following:

**EXTENDED REPORTING PERIOD**

**A.**    With regard to DataBreach$^{SM}$ COVERAGE A. - Data Breach and Privacy Liability Coverage Part, the Named Insured's right to exercise the Extended Reporting Period under this Endorsement shall exist solely if the Named Insured also exercises its right to purchase the Extended Reporting Period under all Insuring Agreements in the policy for which an Extended Reporting Period is available.

**B.**  If the Named Insured nonrenews this policy or cancels this policy pursuant to Common Policy Conditions A., Cancellation, or if the Company nonrenews this policy or cancels this policy pursuant to Common Policy Conditions A., Cancellation, for reasons other than nonpayment of premium, Deductible and/or Co-Insurance Obligation or non-compliance with the terms and conditions of this policy, then the Named Insured shall have the right upon payment of an additional premium calculated at the percentage stated in the Declarations of the adjusted annual premium for the Policy Period, subject to adjustment as per Common Policy Conditions J., Premium and Audit, but in no event less than the percentage stated in the Declarations of the annual minimum premium for the policy, to extend the coverage granted under DataBreach$^{SM}$ COVERAGE A. - Data Breach and Privacy Liability Coverage Part for the period of months stated in the Declarations, as elected by the Named Insured, to apply to Claims first made against the Insured during the period of months as elected, and reported to the Company pursuant to Section CLAIMS, LOSS AND EXPENSES A., Claim Reporting Provision of this Endorsement, following immediately upon the effective date of such cancellation or nonrenewal, by reason of any Unauthorized Access or Potential Unauthorized Access the entirety of which happened during the Policy Period or on or after the Retroactive Date stated in Section INSURING AGREEMENT, DataBreach$^{SM}$ COVERAGE A. - Data Breach and Privacy Liability Coverage Part, Item 1., and prior to the effective date of such cancellation or nonrenewal and which is otherwise covered by this Endorsement. This extended period of coverage as elected by the Named Insured and described in this paragraph shall be referred to in this policy as the Extended Reporting Period.

If, however, this policy is immediately succeeded by similar claims made insurance coverage on which the applicable Retroactive Date is the same as or earlier than that stated above, the succeeding insurance shall be deemed to be a renewal hereof and, in consequence, the Named Insured shall have no right to purchase an Extended Reporting Period.

The quotation of a different premium and/or Deductible and/or Co-Insurance Obligation and/or Limit of Liability for renewal does not constitute a cancellation or refusal to renew for the purpose of this provision.

**C.**    As a condition precedent to the right to purchase the Extended Reporting Period, the Named Insured must have paid:

**1.**  All Deductibles when due;

**2.**  All Co-Insurance Obligations when due;

    **3.**  All premiums due for the Policy Period; and

    4.  All premium, deductibles and co-insurance obligations due on any other policy(ies) issued by the Company or any of its affiliated companies in an uninterrupted series of policies of which this policy is a renewal or replacement.

    The right to purchase the Extended Reporting Period shall terminate unless a written notice as stated in the Notices item of the Declarations of such election for the Extended Reporting Period is received by the Company within thirty (30) days after the effective date of cancellation or nonrenewal together with payment of the additional deposit premium for the Extended Reporting Period. If such written notice of request and payment of additional premium for the Extended Reporting Period are not so received by the Company, there shall be no right to purchase the Extended Reporting Period at a later date.

**D.**    The Named Insured shall pay any additional premium that may be due as a result of audit, promptly when due.

**E.**    In the event of the purchase of the Extended Reporting Period the entire premium therefor shall be fully earned at its commencement.

**F.**    The Extended Reporting Period shall not in any way increase the Limits of Liability stated in this policy or in this Endorsement.

**10.**    Section OTHER CONDITIONS is amended by the addition of the following:

    **Mitigation:** It is a condition precedent to coverage that the Insured shall not willfully fail to comply with any Security Breach Notice Law that the Named Insured may be subject to, by reason of an Unauthorized Access or Potential Unauthorized Access.

**11.**    The following Conditions and provisions of the policy shall also apply to the coverage afforded by this Endorsement.

    Cancellation,
    Representations,
    Entire Agreement,
    Other Insurance,
    Changes,
    Assignment of Interest,
    Subrogation,
    Assistance and Cooperation of the Insured,
    False and Fraudulent Claims,
    Premium and Audit,
    Inspection
    Action Against the Company,
    Authorization, and
    Service of Suit.

All other terms and conditions remain unchanged.



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CLAIM EXPENSES IN ADDITION TO THE EACH OCCURRENCE/EACH PERSON OR ORGANIZATION LIMIT OF LIABILITY

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY INSURANCE COVERAGE PART – CLAIMS MADE

In consideration of the premium paid, it is hereby understood and agreed that the policy is amended as follows:

1. Section LIMITS OF LIABILITY A., B. and C. are deleted and replaced with the following:

   A. **Coverage A. - Limit of Liability-Each Occurrence:** The total liability of the Company for Damages for all Claims first made against the Insured during the Policy Period or Extended Reporting Period, if exercised, under Coverage A. because of all Bodily Injury or Property Damage sustained by one or more persons or organizations as the result of any one Occurrence shall not exceed the Limit of Liability stated in the Declarations as applicable to Each Occurrence.

   B. **Coverage A. - Limit of Liability-Fire Damage:** The total liability of the Company for Damages for all Claims, including those subject to the above provision regarding the Coverage A. - Limit of Liability – Each Occurrence, because of Property Damage to premises, while rented to the Named Insured or temporarily occupied by the Named Insured with the permission of the owner of the premises arising out of any one fire, shall not exceed the Limit of Liability stated in the Declarations as applicable to Fire Damage – Any One Fire.

   C. **Coverage B. - Limit of Liability-Each Person or Organization:** The total liability of the Company for Damages for all Claims under Coverage B. because of all Personal and Advertising Injury sustained by any one person or organization shall not exceed the Limit of Liability stated in the Declarations as applicable to Each Person or Organization.

2. Section DEFENSE, SETTLEMENTS AND CLAIM EXPENSES A. is deleted and replaced with the following:

   A. **Defense, Investigation and Settlement of Claims:** The Company shall have the right and duty to defend and investigate any Claim to which coverage under this policy applies pursuant to the following provisions:

      1. Claim Expenses incurred in defending and investigating such Claim shall be in addition to the applicable Limits of Liability stated in the Declarations; however, such Claim Expenses incurred in defending and investigating such Claim shall be part of and shall not be in addition to the General Liability Coverage Part Aggregate Limit of Liability stated in the Declarations. Such Claim Expenses shall reduce the General Liability Coverage Part Aggregate Limit of Liability and shall be applied against the Deductible. The Company shall have no obligation to pay any Damages or to defend or continue to defend any Claim or to pay Claim Expenses after the applicable Limits of Liability stated in the Declarations have been exhausted by payment(s) of Damages and/or Claim Expenses.

      2. The Company shall select defense counsel; provided, however, that if the law of the state of the Insured's domicile, stated in the Declarations, allows the Insured to control the selection of defense counsel where a conflict of interest has arisen between the Insured and the Company, the Company will provide a list of attorneys or law firms from which the Insured may designate defense counsel who shall act solely in the interest of the Insured, and the Insured shall direct such defense counsel to cooperate with the Company. Such cooperation shall include:

**a.** Providing on a regular basis, but not less frequently than every three (3) months, written reports on claimed Damages**,** potential liability, progress of any litigation, any settlement demands, or any investigation developments that materially affect the Claim;

**b.** Providing any other reasonable information requested;

**c.** Providing fully itemized billing on a periodic basis; and

**d.** Cooperating with the Company and the Insured in resolving any discrepancies;

And the fees and costs incurred by such defense counsel, including those fees and costs generated by cooperation with the Company, as stated above, shall be included in Claim Expenses. Such Claim Expenses shall be in addition to the applicable Limits of Liability stated in the Declarations; however, such Claim Expenses incurred in defending and investigating such Claim shall be part of and shall not be in addition to the General Liability Coverage Part Aggregate Limit of Liability stated in the Declarations. . Such Claim Expenses shall reduce the General Liability Coverage Part Aggregate Limit of Liability stated in the Declarations and shall be applied against the Deductible.

All other terms and conditions remain unchanged.



POLICY NUMBER: SM925939

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**

## RISK MANAGEMENT SERVICES
## EXPENSE REIMBURSEMENT COVERAGE

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART

In consideration of the premium paid, it is hereby understood and agreed that the policy is amended as follows:

1. The policy is amended by the addition of the following:

   **Risk Management Services Expense Reimbursement Limit:  $7,500**

2. Section SUPPLEMENTARY PAYMENTS, Risk Management Services Expense Reimbursement, is added as follows:

   **SUPPLEMENTARY PAYMENTS**

   **Risk Management Services Expense Reimbursement:  In the event that:**

   a. During the Policy Period, the Named Insured incurs Risk Management Services Expense with the prior written approval of the Company; and

   b. During the Policy Period or within six (6) months following the expiration or earlier cancellation or termination of this policy, the Named Insured submits a request for reimbursement of such Risk Management Services Expense by providing an itemized accounting of such Risk Management Services Expense, which is submitted in writing to the Company by completion of the Company's Risk Management Service Expense Reimbursement Form which must be submitted to the Company addressed to Medical Professional Team, Markel Service Incorporated, 10 Parkway North, Deerfield, IL 60015 (Fax: (847) 572-6377);

   The Company will reimburse the Named Insured for such Risk Management Services Expense up to the Risk Management Services Expense Reimbursement Limit set forth in Item 1. of this endorsement.

   Reimbursement to the Named Insured pursuant to this provision shall be in addition to the Limits of Liability stated in the Declarations and shall not be subject to the Deductible.

3. Section DEFINITIONS is amended by the addition of the following:

   **Risk Management Services Expense** means expense incurred with the prior written approval of the Company for risk management seminars, publications, risk management training, onsite risk consulting and training, risk management audit services or other risk management related services provided by a Risk Management Services Firm and related to the risks of professional and/or general liability, data privacy and security. However, Risk Management Services Expense shall not include:

   1. Compensation, fees, benefits, overhead, charges or expense of any person or organization included in the definition of Insured;

   2. Any expenses that are payable on the Named Insured's behalf or reimbursable to the Named Insured under any other insurance, whether collectible or not;

   3. Any amounts related to any existing or anticipated claim or suit, including but not limited to legal fees, fees of a public adjuster or appraiser, court costs, and expert witness fees;

   4. Meal and beverages expenses, and travel expenses including but not limited to airfare, transportation, and lodging.

   **Risk Management Services Firm** means any service provider requested by the Named Insured and approved by the Company to provide risk management services. The Company's approval shall not be unreasonably withheld.

All other terms and conditions remain unchanged.

POLICY NUMBER: SM925939



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EMPLOYEE BENEFITS LIABILITY COVERAGE

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY INSURANCE COVERAGE PART - CLAIMS MADE
COVERAGE

In consideration of the premium paid, it is hereby understood and agreed that solely with respect to the coverage afforded by this endorsement, the policy is amended as follows:

**1.** Item 5. C. of the Declarations is amended by the addition of the following:

| Coverage Part | Coverage Part Limits of Liability | Coverage Part Deductible | Coverage Part Retroactive Date |
|---|---|---|---|
| **C.** | $1,000,000 Employee Benefits Liability Coverage Each Claim<br><br>$1,000,000 Employee Benefits Liability Coverage Aggregate | $1,000 Employee Benefits Liability Coverage Each Claim | July 1, 2013 Employee Benefits Liability Coverage |

**2.** Section THE INSURED is deleted and replaced as follows:

**(i)** The unqualified word "Insured," either in the singular or plural, means:

**(a)** The Named Insured and any principal, partner, officer, director or Employee of the Named Insured; provided that such Employee is authorized to act in the Administration of the Named Insured's Employee Benefits Program.

**3.** Section INSURING AGREEMENTS is amended by the addition of the following:

**(i)** **Employee Benefits Liability - Claims Made Coverage:** The Company shall pay on behalf of the Insured all sums in excess of the Deductible amount stated in Item 5.C. of the Declarations, which the Insured shall become legally obligated to pay as Damages as a result of a Claim first made against the Insured during the Policy Period or during the Extended Reporting Period, if exercised, and reported to the Company pursuant to Section CLAIMS A., Claim Reporting Provision, by Employees, or their legal representatives, which arise out of any act, error or omission in the Administration of the Named Insured's Employee Benefits Program;

Provided:

**(a)** The entirety of such act, error or omission happens during the Policy Period or on or after the applicable Retroactive Date stated in Item 5.C. of the Declarations and before the end of the Policy Period; and

**(b)** Prior to the effective date of this Coverage Part the Insured had no knowledge of such act, error or omission or any fact, circumstance, situation or incident which may have led a reasonable person in the Insured's position to conclude that a Claim was likely; and

(c) There is no prior policy or policies which provide insurance for such act, error or omission regardless of whether or not the available limits of liability of such prior policy or policies are sufficient to pay any liability or Claim or whether or not the deductible provisions and amount of such prior policy or policies are different from this policy.

4. Section DEFINITIONS is amended by the addition of the following:

(i) **Administration** means conduct of the Insured, or of any person for whose acts, errors or omissions the Insured is legally responsible, with respect to:

(a) Providing information to Employees, or their dependents and beneficiaries, regarding the Named Insured's Employee Benefits Program;

(b) Handling of records in connection with the Named Insured's Employee Benefits Program; or

(c) Effecting enrollment, termination or cancellation of Employees, or their dependents and beneficiaries, in the Named Insured's Employee Benefits Program;

However, Administration does not include handling payroll deductions.

(ii) **Employee Benefits Program** means any program providing some or all of the following benefits to Employees of the Named Insured:

(a) Group life, accident or health insurance; dental, vision and hearing plans; and flexible spending accounts; provided that only Employees may subscribe to such benefits and that such benefits are generally made available solely to those Employees who fulfill the plan's eligibility requirements;

(b) Profit sharing plans, employee stock subscription plans, employee stock ownership plans, employee savings plans and pension plans; provided that only Employees may subscribe to such benefits and that such benefits are generally made available solely to those Employees who fulfill the plan's eligibility requirements;

(c) Unemployment insurance, social security benefits, workers' compensation or disability benefits; and

(d) Vacation plans and leave of absence programs.

5. Section DEFINITIONS E., Claim, is deleted and replaced by the following:

**Claim** means a demand received by the Insured for compensation for Damages, including service of suit or institution of arbitration proceedings against the Insured.

6. Section DEFINITIONS I., Employee, is deleted and replaced by the following:

I. **Employee** means any: (i) natural person while in the regular service of the Named Insured in the ordinary course of the Named Insured's business and whom the Named Insured compensates by salary, wages or commissions and has the right to govern and direct the performance of such service; or (ii) former Employee of the Named Insured. Employee does not include any Leased Worker, Temporary Worker or independent contractor.

7. Section THE EXCLUSIONS is amended by the addition of the following:

(i) With respect to Employee Benefits Liability Coverage only, this policy does not apply:

(a) To any Claim based upon or arising out of any intentional, dishonest, fraudulent, criminal or malicious act, error or omission, including willful or reckless violation of any statute;

(b) To Bodily Injury, Property Damage or Personal Injury and Advertising Injury;

(c) To any Claim based upon or arising out of discrimination, wrongful termination or other employment related practices;

(d) To any Claim based upon or arising out of the Insured's failure to comply with workers' compensation, unemployment, social security or disability benefits laws or any similar laws;

(e) To any Claim based upon or arising out of the Insured's activities as a fiduciary under the Employee Retirement Income Security Act of 1974 and its amendments or any regulation or order issued pursuant thereto or any similar federal, state or local law;

(f) To any Claim based upon or arising out of the investment or non-investment of any Employee Benefits Program funds;

**(g)** To any Claim based upon or arising out of failure of any investment or security to perform;

**(h)** To any Claim for failure of performance of contract by any insurer;

**(i)** To any Claim based upon or arising out of insufficient funds to meet any obligations under any Employee Benefits Program;

**(j)** To any Claim based upon or arising out of the failure or inability of any entity to make any payments or provide any benefits due under any Employee Benefits Program;

**(k)** To any Claim for benefits under any Employee Benefits Program to the extent that such benefits, with reasonable effort and cooperation of the Insured, are available from the applicable benefit funds or other available and collectible insurance;

**(l)** To any Claim based upon or arising out of advice given or which should have been given to any Employees to participate or not to participate in any Employee Benefits Program;

**(m)** To criminal or civil fines, taxes, or penalties, including those imposed under the Internal Revenue Code or any similar state or local law;

**(n)** To any Claim based upon or arising out of the selection, design, planning, development, creation, formation, or structure of any Employee Benefits Program;

**(o)** To any Claim based upon or arising out of any change in availability, eligibility or cost of any Employee Benefits Program; or

**(p)** Any Claim based upon or arising out of any change in availability, eligibility or cost of any Employee Benefits Program.

**8.** Section LIMITS OF LIABILITY is amended by the addition of the following:

**(i) Employee Benefits Liability Coverage - Each Claim:** The total liability of the Company for the combined total of Damages and Claim Expenses for each Claim under Employee Benefits Liability Coverage insured herein shall not exceed the Limit of Liability stated in Item 5.C. of the Declarations as applicable to Each Claim.

**(ii) Employee Benefits Liability Coverage –Aggregate:** Subject to the above Limits of Liability (i) for Each Claim, the total liability of the Company under this endorsement for the combined total of all Damages and Claim Expenses arising out of all Claims first made against the Insured during the Policy Period and the Extended Reporting Period, if exercised shall not exceed the Aggregate Limit of Liability as stated in Item 5. C. of the Declarations as amended by this endorsement.

**(iii) Each Claim Deductible:** The deductible amount stated in Item 5.C. of the Declarations shall be paid by the Named Insured and shall be applicable to each Claim under Employee Benefits Liability Coverage and shall include the combined total of Damages and Claim Expenses, whether or not payment for Damages is made.

Such amounts shall, upon written demand by the Company, be paid by the Named Insured within ten (10) days. The total payments requested from the Named Insured in respect of each Claim shall not exceed the applicable Deductible amount stated in Item 5.C. of the Declarations. The determination of the Company as to the reasonableness of the Claim Expenses shall be conclusive on the Named Insured.

**(iv) Multiple Insureds, Claims and Claimants:** With respect to Employee Benefits Liability Coverage, the inclusion herein of more than one Insured in any Claim or the making of Claims by more than one person or organization shall not operate to increase the Limits of Liability stated in Item 5.C. of the Declarations. More than one Claim arising out of a single act, error or omission or a series of related acts, errors or omissions shall be considered a single Claim. All such Claims, whenever made, shall be treated as a single Claim. Such single Claim, whenever made, shall be deemed to be first made on the date on which the earliest Claim arising out of such act, error or omission is made.

**9.** Section EXTENDED REPORTING PERIOD C. is amended by the addition of the following:

**3.** Any act, error or omission in the Administration of the Named Insured's Employee Benefits Program; which happened on or after the applicable Retroactive Date stated in Item 5.C. of the Declarations and prior to the effective date of such cancellation or nonrenewal, and which is otherwise covered by this endorsement.

All other terms and conditions remain unchanged.



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CONSENT TO SETTLEMENT – FLORIDA

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE POLICY
SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART
SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY COVERAGE PART

In consideration of the premium paid, it is hereby understood and agreed that in accordance with Florida Statute, Title XXXVII, Chapter 627.4147, Section Limits of Liability C. is deleted and replaced with the following:

C.   **Consent to Settlement:**   In accordance with Florida Statute, Title XXXVII, Chapter 627.4147, if a notice of intent to file a Claim for medical malpractice is made against the Insured, the Insured shall cooperate fully in the review process prescribed under Florida Statute, Title XLV, Chapter 766.106.

The Company shall have the right to determine, to make, and to conclude, without the permission of the Insured, any offer of admission of liability involved in any arbitration pursuant to Florida Statute, Title XLV, Chapter 766.106, settlement offer or offer of judgment, if the offer is within policy limits of liability and is within the coverage afforded under this policy. No Insured shall have the right, exclusive or otherwise, to veto such Company determination if such offer is within the policy limits. Any offer of admission of liability, settlement offer, or offer of judgment made by the Company shall be made in good faith and in the best interest of the Insured.

The Company shall provide to the Insured or the Insured's legal representative by certified mail, return receipt requested, a copy of such final offer of admission of liability involved in arbitration made pursuant to Florida Statute, Title XLV, Chapter 766.106, settlement offer or offer of judgment and at the same time such offer is provided to the claimant. A copy of any final agreement reached between the Company and claimant in such matter shall also be provided to the Insured or the Insured's legal representative by certified mail, return receipt requested not more than 10 days after effecting such agreement.

The Company shall not make or conclude, without the permission of the Insured, any offer of admission of liability involved in any arbitration pursuant to Florida Statute, Title XLV, Chapter 766.106, settlement offer or offer of judgment, if the offer is outside the policy limits of liability. In such event, if the Insured is a partnership, professional association, professional corporation or limited liability company, the written consent of an Insured who was formerly but is no longer a member of the partnership, professional association or limited liability company or director, officer, stockholder or employee of a professional corporation will not be required, provided the written consent of the corporate directors, officers, stockholders or employees of a professional corporation, or their duly appointed representatives, has been obtained.

All other terms and conditions remain unchanged.

**MESM 2074-FL 11 12**                                                                                              **Page 1 of 1**



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT (HIPAA) — CIVIL MONETARY PENALTY ENDORSEMENT

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY COVERAGE PART — CLAIMS MADE COVERAGE
SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART — CLAIMS MADE COVERAGE

In consideration of the premium paid, it is hereby understood and agreed that the policy is amended as follows:

1. The policy is amended by the addition of the following:

    **SUPPLEMENTARY PAYMENTS**

    **A. HIPAA Civil Monetary Penalty Coverage:** The Company shall pay on behalf of the Insured all sums in excess of the Deductible amount stated in the Declarations, which the Insured shall become legally obligated to pay as a Civil Monetary Penalty as a result of a HIPAA Civil Violation first made against the Insured during the Policy Period or during the Extended Reporting Period, if exercised, arising out of any HIPAA Civil Violation committed or alleged to have been committed by the Insured or by any person for whose actions the Insured is legally responsible provided:

    1. such HIPAA Civil Violation:

        **a.** arises out of the conduct of the Insured's Professional Services; and

        **b.** is committed or alleged to have been committed during the Policy Period or on or after the Retroactive Date as stated in the Declarations; and

    2. prior to the effective date of this policy the Insured had no knowledge of such HIPAA Civil Violation or any fact, circumstance, situation or incident which may result in a HIPAA Civil Violation.

    **Limits of Liability - HIPAA Civil Monetary Penalty**: The total liability of the Company for the combined total of Civil Monetary Penalties and Legal Expenses for each HIPAA Civil Violation first made during the Policy Period or the Extended Reporting Period, if exercised, shall not exceed the Limit of Liability stated below as applicable to Each HIPAA Civil Violation. Subject to the foregoing, the total liability of the Company for the combined total of Civil Monetary Penalties and Legal Expenses for all HIPAA Civil Violations first made during the Policy Period or the Extended Reporting Period, if exercised, shall not exceed the Limit of Liability stated below as applicable to All HIPAA Civil Violations.

    1. $250,000   Each HIPAA Civil Violation

    2. $250,000   All HIPAA Civil Violations

    The Insured shall give the Company written notice as stated in the Declarations within ten (10) days of the Insured receiving a notice of HIPAA Civil Violation and in any event such written notice shall be provided prior to the Insured incurring any legal fees or legal expenses related to such matter.

    The Company shall have the right and duty to defend and investigate any HIPAA Civil Violation to which coverage under this Coverage Part applies. The Company may make such investigation and settlement of any HIPAA Civil Violation as it deems expedient. Legal Expenses incurred in defending and investigating a HIPAA Civil Violation shall be a part of and shall not be in addition to the Limits of Liability stated in Section Supplementary Payments, HIPAA Civil Monetary Penalty Coverage. Such Legal Expenses shall reduce the Limits of Liability stated in Section Supplementary Payments, HIPAA Civil Monetary Penalty Coverage and shall be applied against the

**MESM 2083 01 11**

Deductible. The Company shall have no obligation to pay any Civil Monetary Penalty or to defend or to continue to defend any HIPAA Civil Violation or to pay Legal Expenses for HIPAA Civil Violations after the Limits of Liability stated in Section Supplementary Payments, HIPAA Civil Monetary Penalty Coverage have been exhausted.

Payments pursuant to this Section shall be in addition to the Limits of Liability stated in the Declarations.

2.  Section Definitions is amended by the addition of the following:

**Civil Monetary Penalty** means a civil monetary penalty imposed by the Secretary of the United States Department of Health and Human Services, or his or her designee, under 42 U.S.C. §1320d-5 and 45 C.F.R. §160.404.

**Health Insurance Portability and Accountability Act ("HIPAA")** means the Health Insurance Portability and Accountability Act of 1996, Public Law 104-191.

**HIPAA Civil Violation** means a notice received by the Insured for failure to comply with the HIPAA Standards for Privacy of Individually Identified Health Information (Privacy Rule) which protects the privacy of individual health information, including maintaining the confidentiality of information regarding medical services and limiting the release or use of such information in conformance with state or federal law, including any allegation that the Insured was negligent in hiring, training or supervising any Insured person who failed or is alleged to have failed to comply with the Privacy Rule.

**Legal Expenses** means reasonable and necessary amounts incurred by the Company or by the Insured with the prior written consent of the Company in the defense of that portion of any HIPAA Civil Violation for which coverage is afforded under this Coverage Part, including costs of investigation and costs of appeals; provided, however, Legal Expenses shall not include: (1) salary, wages, overhead, or benefit expenses of or associated with Employees or officials of the Named Insured or employees or officials of the Company; or (2) salary, wages, administration, overhead, benefit expenses, or charges of any kind attributable to any in-house counsel or captive out-of-house counsel for the Named Insured or the Company.

3.  Section The Exclusions is amended by the addition of the following exclusions:

With respect to Supplementary Payments, HIPAA Civil Monetary Penalty Coverage, such coverage does not apply to any HIPAA Civil Violation:

1.  based upon, arising out of, or in any way involving:

    a.  any HIPAA Civil Violation or any claim, fact, circumstance, situation or incident which has or may result in a HIPAA Civil Violation that has been the subject of any notice given prior to the Policy Period under any other policy of insurance; or

    b.  any HIPAA Civil Violation, whenever occurring, which is logically or causally connected to another HIPAA Civil Violation by reason of any common fact, circumstance, situation, event or transaction that has been the subject of any notice given prior to the Policy Period under any other policy of insurance; or

2.  based upon, arising out of, or in any way involving any litigation, demand, investigation, administrative or regulatory proceeding or other proceeding pending, or order, decree or judgment entered, against any Insured on or prior to the inception date of this policy, or the same or any substantially similar HIPAA Civil Violation or any fact, circumstance, situation or incident underlying or alleged therein.

4.  Section Limits of Liability is amended by the addition of the following:

**Multiple Insureds, HIPAA Civil Violations and Protected Health Information Records Released:**  The inclusion herein of more than one Insured in any HIPAA Civil Violation shall not operate to increase the Limits of Liability stated in Section Supplementary Payments, HIPAA Civil Monetary Penalty Coverage. More than one HIPAA Civil Violation arising out of a single release of protected health information or a series of related releases of protected health information shall be considered a single HIPAA Civil Violation. All such HIPAA Civil Violations, whenever made, shall be treated as a single HIPAA Civil Violation. Such single HIPAA Civil Violation, whenever made, shall be deemed to be first made on the date on which the earliest HIPAA Civil Violation arising out of such release of protected health information is made.

All other terms and conditions remain unchanged.

MESM 2083 01 11

POLICY NUMBER: SM925939

**MARKEL®**

# EVANSTON  INSURANCE  COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CRISIS MANAGEMENT EMERGENCY RESPONSE
## EXPENSE REIMBURSEMENT COVERAGE

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART
LOCUM TENENS AND CONTRACT STAFFING PROFESSIONAL LIABILITY INSURANCE COVERAGE PART

In consideration of the premium paid, it is understood and agreed that the policy is amended as follows:

**1.** The policy is amended by the addition of the following:

**Crisis Management Emergency Response Expense Reimbursement Limit:  $25,000**

**2.** Section SUPPLEMENTARY PAYMENTS, Crisis Management Emergency Response Expense Reimbursement, is added as follows:

**SUPPLEMENTARY PAYMENTS**

**Crisis Management Emergency Response Expense Reimbursement:**  In the event that:

    **a.** during the Policy Period, the Named Insured incurs Crisis Management Emergency Response Expenses with the prior written approval of the Company; and

    **b.** during the Policy Period or within six (6) months following the date the Crisis was initiated, the Named Insured submits a request for reimbursement of such Crisis Management Emergency Response Expenses by providing an itemized accounting of such Crisis Management Emergency Response Expenses, which is submitted in writing to the Company by completion of the Company's Crisis Management Emergency Response Expense Reimbursement Form which must be submitted to the Company addressed to Medical Professional Team, Markel Service Incorporated, 10 Parkway North, Deerfield, IL 60015 (Fax: (847) 572-6377);

the Company will reimburse the Named Insured for such Crisis Management Emergency Response Expenses up to the Crisis Management Emergency Response Expense Reimbursement Limit set forth in Item 1. of this endorsement.

Reimbursement to the Named Insured pursuant to this provision shall be in addition to the Limits of Liability stated in the Declarations and shall not be subject to the Deductible.

**3.** Section DEFINITIONS is amended by the addition of the following:

**Crisis** means the public announcement that an Incident occurred on the Named Insured's premises or at an event sponsored by the Named Insured.

**Crisis Management Emergency Response Expenses** mean those expense incurred by the Named Insured for services provided by a Crisis Management Firm. However, Crisis Management Emergency Response Expenses shall not include:

**1.** Compensation, fees, benefits, overhead, charges or expense of any person or organization included in the definition of Insured;

**2.** Any expenses that are payable on the Named Insured's behalf or reimbursable to the Named Insured under any other insurance, whether collectible or not;

MESM 2093 01 14                                                        **Page 1 of 2**

3.  Claim adjustment costs incurred by the Named Insured, such as fees incurred by retaining a public adjuster or appraiser.

**Crisis Management Firm** means any service provider requested by the Named Insured and approved by the Company to provide Crisis management emergency response services. The Company's approval shall not be unreasonably withheld.

**Incident** means an accident or other event, including the accidental discharge of pollutants, resulting in death or Serious Bodily Injury to three (3) or more persons.

**Serious Bodily Injury** means any injury to a person that creates a substantial risk of death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

All other terms and conditions remain unchanged.

POLICY NUMBER: SM925939

**MARKEL**®

# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## HOSPITAL AMENDATORY ENDORSEMENT AGGREGATE POLICY LIMIT

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART - CLAIMS MADE COVERAGE
SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY INSURANCE COVERAGE PART – OCCURRENCE COVERAGE

In consideration of the premium paid, it is understood and agreed that the policy is amended as follows:

**I.**   Item 4.A. of the Declarations, Professional Services, is deleted.

**II.**   The Declarations is amended by the addition of the following:

**LIMITS OF LIABILITY:**  Policy Aggregate:  $15,000,000

**III.**   Specified Medical Professions Professional Liability Insurance Coverage Part is amended as follows:

**1.**   Section THE INSURED B. is deleted and replaced with the following:

**B.**   Any past or current principal, partner, officer, director, Employee or Volunteer Worker of the Named Insured solely while acting on behalf of the Named Insured and within the scope of their duties as such; provided, however, this insurance shall not apply to any Claim made against any Insured who is a Named Healthcare Provider arising out of the rendering of or failure to render Professional Services in his/her capacity Healthcare Provider other than the following Named Healthcare Provider solely:

**1.**   While acting on behalf of the Named Insured and within the scope of his/her duties as a principal, partner, officer, director, Employee or Volunteer Worker of the Named Insured;

**2.**   For an act, error or omission in Professional Services happening:

**a.**   On or after the Retroactive Date stated below; and

**b.**   Before the Departure Date, if any, stated below;

as applicable to such Named Healthcare Provider; and

**3.**   For Claims first made against such Named Healthcare Provider during the Policy Period, provided that prior to the effective date of this policy the Named Healthcare Provider had no knowledge of such act, error or omission or any fact, circumstance, situation or incident which may lead a reasonable person in the Insured's position to conclude that a Claim was likely.

**2.**   Section DEFINITIONS H.1. and I. are deleted and replaced with the following:

**H. 1.**   Any bodily injury, mental injury, sickness, disease, emotional distress or mental anguish, including death resulting therefrom of any natural person that is a patient of the Named Insured's hospital or out-patient department receiving Professional Services arising out of an act, error or omission in Professional Services rendered or that should have been rendered;

**MESM 2095 08 15**                                          **Page 1 of 3**

I. **Professional Services** means the following services in the Named Insured's hospital or its out-patient department, or in any ambulance owned, operated and maintained by the Named Insured's hospital:

   1. Medical, surgical, dental, x-ray, nursing, mental health services or treatments;

   2. The furnishing of food, beverages, drugs or medical, dental or surgical supplies or appliances in connection with the services stated in subparagraph I.1. hereinabove;

   3. The handling or performing of post-mortem examination or organ donation or harvesting on dead human bodies;

   4. Health or therapeutic services, treatments, advice or instructions;

   5. Medical or mental health counseling services, social services or other such treatments;

   6. Furnishing or dispensing of pharmacotherapeutic agents, including chemical and biological products or medical, dental or surgical appliances or equipment;

   7. Services in connection with a Clinical Trial;

   8. Supervising, teaching or proctoring services rendered by a natural person at the Named Insured's request;

   9. Services rendered by an Insured as a member of a formal accreditation or similar professional board or committee of the Named Insured; or

   10. The execution or failure to execute a decision or directive of a formal accreditation or similar professional board or committee of the Named Insured.

3. Section DEFINITIONS is amended by the addition of the following:

   **Clinical Trials** means an organized study using human subjects that follows a pre-defined protocol and is approved and monitored by an Institutional Review Board (IRB) to develop effectiveness or safety data of treatment plans, pharmaceutical products or medical devices.

   **Departure Date** means the date on which the Named Healthcare Provider ceases to provide Professional Services on behalf of the Named Insured.

   **Healthcare Provider** means physician, surgeon, dentist, podiatrist, resident, intern, fellow, chiropractor, nurse anesthetist, nurse practitioner, physician assistant, acupuncturist, midwife or nurse midwife.

4. Section LIMITS OF LIABILITY is amended by the addition of the following:

   **Limit of Liability- Policy Aggregate:** Notwithstanding the Limits of Liability applicable to this Coverage Part and any other purchased Coverage Part(s), the total liability of the Company under this policy shall not exceed the Policy Aggregate Limit of Liability as stated in the Declarations.

Schedule of Active Named Healthcare Providers

| Named Healthcare Provider: | Named Healthcare Provider Retroactive Date: |
| --- | --- |
| Harris Mones, MD | 7/1/1988 |
| James Tracy, DPM | 6/26/1993 |
| Jaime Carbonell, DPM | 9/1/2011 |
| Maria Fernandez, MD | 7/1/2010 |
| Gregory Fox, DO | 7/1/2012 |
| Jeffrey Fox, DO | 7/1/2015 |
| Kevin Fox, DO | 7/1/2015 |
| All interns, residents and students who participate in the Named Insured's Internship and Residency Programs | 7/1/1988 |
| Dr. Jose David Suarez, MD | 5/7/2018 |
| Aimee Gonzalez, MD, Assistant Director of GME | 7/2/2018 |

## Schedule of Departed Named Healthcare Providers

| Named Healthcare Provider: | Named Healthcare Provider Retroactive Date: | Named Healthcare Provider Departure Date: |
| --- | --- | --- |
| Jaime Carbonell, DPM | 6/29/2007 | 8/31/2011 |
| Ivan Rodriguez, DO | 2/1/2008 | 7/1/2009 |
| Antonio Gordon, DO | 4/29/1996 | 6/30/2010 |
| Gregory Fox, DO | 9/30/1992 | 6/30/2010 |
| Monica Ilieuski, ARNP | 8/27/2003 | 5/16/2005 |
| Celia Yero, ARNP | 1/28/2004 | 9/15/2008 |
| Robert Garnet, DPM | 6/29/2007 | 7/1/2012 |
| Robert Goubeaux, DO | 1/1/2010 | 8/12/2014 |
| Federico Dumenigo, MD | 10/24/1988 | 12/31/2012 |
| All interns, residents and students who participated in the Named Insured's Internship and Residency Programs | 7/1/1988 | 5/23/2016 |
| Christopher Estes, MD | 1/3/2017 | 04/27/2018 |
| Rogelio Zaldivar, MD | 7/1/2010 | 6/30/2018 |

**III.** Specified Medical Professions General Liability Insurance Coverage Part is amended as follows:

    **1.** Section DEFINITIONS U. is deleted and replaced with the following:

        **U.** Professional Services means the following:

          **1.** Medical, surgical, dental, x-ray, nursing, mental health services or treatments;

          **2.** The furnishing of food, beverages, drugs or medical, dental or surgical supplies or appliances in connection with the services stated in subparagraph U.1. hereinabove;

          **3.** The handling or performing of post-mortem examination or organ donation or harvesting on dead human bodies;

          **4.** Health or therapeutic services, treatments, advice or instructions;

          **5.** Medical or mental health counseling services, social services or other such treatments;

          **6.** Furnishing or dispensing of pharmacotherapeutic agents, including chemical and biological products or medical, dental or surgical appliances or equipment;

          **7.** Services in connection with a Clinical Trial;

          **8.** Supervising, teaching or proctoring services rendered by a natural person at the Named Insured's request;

          **9.** Services rendered by an Insured as a member of a formal accreditation or similar professional board or committee of the Named Insured; or

          **10.** The execution or failure to execute a decision or directive of a formal accreditation or similar professional board or committee of the Named Insured.

    **2.** Section DEFINITIONS is amended by the addition of the following:

        **Clinical Trials** means an organized study using human subjects that follows a pre-defined protocol and is approved and monitored by an Institutional Review Board (IRB) to develop effectiveness or safety data of treatment plans, pharmaceutical products or medical devices.

    **3.** Section LIMITS OF LIABILITY is amended by the addition of the following:

        **Limit of Liability- Policy Aggregate:** Notwithstanding the Limits of Liability applicable to this Coverage Part and any other purchased Coverage Part(s), the total liability of the Company under this policy shall not exceed the Policy Aggregate Limit of Liability as stated in the Declarations.

All other terms and conditions remain unchanged.

POLICY NUMBER: SM925939

**MARKEL®**

# EVANSTON  INSURANCE  COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EVACUATION EXPENSE REIMBURSEMENT COVERAGE

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART

In consideration of the premium paid, it is understood and agreed that the policy is amended as follows:

1.  The policy is amended by the addition of the following:

    **Evacuation Expense Reimbursement Limit:**  $25,000

2.  Section SUPPLEMENTARY PAYMENTS, Evacuation Expense Reimbursement, is added as follows:

    **SUPPLEMENTARY PAYMENTS**

    **Evacuation Expense Reimbursement:**  In the event that:

    **a.**  During the Policy Period, the Named Insured incurs Evacuation Expenses; and

    **b.**  During the Policy Period or within six (6) months following the date the Evacuation was initiated, the Named Insured submits a request for reimbursement of such Evacuation Expenses by providing an itemized accounting of such Evacuation Expenses, which is submitted in writing to the Company by completion of the Company's Evacuation Expense Reimbursement Form which must be submitted to the Company addressed to Medical Professional Team, Markel Service Incorporated, 10 Parkway North, Deerfield, IL 60015 (Fax: (847) 572-6377);

    The Company will reimburse the Named Insured for such Evacuation Expenses up to the Evacuation Expense Limit set forth in Item 1. of this endorsement.

    Reimbursement to the Named Insured pursuant to this provision shall be in addition to the Limits of Liability stated in the Declarations and shall not be subject to the Deductible.

3.  Section DEFINITIONS is amended by the addition of the following:

    **Evacuation** means the removal of greater than fifty percent (50%) of the Named Insured's patients and residents from one or more of the locations stated in the Schedule of Location(s) (Scheduled Location(s)) below to an alternative location due to a natural or manmade disaster that in the reasonable judgment of the Named Insured's management, causes or could potentially cause such Scheduled Location(s) to be unsafe for such patients and residents. All related or interrelated natural or manmade disasters shall be deemed to be a single natural or manmade disaster.

    **Evacuation Expenses** means reasonable and necessary expenses incurred by the Named Insured in connection with an Evacuation, including, expenses for transporting, lodging, housing and feeding and providing medical care to the Named Insured's patients and residents during an Evacuation or at an alternative location. However, Evacuation Expenses shall not include:

    1.  Compensation, fees, benefits, overhead, charges or expense of any person or organization included in the definition of Insured;

2. Any expenses that are payable on the Named Insured's behalf or reimbursable to the Named Insured under any other insurance, whether collectible or not;

3. Claim adjustment costs incurred by the Named Insured, such as fees incurred by retaining a public adjuster or appraiser.

**Schedule of Location(s)**

Westchester General Hospital

2500 SW 75th Avenue

Miami, FL 33155

All other provisions of the policy shall remain unchanged.



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXCLUSION – UNMANNED AIRCRAFT

This endorsement modifies insurance provided under the following:

SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART – CLAIMS MADE
   COVERAGE
SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY INSURANCE COVERAGE PART - CLAIMS MADE
   COVERAGE
SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY INSURANCE COVERAGE PART – OCCURRENCE

In consideration of the premium paid, it is understood and agreed that the policy is amended as follows:

**A.** The SPECIFIED MEDICAL PROFESSIONS PROFESSIONAL LIABILITY INSURANCE COVERAGE PART is amended as follows:

   **1.** Section DEFINITIONS is amended by the addition of the following:

      **Unmanned Aircraft** means an aircraft that is not designed, manufactured, or modified after manufacture, to be controlled directly by a person from within or on the aircraft.

   **2.** Section THE EXCLUSIONS is amended by the addition of the following exclusion:

      Any Claim based upon, arising out of or in any way involving the ownership, maintenance, use or entrustment to others of any aircraft that is an Unmanned Aircraft. Solely for purposes of this exclusion, "use" includes operation of or exercise of any control over an Unmanned Aircraft; and the Insured's authorization, direction or acquiescence in the operation or control of Unmanned Aircraft by any person or entity; and loading or unloading of any such Unmanned Aircraft. This exclusion applies even if any such Claim alleges negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by the Insured, involving the ownership, maintenance, use or entrustment to others of any aircraft that is an Unmanned Aircraft.

**B.** The SPECIFIED MEDICAL PROFESSIONS GENERAL LIABILITY INSURANCE COVERAGE PART is amended as follows:

   **1.** Section DEFINITIONS B., Aircraft Products, is deleted and replaced as follows:

      **B. Aircraft Products** means any aircraft whether or not heavier than air, including manned and Unmanned Aircraft, spacecraft and missiles, and any ground support, guidance, control or communications equipment used in connection therewith, and also includes parts, supplies, or equipment installed in or on or used in connection with aircraft, including tools, training aids, instructions, manuals, blueprints and other data, engineering and other advice, services and labor used in the operation, maintenance or manufacture of Aircraft Products.

   **2.** Section DEFINITIONS is amended by the addition of the following:

      **Unmanned Aircraft** means an aircraft that is not designed, manufactured, or modified after manufacture, to be controlled directly by a person from within or on the aircraft.

   **3.** Section THE EXCLUSIONS A. is amended by the addition of the following:

      Based upon, arising out of or in any way involving Bodily Injury, Property Damage or Personal Injury and Advertising Injury arising out of the ownership, maintenance, use or entrustment to others of any aircraft that is an Unmanned Aircraft. Solely for purposes of this exclusion, "use" includes operation of or exercise of any control over an Unmanned Aircraft; and the Insured's authorization, direction or acquiescence in the operation or control of Unmanned Aircraft by any person or entity; and loading or unloading of any such Unmanned Aircraft. This

exclusion applies even if any such Claim alleges negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by the Insured, if the Occurrence which caused the Bodily Injury or Property Damage or the offense which caused the Personal Injury and Advertising Injury involved the ownership, maintenance, use or entrustment to others of any aircraft that is an Unmanned Aircraft.

4.  Section THE EXCLUSIONS B.6. is deleted and replaced as follows:

   6.  Based upon or arising out of Bodily Injury or Property Damage arising out of ownership, maintenance, operation, use or entrustment to others or loading or unloading of:

   a.  Any Auto, aircraft other than an Unmanned Aircraft or watercraft owned or operated by or rented or loaned to any Insured; or

   b.  Any other Auto, aircraft other than an Unmanned Aircraft or watercraft operated by any person in the course of their employment or activities on behalf of the Named Insured;

   This exclusion applies even if any such Claim alleges negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by the Insured, if the Occurrence which caused the Bodily Injury or Property Damage involved the ownership, maintenance, use or entrustment to others of any aircraft other than Unmanned Aircraft, Auto or watercraft that is owned or operated by or rented or loaned to any Insured;

   provided, however, this exclusion shall not apply to:

   (1)  The parking of an Auto on premises owned by, rented to or controlled by the Named Insured or on ways next to such premises, if such Auto is not owned by or rented or loaned to any Insured;

   (2)  A watercraft while ashore on premises owned by, rented to or controlled by the Named Insured; or

   (3)  A watercraft that is less than twenty-six (26) feet in length, that is not owned by the Named Insured and that is not being used to carry persons or property for a charge;

All other terms and conditions remain unchanged.



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# MOLD EXCLUSION

In consideration of the premium paid, it is hereby understood and agreed that this policy does not apply to any Claim based upon, arising out of, or in any way involving **Mold** or **Mold Event**.

Solely for the purposes of this endorsement:

**Mold** means any permanent or transient fungus, mold, mildew or mycotoxin, or any of the spores, scents or by-products resulting therefrom that exist, emanate from or move anywhere indoors or outdoors, regardless of whether they are proved to cause disease, injury or damage.

**Mold Event** means any actual, alleged or threat of contact with, exposure to, or inhalation, ingestion, absorption, discharge, dispersal, seepage, migration, release, escape, presence, growth or reproduction of **Mold**.

All other terms and conditions remain unchanged.

# E

# X

# H

# I

# B

# I

# T

# C

**EXHIBIT C**

**A STOCK COMPANY**



# EVANSTON INSURANCE COMPANY

Ten Parkway North

Deerfield, IL 60015

**INSURANCE POLICY**

**Coverage afforded by this policy is provided by the Company (Insurer) and named in the Declarations.**

In **Witness Whereof**, the company (insurer) has caused this policy to be executed and attested and countersigned by a duly authorized representative of the company (insurer) identified in the Declarations.

**Secretary**                                    **President**

INTERLINE



# EVANSTON INSURANCE COMPANY

## FLORIDA POLICYHOLDER NOTICE

"THIS INSURANCE IS ISSUED PURSUANT TO THE FLORIDA SURPLUS LINES LAW.  PERSONS INSURED BY SURPLUS LINES CARRIERS DO NOT HAVE THE PROTECTION OF THE FLORIDA INSURANCE GUARANTY ACT TO THE EXTENT OF ANY RIGHT OF RECOVERY FOR THE OBLIGATION OF AN INSOLVENT UNLICENSED INSURER."

**"SURPLUS LINES INSURERS' POLICY RATES AND FORMS ARE NOT APPROVED BY ANY FLORIDA REGULATORY AGENCY."**

INTERLINE



# PRIVACY NOTICE

We are committed to safeguarding your privacy. We understand your concerns regarding the privacy of your nonpublic personal information. No nonpublic personal information is required to be collected when you visit our websites; however, this information may be requested in order to provide the products and services described.  We do not sell nonpublic personal information to non-affiliated third parties for marketing or other purposes. We only use and share this type of information with non-affiliated third parties for the purposes of underwriting insurance, administering your policy or claim and other purposes as permitted by law, such as disclosures to insurance regulatory authorities or in response to legal process. Notwithstanding the foregoing, we may use this information for the purpose of marketing our own products and services to you.

We collect nonpublic personal information about you from the following sources:

- Information we receive from you on applications or other forms;

- Information about your transactions with us, our affiliates, or others; and/or

- Information we receive from consumer reporting agencies and inspection reports.

We do not disclose any nonpublic personal information about our customers/claimants or former customers/claimants to anyone, except as permitted by law.

We may disclose nonpublic personal information about you to the following types of third parties:

- Service providers, such as insurance agents and/ or brokers and claims adjusters; and/or

- Other non-affiliated third parties as permitted by law.

We restrict access to nonpublic personal information about our customers/claimants to those individuals who need to know that information to provide products and services to our customers/claimants or as permitted by law.  We maintain physical, electronic, and procedural safeguards to guard your nonpublic personal information.

*Residents of California:*

You may request to review and make corrections to recorded non-public personal information contained in our files.  A more detailed description of your rights and practices regarding such information is available upon request.  Please contact your agent/broker for instructions on how to submit a request to us.

INTERLINE



# EVANSTON INSURANCE COMPANY

## U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.



**MARKEL**®

## POLICYHOLDER DISCLOSURE NOTICE OF TERRORISM INSURANCE COVERAGE

RE:   Policy Number:  UM800928
        Insured:   WESTCHESTER GENERAL HOSPITAL, INC.; HEALTH EXCELLENCE, LLC; SOUTHERN WINDS
        HOSPITAL
        Insurer:   EVANSTON INSURANCE COMPANY

You are hereby notified that under the Terrorism Risk Insurance Act as amended in 2015 the definition of terrorism has changed. As *defined in Section 102(1) of the Act*: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury—in consultation with the Secretary of Homeland Security, and the Attorney General of the United States—to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Under the Act, any losses resulting from certified acts of terrorism may be partially reimbursed by the United States Government under a formula established by the Terrorism Risk Insurance Act as amended. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. The Act requires Evanston Insurance Company to also notify you that Terrorism Coverage required to be offered by the Act for losses caused by certified acts of terrorism is partially reimbursed by the United States Government under a formula established by federal law. Under this formula, the United States Government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019 and 80% beginning on January 1, 2020 of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage.

The Terrorism Risk Insurance Act as amended, contains a $100 billion cap that limits United States Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

Nothing in this notice affects or modifies your coverage except and only to the extent specifically required by the Act.

Certified Acts of Terrorism coverage is provided for no additional premium.



# EVANSTON INSURANCE COMPANY

## HEALTH CARE UMBRELLA LIABILITY POLICY
## DECLARATIONS

POLICY NUMBER: UM800928             PREVIOUS POLICY NUMBER: UM920018

**1.** **Named Insured and Mailing Address:**

WESTCHESTER GENERAL HOSPITAL, INC.; HEALTH EXCELLENCE, LLC; SOUTHERN WINDS HOSPITAL
2500 SW 75TH AVE
MIAMI, FL  33155

**2.** **Policy Period:** From:   05/23/2018 To: 05/23/2019
12:01 A.M. Standard Time At Your Address Shown Above

**3.** **Retroactive Date:** August 10, 2004 (This policy's inception date applies unless otherwise noted here.)

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**

| **4.** | **Policy Premium:** | | |
|---|---|---|---|
| **A.** | Flat Premium: X or Adjustable Premium: (check flat or adjustable) | | |
| **B.** | Rate: FLAT | | |
| **C.** | Minimum Premium: | $ | 41,500.00 |
| **D.** | Deposit Premium: | $ | 155,000.00 |
| **E.** | Policy Minimum Earned Premium:  25% | | |

| **5.** | **Limits of Insurance:** | | |
|---|---|---|---|
| **A.** | Each Occurrence, Offense or Claim Limit: | $ | 5,000,000 |
| **B.** | Combined Aggregate Limit: | $ | 5,000,000 |

**6.** **Underlying Insurance:** See Schedule of Underlying Insurance attached MDHX 2001 03 11.

**7.** **Forms and Endorsements attached to this policy at time of issuance:**
See Schedule of Forms and Endorsements attached MDIL 1001 08 10.

| Producer Number, Name and Address |
|---|
| 74630 |
| RPS Healthcare |
| 550 W. Van Buren Suite 1200 |
| Chicago, IL  60607 |

8.    **NOTICES:**

Notices required to be provided to us under this policy shall be addressed to:

| **CLAIM AND POTENTIAL CLAIM NOTICES:** | **ALL OTHER NOTICES:** |
|---|---|
| Claims Service Center<br>MARKEL SERVICE, INCORPORATED<br>Ten Parkway North<br>Deerfield, Illinois 60015<br><br>Fax: (855) 662-7535<br>E-mail: newclaims@markelcorp.com | Markel Midwest Region, a division of Markel Service, Incorporated<br>222 South Riverside Plaza Suite 2250<br>Chicago, IL  60606<br>Telephone: (847)-572-6000<br>Fax: |

**These declarations, together with the Policy, any Endorsement(s) and any application(s), complete the above numbered policy.**

| Countersigned 07/27/2018 | By: |
|---|---|
| (Date) | _____<br>AUTHORIZED REPRESENTATIVE |



# EVANSTON INSURANCE COMPANY

## HEALTH CARE UMBRELLA LIABILITY POLICY
## SCHEDULE OF UNDERLYING INSURANCE

| Policy Number: | Effective Date: | Named Insured: |
|---|---|---|
| UM800928 | 05/23/2018 | WESTCHESTER GENERAL HOSPITAL, INC.; HEALTH EXCELLENCE, LLC; SOUTHERN WINDS HOSPITAL |

| Carrier, Policy Number, and Period | Type of Policy | Applicable Limits or Amounts of Insurance |
|---|---|---|
| Evanston Insurance Company SM925939 05/23/2018 to 05/23/2019 "controlling underlying insurance" | Commercial General Liability | Bodily Injury and Property Damage Combined $1,000,000 Each Occurrence $3,000,000 General Aggregate [ ] per project/location $Included Products-Completed Operations Aggregate $Included Personal & Advertising Injury Limit Retroactive Date, if applicable: July 1, 2001 |
| The Travelers Indemnity Company BA-4K252627-17-CAG 12/01/2017 to 12/01/2018 "controlling underlying insurance" | Commercial Automobile Liability | Bodily Injury and Property Damage Combined $1,000,000 Combined Single Limit |
| The Zenith Z071786607 12/01/2017 to 12/01/2018 "controlling underlying insurance" | Employers Liability | Bodily Injury by Accident $1,000,000 Each accident Bodily Injury by Disease $1,000,000 Policy limit aggregate Bodily Injury by Disease $1,000,000 Each employee |
| Evanston Insurance Company SM925939 05/23/2018 to 05/23/2019 "controlling underlying insurance" | Professional Liability | $1,000,000 Per Claim $3,000,000 Aggregate Retroactive Date, if applicable: April 1, 1988 |
|  |  |  |



**INTERLINE**
**POLICY NUMBER:** UM800928

# EVANSTON INSURANCE COMPANY

## FORMS SCHEDULE

| FORM NUMBER | FORM NAME |
|---|---|
| MJIL 1000 06 10 | Policy Jacket |
| MPIL 1006-FL 01 10 | Florida Policyholder Notice |
| MPIL 1007 03 14 | Privacy Notice |
| MPIL 1083 04 15 | US Treasury Dept's Office Of Foreign Assets Control ("OFAC") Policyholder Notice |
| ZZ-50000 01 15 | Policyholder Disclosure of Terrorism Insurance Cov |
| MDHX 2000 03 11 | Health Care Umbrella Liability Policy Declarations |
| MDHX 2001 03 11 | Health Care Umbrella Liab Pol Sched of Underly Ins |
| MDIL 1001 08 10 | Forms Schedule |
| MEHX 0001 03 11 | Health Care Umbrella Liability Policy |
| MEHX 2302 05 15 | Exclusion - Unmanned Aircraft |
| MEIL 5231 01 15 | Certified Acts of Terrorism Coverage |



# EVANSTON INSURANCE COMPANY

## HEALTH CARE UMBRELLA LIABILITY POLICY
### FOLLOWING FORM - OCCURRENCE OR CLAIMS MADE

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties, and what is and is not covered.

Throughout the policy the words "you" and "your" refer to the Named Insured shown in item 1. of the Declarations. The words "we," "us," and "our" refer to the Insurance Company stated in the Declarations providing this insurance.

The word "insured" means any person or organization qualifying as such under Section Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section Definitions for their explanation.

In consideration of the payment of the premium, and in reliance upon the statements and representations made in the Application, and subject to mutual agreements set forth herein and in the Declarations, and subject to all the terms and conditions of this policy, we hereby agree with you as follows:

## INSURING AGREEMENTS

**A.    Coverage A – "Bodily Injury" and "Property Damage" Liability Insuring Agreement**

    **1.**    We will pay on behalf of the insured for that portion of "ultimate net loss" in excess of the "underlying limit" because of "bodily injury" or "property damage" to which this insurance applies, but only up to the Limits of Insurance stated in the Declarations. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Section Defense And Supplementary Payments Coverages A And B.

    **2.**    We will follow form over Additional Insureds covered in the "controlling underlying insurance" to the extent of their liability due to the negligence of the Named Insured.

**B.    Coverage B – "Personal and Advertising Injury" Liability Insuring Agreement**

    **1.**    We will pay on behalf of the insured that portion of "ultimate net loss" in excess of the "underlying limit" because of "personal and advertising injury" to which this insurance applies, but only up to the Limits of Insurance stated in the Declarations. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Section Defense And Supplementary Payments Coverages A And B.

    **2.**    We will follow form over Additional Insureds covered in the "controlling underlying insurance" to the extent of their liability due to the negligence of the Named Insured.

**C.    Occurrence or Claims-Made Coverage Following Form Agreement**

    **1.**    **Occurrence Following Form:**  With respect to Coverage A and Coverage B, this insurance applies to "bodily injury," "property damage," or "personal and advertising injury" covered by the "controlling underlying insurance" written on an "occurrence" basis and listed in the Schedule of Underlying Insurance, but only if:

        **a.**    The "bodily injury" or "property damage" was caused by an "occurrence," and/or the "personal and advertising injury" was caused by an "offense";

**b.**   The "occurrence" or "offense" took place in the "coverage territory," and

**c.**   The "bodily injury," "property damage," "personal and advertising injury" occurred during the policy period of this policy.

It is agreed that:

**(1)**   With respect to your liability for "bodily injury" to your "employees" arising out of and in the course of their employment by you:

**(a)**   "Bodily injury" by disease must be caused by or aggravated by the conditions of that employment; and

**(b)**   An "employee's" last day of last exposure to conditions causing or aggravating such a disease must occur during the policy period of this policy.

**(2)**   "Damages" because of "bodily injury" include "damages" claimed by a person or organization for care or loss of services or death resulting at any time from the "bodily injury."

**(3)**   "Property damage" that is loss of use of tangible property that is not physically injured or destroyed shall be deemed to occur at the time of the "occurrence" that caused it.

**2.**   **Claims Made Following Form:**   With respect to Coverage A and Coverage B, this insurance applies to "bodily injury," "property damage," or "personal and advertising injury" covered by the "controlling underlying insurance" written on a claims made basis and listed in the Schedule of Underlying Insurance; this insurance applies only if a "claim" for "damages" is first made against an insured during the policy period, including the extended reporting period, if exercised pursuant to all "underlying insurance". With respect to Coverage A and Coverage B, this insurance also applies to an "occurrence," "offense," "bodily injury," "property damage," or "personal and advertising injury" which is reported to the "underlying insurer" with the required detail as an event reasonably expected to result in a "claim," provided such event is covered by all applicable "underlying insurance" written on a claims made basis and listed in the Schedule of Underlying Insurance and provided such event is also reported to us on the same date including the required elements stated in the "underlying insurance."

But this insurance does not apply to "bodily injury," "property damage," or "personal and advertising injury" which occurred:

**a.**   Before the "retroactive date" shown in item 3. of the Declarations Page of this policy ; or

**b.**   After the expiration of this policy.

It is agreed that:

**(1)**   With regard to an "occurrence," "offense," "bodily injury," "property damage," or "personal and advertising injury" which is reported to the "underlying insurer" and to us with the required detail, as an event reasonably expected to result in a "claim," and which, by such reporting, is subject to the coverage afforded by the "underlying insurer," then any "claim" subsequently made against the insured arising out of such event shall be deemed for the purpose of this insurance to have been made on the date on which such written notice is received by the "underlying insurer."

**(2)**   All "claims" for "damages" because of "bodily injury" to the same person will be deemed to have been made at the time the first of those "claims" is made against an insured. This includes "damages" claimed by a person or organization for care, loss of services, or death resulting at any time from the "bodily injury."

**(3)**   All "claims" for "damages" because of "property damage" causing loss to the same person or organization as a result of an "occurrence" will be deemed to have been made at the time the first of those "claims" is made against an insured.

(4)   All "claims" for "damages" because of "personal and advertising injury" to the same person or organization as a result of an "offense" will be deemed to have been made at the time the first of those "claims" is made against any insured.

## EXCLUSIONS

**A.   Coverage A – "Bodily Injury" and "Property Damage" Liability Exclusions**

Coverage A of this policy does not apply to:

**1.**   "Bodily injury" or "property damage" that is intended by the insured or can be expected from the standpoint of a reasonable person to cause "bodily injury" or "property damage," even if the "bodily injury" or "property damage" is of a different degree or type than actually intended or expected. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

**2.**   "Bodily injury" or "property damage" for which the insured is obligated to pay "damages" by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for "damages":

    **a.**   Assumed in an "insured contract," provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement; or

    **b.**   That the insured would have in the absence of the contract or agreement.

**3.**   "Bodily injury" to:

    **a.**   Any "executive officer," director, or "employee" of the insured who is injured by another "executive officer," director, or "employee" of the same insured in the course of such employment except to the extent that coverage is provided by a policy listed in the Schedule of Underlying Insurance and then only to the extent provided by such policy or policies; or

    **b.**   Any "executive officer," director, or "employee" of the insured, or an applicant for employment by the insured, caused by employment practices of the insured. Employment practices include, but are not limited to, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination, wrongful dismissal or wrongful termination of an "executive officer," director, or "employee"; or

    **c.**   Any "executive officer," director, or "employee" of the insured while employed in violation of the law with the actual knowledge of the insured, or the actual knowledge of any "executive officer, " director, or "employee" of the insured.

    **d.**   The spouse, child, parent, brother, or sister of that "executive officer," director, or "employee" or applicant for employment as a consequence of a., b., or c. above.

This exclusion applies:
**(1)**   Whether the insured may be liable as an employer or in another capacity; and
**(2)**   To any duty to share "damages" with or repay someone else who must pay "damages" because of such "bodily injury."

This exclusion does not apply to liability assumed by the insured in an "insured contract."

**4.**   "Bodily injury" or "property damage" arising out of the ownership, maintenance, operation, use, loading, unloading, or entrustment to others of an "aircraft" or "watercraft" owned or operated by, or chartered, rented, or loaned to any insured, except to the extent that coverage is provided by a policy listed in the Schedule of Underlying Insurance and then only to the extent provided by such policy or policies.

**5.**   "Bodily injury" or "property damage" arising out of the use of "mobile equipment" in, or while in practice or preparation for, a prearranged racing, speed, or demolition contest or in a stunting activity.

**6.**   "Property damage" to:

    **a.**   Property you own, rent or occupy;

    **b.**   Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

    **c.**   Property loaned to you;

**d.** Property in your care, custody, or control;

**e.** That particular part of real property on which you or a contractor or subcontractor working directly or indirectly for you are performing operations, if the "property damage" is due to those operations; or

**f.** That particular part of real property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraph b. of this exclusion does not apply if the premises are "your work" and were never occupied, rented, or held for rental by you.

Paragraph c., d., e., and f. of this exclusion do not apply to liability assumed in a sidetrack agreement.

Paragraph f. of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

**7.** "Property damage" to "your product" arising out of it or any part of it.

**8.** "Property damage" to "your work" arising out of it or any part of it and included in the "products completed operations hazard."

This exclusion does not apply if the damaged work or the work out of which the "damages" arises was performed for you by a subcontractor.

**9.** "Property damage" to "impaired property" or property that has not been physically injured or destroyed arising out of:

**a.** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**b.** A delay or failure by you or anyone acting for you or on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property due to sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**10.** "Damages" claimed for all loss, costs or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of "your product," "your work," or "impaired property" is such work or property is withdrawn or recalled from the market or from use by a person or organization due to a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**11.** "Bodily injury" for which an insured may be held liable by reason of:

**a.** Causing or contributing to the intoxication of a person;

**b.** The furnishing of alcoholic beverages to a person who is under:
    **(1)** The legal drinking age; or
    **(2)** The influence of alcohol;

**c.** Violation of a statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion only applies if any insured is in the business of manufacturing, distributing, selling, serving, or furnishing alcoholic beverages.

This exclusion does not apply to the extent that coverage is provided by a policy listed in the Schedule of Underlying insurance. Coverage provided will follow the provisions, exclusions and limitations of the underlying insurance.

**12.** "Bodily injury" or "property damage" arising out of the ownership, maintenance, operation, use, loading, unloading, or entrustment to others of any "auto," except to the extent that coverage is provided by a policy listed in the Schedule of Underlying insurance and then only to the extent provided by such policy or policies.

**13.** Any duty to reimburse an insurer as required by the terms of any endorsement for Motor Carrier Policies of Insurance For Public Liability under Section 29 and 30 of the Motor Carrier Act of 1980, or any similar law.

**B.** **Coverage B – "Personal and Advertising Injury" Liability Exclusions**

Coverage B of this policy does not apply to:

**1.** "Personal and advertising injury":

    **a.** Arising out of the oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

    **b.** Arising out of the oral or written publication of material whose first publication took place before the beginning of the policy period, or if written on a claims-made basis, before the "retroactive date" shown in item 3. of the Declarations page of this policy;

    **c.** Arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured;

    **d.** For which the insured has assumed liability in a contract or agreement; however, this exclusion does not apply to liability for "damages" that the insured would have in the absence of the contract or agreement; or

    **e.** To an "executive officer," director, or "employee" of the insured arising from that person's employment by the insured.

**2.** "Personal and advertising injury" arising out of:

    **a.** Breach of contract, other than misappropriation of advertising ideas under an implied contract;

    **b.** The failure of goods, services to conform with advertised quality or performance;

    **c.** The wrong description of the price of goods, products or services;

    **d.** An electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control;

    **e.** An "offense" committed by an insured whose business is:

        **(1)** Advertising, broadcasting, publishing, or telecasting;

        **(2)** Designing or determining content of web-sites for others; or

        **(3)** An Internet search, access, content or service provider.

        For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**3.** "Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

**4.** "Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**5.** "Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

**C.** **Coverages A and B – Exclusions**

Coverages A and B of this policy do not apply to:

**1.** "Ultimate net loss" arising out of or contributed to in any way by:

    **a.** The actual, alleged, or threatened discharge, dispersal, release, migration, escape, or seepage of pollutants; or

    **b.** Any loss, cost, or expense arising out of any:

        **(1)** Request, demand, or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize, or in any way respond to, or assess the effects of pollutants; or

        **(2)** Claim or suit, whether by or on behalf of any governmental authority or any other entity, for "damages" because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, or neutralizing, or in any way responding to, or assessing the effects of pollutants.

As used in this exclusion, pollutants means any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste. Waste includes materials to be recycled, reconditioned, reclaimed, or disposed of.

**2.** "Ultimate net loss" arising out of or in connection with:

    **a.** Asbestos or asbestos-related material(s), lead, or silica dust, regardless of whether used, manufactured, sold, handled, maintained, repaired, removed, disposed of, transported, distributed, installed by, or in any way connected with the insured; or

    **b.** The existence of asbestos or asbestos-related material(s), lead, or silica dust in any goods, products, materials, storage devices, containers, wrappings, packaging, warehouses, buildings, or other structures of any kind, or any part thereof; or

    **c.** Any goods or products which are damaged, contaminated, or otherwise affected by asbestos or any asbestos-related material(s), lead or silica dust; or

    **d.** Asbestos abatement activities, including clean-up, repair, or any other corrective measures which are occasioned by the existence of asbestos or asbestos-related material(s), lead, or silica dust in any land, soil, water or watercourses, the atmosphere an/or building(s), whether voluntarily undertaken or require by any governmental body or other entity to eliminate asbestos or asbestos-related material(s), lead or silica dust; or

    **e.** Any supervision, instructions, recommendations, warnings, or advice given or which should have been given, and any obligation to share "damages" with or repay someone else who must pay "damages" in connection with 2.a., 2.b., 2.c., or 2.d. above.

**3.** "Ultimate net loss" arising out of or in connection with:

    **a.** "Bodily injury," "property damage" and/or "personal and advertising injury" which would not have occurred in whole or in part but for the actual, alleged or threatened contact with, exposure to, or inhalation, ingestion, absorption, discharge, dispersal seepage, migration, release, escape, presence, growth or reproduction of "mold."

    **b.** Costs and expenses to investigate or defend any claim or "suit" or payment of any fine or penalty for a. above.

    **c.** Any loss, cost, expense, fine or penalty arising out of any:

        **(1)** Claim, "suit," request, demand, order or statutory or regulatory requirement than any insured or others test for, monitor, clean up, remove, abate, mitigate, remediate, dispose of, contain, treat, detoxify or neutralize, or in any way respond to, or assess the concentration or effects of "mold," or

        **(2)** Claim or "suit" for "damages" because of testing for, monitoring, cleaning up, removing, abating, mitigating, remediating, disposing of, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the concentration or effects of "mold."

This exclusion 3.c.(1) and 3.c.(2) apply to any actual or alleged supervision, instructions, recommendations, warnings or advice given or which should have been given by any insured or others.

This exclusion 3.a., 3.b. and 3.c. above applies to:

    **(i)** "Bodily injury", "property damage" and "personal and advertising injury" regardless of whether such is included within the "products-completed operations hazard;"

    **(ii)** Any obligation to share "damages" with or repay someone else who must pay "damages"; and

    **(iii)** "Mold" existing, emanating from or moving anywhere indoors or outdoors.

As used in this exclusion "Mold" means any permanent or transient fungus, mold, mildew or mycotoxin, or any of the spores, scents or byproducts resulting therefrom regardless of whether they are proved to cause disease, injury or damage.

**4.** "Ultimate net loss" arising out of or in connection with any:

    **a.** Refusal to employ;

    **b.** Termination of employment;

    **c.** Coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination, any of which arise from an employment related practice;

    **d.**    Employment-related practices, policies, acts, or omissions; or

    **e.**    Consequential "bodily injury," "property damage," or "personal and advertising injury" as a result of 4.a., 4.b., 4.c. or 4.d. above.

This exclusion applies whether the insured may be held liable as an employer or in any other capacity, and to any obligation to share "damages" with or repay someone else who must pay "damages" because of such "bodily injury," "property damage," or "personal and advertising injury."

**5.**    Liability imposed on the insured or the insured's insurer under the following laws:

    **a.**    The Employee Retirement Income Security Act (E.R.I.S.A.) of 1974 as now or hereafter amended, or any similar law, regulation, or order issued pursuant to it; or

    **b.**    Any uninsured motorists, underinsured motorists, or automobile no-fault or first party "bodily injury" or "property damage" law; or

    **c.**    Any workers' compensation, unemployment compensation, or disability benefits law, or any similar law.

**6.**    "Ultimate net loss" arising out of or that results from any consequence, direct or indirect, due to war (whether war be declared or not), warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents, or any act or condition incident to war. War includes invasion, act of a foreign enemy, hostilities, civil war, insurrection, rebellion, revolution, military or usurped power, strike, riot, civil commotion, revolution, bombardment, or confiscation by order of any government or public authority.

**7.**    "Bodily injury" or "property damage":

    **a.**    With respect to which any insured under this policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limits of liability; or

    **b.**    Resulting from the "hazardous properties" of "nuclear material" and with respect to which:

        **(1)**    Any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof; or

        **(2)**    The insured is, or had this policy not been issued would be, entitled to indemnity from the United Sates of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

    **c.**    Resulting from the "hazardous properties" of "nuclear material," if:

        **(1)**    The "nuclear material":
            **(a)**    Is at any "nuclear facility" owned by, or operated by or on behalf of, an insured; or
            **(b)**    Has been discharged or dispersed therefrom;

        **(2)**    The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

        **(3)**    The "bodily injury" or "property damage" arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility," but if such facility is located within the United States of America, its territories or possessions or Canada, this subparagraph (3) applies only to "property damage" at such "nuclear facility" and any property thereat.

As used in this exclusion:
**a.**    "Hazardous properties" include radioactive, toxic or explosive properties;
**b.**    "Nuclear material" means "source material," "special nuclear material," or "by-product material";
**c.**    "Source material," "special nuclear material" and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;
**d.**    "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor";
**e.**    "Waste" means any waste material:

**(1)** Containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any one ore processed primarily for its "source material content"; and

**(2)** Resulting from the operation by any person or organization of any "nuclear facility" included under paragraphs (1) and (2) of the definition of "nuclear facility."

**f.** "Nuclear facility" means:

**(1)** Any "nuclear reactor";

**(2)** Any equipment or device designed or used for:

**(a)** Separating the isotopes of uranium or plutonium;

**(b)** Processing or utilizing "spent fuel"; or

**(c)** Handling, processing or packaging "waste";

**(3)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235.

**(4)** Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

And includes the site on which any of the foregoing is located, all operations conducted on such site, and all premises used for such operations;

**g.** "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

**h.** "Property damage" includes all forms of radioactive contamination of property.

**8.** "Ultimate net loss" arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**9.** "Ultimate net loss" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**a.** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**b.** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**c.** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

## DEFENSE AND SUPPLEMENTARY PAYMENTS COVERAGES A AND B

**A.** We will have the right to defend any "claim" or "suit" seeking "damages" for "bodily injury," "property damage," "personal and advertising injury" to which this insurance applies, but:

**1.** We have no duty to defend any insured against a "claim" or "suit" not covered by this policy.

We have no duty to defend any insured against a "claim" or "suit" not covered by the "underlying insurance."

**2.** When a "claim" or "suit" is covered by this policy and is also covered by "underlying insurance" or any other applicable insurance, we have no duty to defend. We shall have the right to associate with the insured in the defense and control of any "claim" or "suit" that we think may involve this policy.

**3.** When a "claim" or "suit" covered by this policy, would have been covered by "underlying insurance" but for the exhaustion of the applicable limit of such "underlying insurance" as a result of any "occurrence" or "offense" to which this policy would have applied, we will have a duty to defend any "claim" or "suit" to which this policy applies.

**4.** When we have a duty to defend as described in 3. above, we will:

    **a.**   Defend any "claim" or "suit" against the insured seeking "damages" on account of "bodily injury," "property damage," or "personal and advertising injury" even if such "claim" or "suit" is groundless, false, or fraudulent;

    **b.**   Investigate, negotiate, and settle any "claim" or "suit" as we deem expedient;

    **c.**   Pay the following Supplementary Payments:

        **(1)**   Up to $250 for the cost of bail bonds required because of accidents or traffic law violations related to an accident arising out of the use of any vehicle to which this policy applies. We do not have to furnish these bonds.

        **(2)**   All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of any "claim" or "suit," including actual loss of earnings up to $250 a day because of time off from work.

        **(3)**   "Pre-judgment interest" awarded against the insured on that part of the judgment covered under this policy. If we offer the applicable Limit of Insurance in settlement of a "claim" or "suit," we will not pay any "pre-judgment interest" imposed or earned after the date of such offer.

        **(4)**   All interest earned on that part of any judgment within the Limit of Insurance after entry of the judgment and before we have paid, offered to pay, or deposited in court that part of any judgment that is within the applicable Limit of Insurance.

**B.**   Payments under this section of the policy, as well as payments for all expenses we incur, will not reduce the Limit of Insurance as set forth in this policy, unless such expenses of the "underlying insurer(s)" reduce the limits of "underlying insurance" of any policy listed in the Schedule of Underlying Insurance.

**C.**   Both our right and duty to defend any existing or future "claim" or "suit" end when we have exhausted the applicable Limit of Insurance by payment of judgments or settlements or expenses, if applicable, under Coverages A or B.

**D.**   If we are prevented by law from carrying out A., B., and C. above, we will pay any expense incurred with our consent.

## WHO IS AN INSURED

**A.**   If the Named Insured stated in item 1. of the Declarations is:

    **1.**   An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

    **2.**   A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

    **3.**   A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

    **4.**   An organization other than a partnership, joint venture, or "limited liability company," you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your "executive officers" and directors. Your stockholders are also insureds, but only with respect to their liability as your stockholders.

    **5.**   A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

**B.**   Each of the following is also an insured:

    **1.**   Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees," other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you and while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for "bodily injury" arising out of his or her providing or failing to provide professional health care services unless such individual is included as an insured in a policy of "underlying insurance" listed in the Schedule of Underlying Insurance.

2.    Any person (other than your "employee" or "volunteer worker") or an organization while acting as your real estate manager.

3.    Any person or organization having proper temporary custody of your property if you die, but only:

   a.    With respect to liability arising out of the maintenance or use of that property; and
   b.    Until your legal representative has been appointed.

4.    Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and all of your duties under this policy.

5.    Any other person or organization who is insured under the "controlling underlying insurance." The coverage afforded such insureds under this policy will be no broader than the "controlling underlying insurance" except for this policy's Limit of Insurance.

C.    With respect to:

1.    An "auto"; or
2.    "Mobile equipment" registered in your name under a motor vehicle registration law;
   To which the "controlling underlying insurance" applies, any person is an insured while driving such "auto" or "mobile equipment" along a public highway with your permission.

   Other persons or organizations responsible for the conduct of such person(s) are also insureds, but only for their liability due to the operation of the "auto" or registered "mobile equipment."

   However, the owner or anyone else from whom you hire or borrow an "auto" is an insured only if that "auto" is a trailer connected to an "auto" owned by you.
   But no person or organization is an insured under this paragraph C. for:

   a.    "Bodily injury" to a co-employee of the person driving the "auto" or "mobile equipment"; or
   b.    "Property damage" to property owned by you or the employer of a person who is an insured under this provision; or
   c.    An "auto" you hire or borrow from one of your partners, or "employees," or members of their households, if they are the owner of such "auto"; or
   d.    An "auto" being used by a person employed in the business of selling, servicing, repairing, or parking "autos" unless they are your "employees"; or
   e.    The movement of property to or from an "auto" except you, your "employees," partners, lessees, or borrowers of such auto and employees of the lessees or borrowers.

D.    Any organization you newly acquire or form, other than a partnership, joint venture, or limited liability company, and over which you maintain ownership or majority interest, will be deemed to be a Named Insured, However:

1.    Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

2.    Coverage is applicable only in excess of the limits of the "underlying insurance" as shown in the Schedule of Underlying Insurance. You must add such organization to your "underlying insurance" as soon as possible, advising us of such additions. We may then make adjustment of premium charges.

3.    Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

4.    Coverage B does not apply to "personal and advertising injury" due to an "offense" committed before you acquired or formed the organization.

E.    No person or organization is an insured with respect to the conduct of a current or past partnership, joint venture, or limited liability company that is not shown as a Named Insured in the Declarations.

## LIMITS OF INSURANCE

**A.** The Each Occurrence, Offense or Claim Limit stated in the Declarations is the most we will pay for the total of all "ultimate net loss" arising out of any one "occurrence," "offense" or "claim."

**B.** The limit stated in the Declarations for the Combined Aggregate Limit is the most we will pay under Section Insuring Agreements for all "ultimate net loss".

**C.** With respect to Coverage A and Coverage B, the Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   **1.** Insureds;
   **2.** "Autos" or "mobile equipments";
   **3.** "Claims" made or "suits" brought;
   **4.** Persons or organizations making "claims" or bringing "suits"; or
   **5.** Coverage afforded under this policy.

**D.** If the applicable limits of "underlying insurance" are reduced or exhausted by payments from one or more "occurrences," "offenses," or "claims" the Limits of Insurance of this policy will apply in excess of such reduced or exhausted limits.

**E.** The Limits of Insurance of this policy apply to the policy period, including the extended reporting period, if applicable to all "underlying insurance" and if exercised pursuant to all "underlying insurance."

## POLICY CONDITIONS

**A.** **Appeals**

If the insured or an "underlying insurer" elects not to appeal a judgment, which exceeds the "underlying limit," we may elect to do so. If we do so, we shall be liable, in addition to the Limit of Insurance, for all costs, taxes, expenses, and interest on judgments incidental to such an appeal. We shall also be liable for all such costs, expenses and interest on appeals in connection with our right and duty to defend the insured under Section Defense and Supplementary Payments Coverages A and B.

**B.** **Bankruptcy**

Bankruptcy, insolvency, or receivership of the insured, or of the insured's estate, or of any "underlying insurer" will not relieve us of our obligations under this policy; however, with regard to bankruptcy, insolvency, or receivership of an "underlying insurer," this policy shall not apply as a replacement of such bankrupt or insolvent insurer. Our Limits of Insurance will apply only in excess of the limit(s) of insurance stated in the Schedule of Underlying Insurance of this policy.

**C.** **Cancellation**

This policy may be cancelled by the Named Insured authorized to act on behalf of all of insureds by surrender thereof to us or to our underwriting manager, on behalf of us, or by mailing to the aforementioned written notice stating when thereafter such cancellation shall be effective. If cancelled by the Named Insured, we shall retain the customary short rate proportion of the premium.

This policy may be cancelled by us or by our underwriting manager, by mailing to the Named Insured authorized to act on behalf of all insureds at the address stated in the Declarations written notice stating when, not less than thirty (30) days thereafter, such cancellation shall be effective. However, if we cancel the policy because the Named Insured authorized to act on behalf of all insureds has failed to pay a premium or deductible when due, including premium and deductible(s) due on any other policy(ies) issued by us or any of our affiliated companies in an uninterrupted series of policies for which this policy is a renewal or replacement, this policy may be cancelled by us by mailing a written notice of cancellation to the. Named Insured stating when, not less than ten (10) days thereafter, such cancellation shall be effective. The mailing of notice as aforementioned shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the policy period. Delivery of such written notice by the Named Insured, us, or our underwriting manager shall be equivalent to mailing. If cancelled by us or

by our underwriting manager, earned premium shall be computed pro rata. Premium adjustment may be made at the time cancellation is effected or as soon as practicable thereafter.

**D.    Changes**

Notice to any agent or knowledge possessed by any agent or other person acting on behalf of us shall not effect a waiver or a change in any part of this policy and shall not estop us from asserting any right under the terms of the policy. The terms of this policy shall not be waived or changed, except by written endorsement issued to form a part of this policy, and this policy embodies all agreements existing between the insureds and us or any of our agents relating to this insurance.

**E.    Assignment of Interest**

We shall not be bound by an assignment of interest by any insured unless our consent to such assignment is endorsed onto this policy.

**F.    Duties in the Event of an Occurrence, Offense, Claim, or Suit**

You must see to it that we and your "underlying insurers":

**1.**    Are notified in writing as soon as practicable of any "occurrence" or "offense" which may result in a "claim" involving this insurance or any "underlying insurance";

**2.**    Receive written notice of the "claim" as soon as practicable and of the "suit" immediately. Notice includes:
    **a.**    How, when, and where the "occurrence" or alleged "offense" took place;
    **b.**    The insured's name and address;
    **c.**    The names and addresses of any injured persons and witnesses;
    **d.**    The nature and location of any injury or damage arising out of the "occurrence" or "offense";
    **e.**    Copies of any demands, notices, summonses, or legal papers received in connection with a "claim" or "suit" involving you or any other insured.

**3.**    Are assisted, upon our request, in the enforcement of any right against any person or organization which may be liable to you or any other insured because of "bodily injury," "property damage," or "personal and advertising injury" to which this insurance may apply; and

**4.**    Receive the insured's full cooperation in the investigation, adjustment, settlement, or defense of any "claim" or "suit," "occurrence" or "offense."

**G.    Assistance and Cooperation**

The insured shall cooperate with us and upon our request, the insured shall: (1) submit to examination and interview by our representative, under oath if required; (2) attend hearings, depositions and trials; (3) assist in effecting settlement, securing and giving evidence, obtaining the attendance of witnesses in the conduct of "suits"; (4) give a written statement or statements to our representatives and meet with such representatives for the purpose of determining coverage and investigating and/or defending any "claim"; (5) provide any information required to comply with federal or state reporting regulations; all without cost to us. The insured shall further cooperate with us and do whatever is necessary to secure and effect any right of indemnity, contribution or apportionment which the insured may have. The insured shall not, except at his/her own cost, make any payment, admit any liability, settle any "claim," assume any obligation or incur any expense without our written consent.

If denial of coverage by the "controlling underlying insurer" is legally upheld because of a breach of a policy condition by the insured and if said breach is not also a breach of a condition of this policy, the insurance afforded by this policy shall apply in the same manner as though such "controlling underlying insurance" had not been breached and had remained in full effect.

**H.    Examination of Your Books and Records**

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

**I.    Inspections and Surveys**

    **1.**    We have the right but are not obligated to:

        **a.**    Make inspections and surveys of your premises, operations, and equipment at any time;

        **b.**    Give you reports on the conditions we find; and

        **c.**    Recommend changes to those conditions.

    **2.**    Any inspections, surveys, reports, or recommendations we make relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public and we do not warrant the premises, operations, equipment, or conditions:

        **a.**    Are safe or healthful; or

        **b.**    Comply with laws, regulations, codes, or standards.

This condition applies not only to us, but also to any rating, advisory, rate service, or similar organization which makes insurance inspections, surveys, reports, or recommendations on our behalf.

**J.    Legal Action Against Us**

No action shall lie against us unless, as a condition precedent thereto, the insured shall have fully complied with all of the terms and conditions of this policy, nor until the amount of the insured's obligation to pay shall have been fully and finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and us.

Nothing contained in this policy shall give any person or organization any right to join us as a co-defendant in any action against the insured to determine the insured's liability. Bankruptcy or insolvency of the insured or of the insured's estate shall not relieve us of any of our obligations hereunder.

An agreed settlement means a settlement and release of liability signed by us, the insured, and the claimant or the claimant's legal representative.

**K.    Maintenance of Underlying Insurance**

    **1.**    You must keep the "underlying insurance" stated in the Schedule of Underlying Insurance of this policy, including renewal or replacement policies not more restrictive in their terms and conditions, in full force and effect during the policy period of this policy. This also applies with respect to claims-made "underlying insurance" during any Extended Reporting Period of this policy. The limits of "underlying insurance" shall be unimpaired as of this policy's effective date and be maintained without reduction other than by payment of "damages" and "claim expenses" covered thereunder.

    **2.**    You must notify us immediately of any changes to the terms of any "underlying insurance" policy, including cancellation or replacement of such policy or policies by the "underlying insurer" or any other insurer. We may make adjustment of premium charges under this policy for the period from the effective date of such changes to the termination of any "underlying insurance" policies.

Your failure to comply with the foregoing shall not invalidate this policy; but, in the event of such failure, we shall be obligated only to the extent that we would have been obligated had the terms of the "underlying insurance" specified in the Schedule of Underlying Insurance been maintained in place.

**L.    Other Insurance**

    **1.**    We will pay only our share of the amount of "ultimate net loss", if any, that exceeds the sum of:

        **a.**    The total amount that all such other insurance would pay in the absence of this insurance; and

        **b.**    The total of all deductible and self-insured amounts under any other insurance.

    **2.**    This insurance is excess over any other insurance, whether such insurance is stated to be primary, excess, contributing, contingent, or on any other basis. This provision does not apply to such insurance specifically purchased to apply in excess of this policy's Limit of Insurance.

3.    We will have no duty under Coverages A and B to defend any "claim" or "suit" that any other insurer has a duty to defend. If no other insurer defends, we may undertake to do so, but we will be subrogated to the insured's right against all other insurers.

4.    If the insured has another Excess or Umbrella Policy with us covering a "claim" also covered by this policy, the insured must elect which policy shall apply and we shall be obligated under the policy so elected and shall not be obligated under any other policy.

## M.    Premium Audit

1.    For policies issued on an adjustable basis (not a flat basis), upon expiration of this policy or its earlier termination date, the earned premium shall be computed on the basis of units of exposure times the rate. If the earned premium thus computed is more than the paid Deposit Premium stated in the Declarations, the insured shall immediately pay the excess to us; if less, we shall retain the Minimum Premium stated in the Declarations or the Policy Minimum Earned Premium stated in the Declarations, whichever is greater. The Policy Minimum Earned Premium is the smallest amount of premium that is fully earned in the event of cancellation, initiated by any party, prior to policy expiration.

2.    The first Named Insured must keep records of the information we need for premium computation, and must send us copies at such times as we may request.

3.    The first Named Insured shall cooperate in promptly providing to us the entire amount (or number) of such premium base during the whole or any specified part of the said period, including making their books available for verification and audit by our duly authorized representative of the information for a period of three years from the expiration date. If the insured fails to cooperate, we have the right to invoice an estimated audit which is due and payable immediately. The insured must pay all costs or expenses resulting from their failure to cooperate or their failure to pay an audit invoice. The providing of any estimate or statement or the making of any previous settlement shall not bar the examination herein provided for, nor our right to additional premium.

## N.    Authorization

By acceptance of this policy, the first Named Insured stated in Item 1. of the Declarations shall act on behalf of all insureds with respect to the giving and receiving of all notices to and from us as provided herein: the cancellation of this policy in whole or part; the payment of premiums and Deductibles when due; the receiving of any return premiums that may become due under this policy; and the insureds agree that such person or organization shall act on their behalf.

## O.    Representations

By acceptance of this policy, the insureds agree as follows:

1.    That the information and statements contained in the application(s) are the basis of this policy and are to be considered as incorporated into and constituting a part of this policy; and

2.    That the information and statements contained in the application(s) are their representations, that they shall be deemed material to the acceptance of the risk or hazard assumed by us under this policy, and that this policy is issued in reliance upon the truth of such representations.

## P.    Separation of Insureds

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned to the first Named Insured, this insurance applies:

1.    As if each Named Insured were the only Named Insured; and
2.    Separately to each insured against whom a "claim" is made or a "suit" is brought.

**Q.    Transfer of Rights of Recovery Against Others to Us**

1.    If the insured has rights to recover all or part of any payment we have made under this policy, those rights are transferred to us. The insured must do nothing after loss to impair those rights. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce those rights.

2.    Any recoveries shall be applied first to reimburse any interests (including the insured) that have paid any amounts in excess of our liability under this policy; then to reimburse us for any payment hereunder; and lastly to reimburse such interests (including the insured) as to which this policy is excess, as are entitled to the remainder, if any.

3.    When we assist in pursuit of the insured's rights of recovery, resulting reasonable expenses shall be apportioned among all interests in the ratio of their respective losses for which recovery is sought.

**R.    When "Ultimate Net Loss" Is Payable**

Our obligation for any portion of "ultimate net loss" shall not arise until the insured or any "underlying insurer" has paid the "underlying limit." In the event that a policy stated in the Schedule of Underlying Insurance includes a specific coverage which has a sublimit, a separate limit or a supplemental limit of less than $500,000 for Employer's Liability or less than $1,000,000 for any other "underlying insurance," this policy shall exclude any "occurrence," "offense" or "claim" to which such specific coverage applies and shall not drop down to afford coverage in excess of such sublimit, separate limit or supplemental limit.

**S.    Service of Suit**

Except with respect to any policy issued in any state in which we are licensed as an admitted insurer to transact business, it is agreed that in the event of our failure to pay any amount claimed to be due hereunder, we, at your request, will submit to the jurisdiction of a court of competent jurisdiction within the United States and will comply with all requirements necessary to give such court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such court. Nothing in this clause constitutes or should be understood to constitute a waiver of our rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon Secretary, Legal Department, Markel Midwest, Ten Parkway North, Deerfield, Illinois 60015 and that in any suit instituted against us upon this policy, we will abide by the final decision of such court or of any appellate court in the event of an appeal.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, we hereby designate the Superintendent, Commissioner or Director of Insurance or other official specified for that purpose in the statute, or his/her successor or successors in office, as our true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of you or any beneficiary hereunder arising out of this policy, and hereby designate the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

# EXTENDED REPORTING PERIOD

**A.**    This Section applies to claims-made insurance under Coverages A and B.

1.    We will provide an Extended Reporting Period as described below, if the Extended Reporting Period is exercised pursuant to the "underlying insurance." We will also provide an Extended Reporting Period when our layer of insurance is not renewed or replaced by you or by us provided you maintain the "underlying insurance" for the duration of the Extended Reporting Period.

2.    The Extended Reporting Period is available, but only by an endorsement and for an additional charge. This Extended Reporting Period starts immediately at the end of the policy period and extends for the period of months as elected by the first Named Insured, but in no case will the Extended Reporting Period be for a longer duration than the Extended Reporting Period of the "underlying insurance" listed in the Schedule of Underlying Insurance.

3.    You must give us a written request for the endorsement within 30 days after the end of the policy period. The Extended Reporting Period will not go into effect unless you pay the additional premium promptly when due and;

a. Maintain any "underlying insurance" in full force and effect as specified in Condition K., Maintenance of Underlying Insurance of this policy; or

b. Purchase an Extended Reporting Period endorsement on any "underlying insurance" written on a claims-made basis.

The period of months for which the first Named Insured may exercise the Extended Reporting Period shall be as stated below:

**(1)** 12 months;

**(2)** 24 months;

**(3)** 36 months; or

**(4)** 48 months.

The additional premium for the Extended Reporting Period shall be determined by us in accordance with rates and rules in effect at the expiration of this policy period.

The endorsement shall set forth the terms, not inconsistent with this section, applicable to the Extended Reporting Period, including a provision to the effect that the insurance afforded for "claims" first received during such period is excess over any other insurance available under policies in force after the Extended Reporting Period starts.

**4.** Extended Reporting Periods do not extend the policy period or change the scope of coverage provided. They apply only to "claims" covered by this policy on a claims-made basis for "bodily injury" or "property damage" that occurs before the end of the policy period but not before the "retroactive date" shown in item 1. of the Declarations of this policy.

Once in effect, Extended Reporting Periods may not be cancelled unless "underlying insurance" is not maintained. If canceled due to the failure of the insured to maintain an "underlying insurance", return premium shall be determined by us based on the "underlying insurance" maintained relative to that not maintained.

**5.** In addition to the availability of the Extended Reporting Period for the period of months stated in A.3. above, an Extended Reporting Period of the following duration shall also be available:

60 months;

72 months; or

84 months.

The first Named Insured must make a written request for the longer duration Extended Reporting Period received by us within 10 days after the end of the Policy Period. The written request must specify from the options stated above which period of Extended Reporting Period is requested. We will determine the additional premium to be charged for such Extended Reporting Period.

We will provide to the first Named Insured in writing the amount of the additional premium for an Extended Reporting Period of the duration specified within 10 days of receipt of the Named Insured's written request.

All other terms and conditions of the Section Extended Reporting Period shall apply with regard to the first Named Insured's exercise of any such longer duration Extended Reporting Period.

**6.** Extended Reporting Periods do not reinstate or increase the Limits of Insurance.

## DEFINITIONS

**A.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

b. Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**B.**   "Aircraft" means any heavier-than-air or lighter-than-air vehicle designed to travel principally in the air to transport persons or property. "Aircraft" does not mean hovercraft. "Aircraft" also includes any vehicle or device specifically designed for travel or use outside the earth's atmosphere.

**C.**   "Aggregate limit" means the maximum amount stated in the policy for which the insurer will be liable, regardless of the number of covered "claims."

**D.**   "Auto" means a land motor vehicle, trailer, or semi-trailer designed for travel on public roads, including attached machinery or equipment. However, "auto" does not include "mobile equipment."

**E.**   "Automobile hazard" means liability arising out of the ownership, maintenance, operation, use, "loading or unloading" of any "auto."

**F.**   "Bodily injury" means bodily injury, sickness, disease, shock, fright, mental injury, or disability sustained by a person, and includes death from any of these at any time.

**G.**   "Claim" means the insured's receipt of:
   **1.**   Any demand for "damages" or services; or
   **2.**   The service of "suit" papers or arbitration proceedings alleging liability of the insured, due to an "occurrence" or "offense" which may or may not be covered by this policy.
   "Claim" does not include reports of accidents, or "occurrences," or any acts, errors, "offenses" or omissions which may give rise to a "claim."

**H.**   "Claim expenses" means reasonable and necessary amounts incurred by us or by you with our prior written consent in the defense of that portion of any "claim" or "suit" for which coverage is afforded under this policy, including costs of investigation, court costs, costs of bonds to release attachments and similar bonds, but without any obligation of us to apply for or furnish any such bonds, and costs of appeals; provided, however, "claim expenses" shall not include: (1) salary, wages, overhead, or benefit expenses of or associated with employees or officials of yours or our employees or officials; or (2) salary, wages, administration, overhead, benefit expenses, or charges of any kind attributable to any in-house counsel or captive out-of-house counsel for you or us.

**I.**   "Controlling underlying insurance" means the coverage(s) afforded under insurance policies designated in the Schedule of Underlying Insurance of this policy as "controlling underlying insurance" and any renewals or replacements of such policies. "Underlying insurance" also includes any other insurance available to the insured, except such insurance as may be purchased to apply specifically in excess of this policy.

**J.**   "Controlling underlying insurer" means an insurance company issuing a policy of "controlling underlying insurance."

**K.**   "Coverage territory" means anywhere in the world if the insured's responsibility to pay "damages" is determined in a "suit" on the merits, in the United States of America (including its territories and possessions), Puerto Rico, Canada, or in a settlement we agree to.

**L.**   "Damages" means the monetary portion of any judgment, award or settlement; provided, however, "damages" shall not include:
   **1.**   Punitive or exemplary damages or any multiplied portions of damages in excess of actual damages, including trebling of damages;
   **2.**   Taxes, criminal or civil fines, or attorneys' fees of a party other than an insured or other penalties imposed by law;
   **3.**   Sanctions;
   **4.**   Matters which are uninsurable under the law pursuant to which this policy shall be construed; or
   **5.**   The return, withdrawal, reduction or restitution or payment of fees, profits or charges for services or consideration and/or any expenses paid to the insured.

**M.**   "Employee" includes a "leased worker." "Employee" does not include a "temporary worker."

**N.**   "Executive officers" means a person holding any of the officer positions created by your charter, constitution, by-laws, or any similar governing document. "Executive officer" includes any other officer of the corporation.

**O.**   "Impaired property" means tangible property, other than "your product" or "your work," that cannot be used or is less useful because:

1. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate, or dangerous; or
2. You have failed to fulfill the terms of a contract or agreement;

If such property can be restored to use by:

a. The repair, replacement, adjustment, or removal of "your product" or "your work"; or
b. Your fulfilling the term of the contract or agreement.

**P.** "Insured contract" means:

1. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";
2. A sidetrack agreement;
3. Any easement or license agreement in connection with vehicle or pedestrian private railroad crossings at grade; or
4. Any other easement agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;
5. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality.
6. An elevator maintenance contract; or
7. That part of any other contract or agreement pertaining to your business under which you assume the tort liability of another to pay "damages" because of "bodily injury" or "property damage" to a third person or organization, if the contract or agreement is made prior to the "bodily injury" or "property damage." Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

An "insured contract" does not include that part of any contract or agreement:

a. That indemnifies an architect, engineer, or surveyor for injury or damage arising out of:
   (1) Preparing, approving or failing to approve maps, drawings, opinions, reports, surveys, change orders, designs, or specifications; or
   (2) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage.
b. Under which the insured, if an architect, engineer, or surveyor, assumes liability for injury or damage arising out of the insured's rendering or failing to render professional services, including but not limited to those listed in a. above and supervisory, inspection, or engineering services; or
c. That indemnifies any person or organization for damage by fire to premises rented to you, loaned to you, or temporarily occupied by you.

**Q.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker."

**R.** "Loading or unloading" means the handling of property:

1. After it is moved from the place where it is accepted for movement into or onto an "aircraft," "watercraft," or "auto;"
2. While it is in or on an "aircraft," "watercraft," or "auto;" or
3. While it is being moved from an "aircraft," "watercraft," or "auto" to the place where it is finally delivered.

But "loading and unloading" does not include the movement of property by means of a mechanical device, other than a hand truck that is not attached to the "aircraft," "watercraft," or "auto."

**S.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

1. Bulldozers, farm machinery, forklifts, and other vehicles designed for use principally off public roads;
2. Vehicles maintained for use solely on or next to premises you own or rent;
3. Vehicles that travel on crawler treads;
4. Vehicles, whether self-propelled or not, on which are permanently mounted:
   a. Power cranes, shovels, loaders, diggers, or drills; or
   b. Road construction or resurfacing equipment such as graders, scrapers, or rollers;
5. Vehicles not described in 1., 2., 3., or 4. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:
   a. Air compressors, pumps, and generators, including spraying, welding, building cleaning, geographical exploration, lighting, and well servicing equipment; or
   b. Cherry pickers and similar devices used to lift workers to heights;

6. Vehicles not described in 1., 2., 3., or 4. above maintained primarily for purposes other than the transportation of person or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

**a.** Equipment designed primarily for:
- **(1)** Snow removal;
- **(2)** Road maintenance, but not construction or resurfacing;
- **(3)** Street cleaning;

**b.** Cherry pickers and similar devices mounted on automobile chassis and used to raise or lower workers; and

**c.** Air compressors, pumps, and generators, including spraying, welding, building cleaning, geographical exploration, lighting, and well servicing equipment.

**T.** "Occurrence" means:

**1.** With respect to "bodily injury" or "property damage" liability, an accident, including continuous or repeated exposure to substantially the same general harmful conditions; or

**2.** With respect to employees of the Named Insured, "bodily injury" caused by accident or disease.

**U.** "Offense" means any of the offenses included in the definition of "personal and advertising injury."

**V.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

**1.** False arrest, detention or imprisonment;

**2.** Malicious prosecution;

**3.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**4.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**5.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

**6.** The use of another's advertising idea in your "advertisement"; or

**7.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**W.** "Pre-judgment interest" means interest added to a settlement, verdict, award, or judgment based on the amount of time prior to the settlement, verdict, award, or judgment whether or not made part of the settlement, verdict, award, or judgment.

**X.** "Products-completed operations hazard:"

**1.** "Products-completed operations hazard" includes all "bodily injury" and "property damage" occurring away from premises you own or rent and caused by or arising out of "your product" or "your work" except:
- **a.** Products that are still in your physical possession; or
- **b.** Work that has not yet been completed or abandoned.

**2.** "Your work" will be deemed completed at the earliest of the following times:
- **a.** When all work called for in your contract has been completed;
- **b.** When all of the work to be done at the site has been completed if your contract calls for work at more than one site; or
- **c.** When that part of the work done at a job site has been put to its intended use by an person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair, or replacement, but which is otherwise complete, will be treated as completed.

**3.** This hazard does not include "bodily injury" or "property damage" caused by or arising out of:
- **a.** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle created by the "loading or unloading" of it:
- **b.** The existence of tools, uninstalled equipment, or abandoned or unused materials.

**Y.** "Property damage" means:

**1.** Physical injury to tangible property, including all resulting loss of use of that property; or

**2.** Loss of use of tangible property that is not physically injured or destroyed. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**Z.** "Retained limit" means the amount of "underlying insurance" applicable to a "claim" or "suit," whether such "underlying insurance" is collectible or not.

**AA.** "Retroactive date" means the retroactive date stated in item 3. of the Declarations of this policy.

**BB.** "Suit" means a civil proceeding in which "damages" because of "bodily injury," "property damage," "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes any arbitration proceeding alleging such "damages" to which you must submit or submit with your consent, or any other alternative dispute resolution proceeding in which "damages" are claimed and to which you submit with our consent.

**CC.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**DD.** "Ultimate net loss" means the total amount of "damages" for which the insured is legally liable in payment of "bodily injury", "property damage", "personal and advertising injury." "Ultimate net loss" shall include "claim expenses" we incur with respect to any "bodily injury", "property damage", "personal and advertising injury" subject to coverage under this policy, if "claim expenses" of the "underlying insurer(s)" with respect to such "bodily injury", "property damage", "personal and advertising injury" reduce the limits of "underlying insurance" of the policy listed in the Schedule of Underlying Insurance applicable to such "bodily injury", "property damage", "personal and advertising injury". "Ultimate net loss" may be established by adjudication, arbitration, or a compromise settlement to which we have previously agreed in writing. "Ultimate net loss" shall be reduced by any recoveries or salvages which have been paid or will be collected, but the amount of "ultimate net loss" shall not include any other expenses incurred by an insured, by us, or by any "underlying insurer."

**EE.** "Underlying insurance" means the coverage(s) afforded under insurance policies designated in the Schedule of Underlying Insurance of this policy and any renewals or replacements of such policies. "Underlying insurance" also includes any other insurance available to the insured, except such insurance as may be purchased to apply specifically in excess of this policy.

**FF.** "Underlying insurer" means an insurance company issuing a policy of "underlying insurance."

**GG.** "Underlying limit" means the limit of insurance stated in the Schedule of Underlying Insurance of this policy.

**HH.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**II.** "Watercraft" means a vehicle designed to travel principally on or under water. "Watercraft" includes hovercraft.

**JJ.** "Your product" means:
   **1.** Any goods or products, other than real property, manufactured, sold, handled, distributed, or disposed of by:
   **a.** You;
   **b.** Others trading under your name; or
   **c.** A person or organization whose business or assets you have acquired; and
   **2.** Containers (other than vehicles), materials, parts, or equipment furnished in connection with such goods or products.
   "Your product" includes warranties or representations made at any time with respect to the fitness, quality, durability, or performance of any of the items included in 1., or 2. above.
   "Your product" does not include vending machines or other property rented to or located for the use of others but not sold.

**KK.** "Your work" means:

    **1.**     Work or operations performed by you or on your behalf; and

    **2.**     Material, parts, or equipment furnished in connection with such work or operations.

    "Your work" includes warranties or representations made at any time with respect to the fitness, quality, durability, or performance of any of the items included in 1. or 2. above.



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION – UNMANNED AIRCRAFT

This endorsement modifies insurance provided under the following:

HEALTH CARE UMBRELLA LIABILITY POLICY

In consideration of the premium paid, it is understood and agreed that the policy is amended as follows:

1. Section EXCLUSIONS A.4. is deleted and replaced as follows:

   4. "Bodily injury" or "property damage" arising out of the ownership, maintenance, operation, use, loading, unloading, or entrustment to others of an "aircraft" other than an "unmanned aircraft" or a "watercraft" owned or operated by, or chartered, rented, or loaned to any insured, except to the extent that coverage is provided by a policy listed in the Schedule of Underlying Insurance and then only to the extent provided by such policy or policies.

2. Section EXCLUSIONS C. is amended by the addition of the following exclusion:

   Coverages A and B of this policy do not apply to:

   "Ultimate net loss" arising out of or in connection with the ownership, maintenance, operation, use or entrustment to others of an "unmanned aircraft." Solely for purposes of this exclusion, "use" includes operation of or exercise of any control over an "unmanned aircraft"; and the insured's authorization, direction or acquiescence in the operation or control of "unmanned aircraft" by any person or entity; and "loading or unloading" of any such "unmanned aircraft." This exclusion applies even if any such "claim" alleges negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by the insured, if the "occurrence" which caused the "bodily injury" or "property damage" or the "offense" which caused the "personal and advertising injury" involved the ownership, maintenance, use or entrustment to others of any "unmanned aircraft."

3. Section DEFINITIONS B. and R. are deleted and replaced as follows:

   B. "Aircraft" means any heavier-than-air or lighter-than-air vehicle designed to travel principally in the air to transport persons or property. "Aircraft" does not mean hovercraft or "unmanned aircraft." "Aircraft" also includes any vehicle or device specifically designed for travel or use outside the earth's atmosphere.

   R. "Loading or unloading" means the handling of property:
      1. After it is moved from the place where it is accepted for movement into or onto an "aircraft," "unmanned aircraft," "watercraft," or "auto;"
      2. While it is in or on an "aircraft," "unmanned aircraft," "watercraft," or "auto;" or
      3. While it is being moved from an "aircraft," "unmanned aircraft," "watercraft," or "auto" to the place where it is finally delivered.
      But "loading and unloading" does not include the movement of property by means of a mechanical device, other than a hand truck that is not attached to the "aircraft," "unmanned aircraft," "watercraft," or "auto."

2. Section DEFINITIONS is amended by the addition of the following:

   "Unmanned aircraft" means an aircraft that is not designed, manufactured, or modified after manufacture, to be controlled directly by a person from within or on the aircraft.

All other terms and conditions remain unchanged.



# EVANSTON INSURANCE COMPANY

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CERTIFIED ACTS OF TERRORISM COVERAGE

This endorsement modifies insurance provided under the following:

HEALTH CARE UMBRELLA LIABILITY POLICY
SPECIFIED MEDICAL PROFESSIONS EXCESS GENERAL LIABILITY INSURANCE POLICY

It is agreed that the following is added:

**Certified Acts of Terrorism**

It is hereby understood and agreed that this policy includes coverage on account of any "ultimate net loss" in excess of the "underlying limit" resulting from any "certified act of terrorism." Notwithstanding the foregoing, if no coverage is afforded by an applicable policy of "underlying insurance" for any "certified act of terrorism," this policy shall not drop down but shall apply to "ultimate net loss" in excess of the "underlying limit" of the applicable "underlying insurance" as if such "underlying insurance" had included coverage for any "certified act of terrorism." We shall be obligated only to the extent that we would have been obligated had you effected coverage for any "certified act of terrorism" under such applicable "underlying insurance."

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The federal Terrorism Risk Insurance Act set forth the following criteria for a "certified act of terrorism":

1.   The act resulted in insured losses in excess of $5 million in the aggregate attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and
2.   The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

If the aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a Calendar Year and the Insurer has met the Insurer's deductible under the Terrorism Risk Insurance Act, the Insurer shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such cases insured losses up to that amount are subject to pro rata allocation in accordance with the procedures established by the Secretary of the Treasury.

The terms and limitations of any terrorism coverage provided therewith, or the inapplicability or omission of terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this policy.

All other terms and conditions remain unchanged.

**MEIL 5231 01 15**                                                                                              **Page 1 of 1**

Clerk's Home (http://www.miami-dadeclerk.com/home.asp)
Online Services (http://www.miami-dadeclerk.com/online_services.asp)    About Us (http://www.miami-dadeclerk.com/about.asp)
Contact Us (http://www.miami-dadeclerk.com/contact.asp)
My Account (https://www2.miami-dadeclerk.com/PremierServices/login.aspx)



# Miami-Dade County Civil, Family and Probate Courts Online System

◀◀ Back to Search

## WESTCHESTER GENERAL HOSPITAL INC VS EVANSTON INSURANCE COMPANY

**Local Case Number:** 2019-016152-CA-01

**Filing Date:** 05/29/2019

**State Case Number:** 132019CA016152000001

**Case Type:** Declaratory Judgment (Greater than $15,000)

**Consolidated Case No.:** N/A

**Judicial Section:** CA32

**Case Status:** OPEN

---

### 👥 Parties     Number of Parties: 2 ▬

☞ Export to ▾

| Party Description | Party Name | Attorney Information | Other Attorney(s) |
|---|---|---|---|
| Plaintiff | Westchester General Hospital Inc | *B#: (Bar Number)*79170 *N: (Attorney Name)*Marino, Stephen A, Jr | |
| Defendant | Evanston Insurance Company | | |

---

### ⚒ Hearing Details     Number of Hearing: 0 ✚

## 🔊 Dockets

⟶ Export to ▾

**Dockets Retrieved: 4** ▬

| | Number | Date | Book/Page | Docket Entry | Event Type | Comments |
|---|---|---|---|---|---|---|
| 📄 | 4 | 06/24/2019 | | Waiver: | Event | |
| | 3 | 05/31/2019 | | Receipt: | Event | **RECEIPT#:3440026 AMT PAID:$401.00 NAME:MARINO, STEPHEN A, JR. 100 SE 2ND ST STE 3000 MIAMI FL 33131-2100 COMMENT: ALLOCATION CODE QUANTITY UNIT AMOUNT 3100-CIRCUIT FILING FEE 1 $401.00 $401.00 TENDER TYPE:E-FILING ACH TENDER AMT:$40** |
| 📄 | 2 | 05/29/2019 | | Complaint | Event | |
| 📄 | 1 | 05/29/2019 | | Civil Cover | Event | |

◀◀ Back to Search

**Please be advised:**

The Clerk's Office makes every effort to ensure the accuracy of the following information; however it makes no warranties or representations whatsoever regarding the completeness, accuracy, or timeliness of such information and data. Information on this website has been posted with the intent that it be readily available for personal and public non-commercial (educational) use and to provide the public with direct online access to information in the Miami-Dade Clerk's Office information systems. Other than making limited copies of this website's content, you may not reproduce, retransmit, redistribute, upload or post any part of this website, including the contents thereof, in any form or by any means, or store it in any information storage and retrieval system, without prior written permission from the Miami-Dade Clerk's Office.

If you are interested in obtaining permission to reproduce, retransmit or store any part of this website beyond that which you may use for personal use, as defined above, visit our Web API Services (https://www2.miami-dadeclerk.com/Developers). To review the complete Miami-Dade County Disclaimer, follow this link: https://www8.miamidade.gov/global/disclaimer/disclaimer.page (https://www8.miamidade.gov/global/disclaimer/disclaimer.page)

Email (https://miamidadecounty.co1.qualtrics.com/SE/?SID=SV_bDvccbiqJBvQ2LH)  |
Logout (/PremierServices/Logout.aspx?ReturnUrl=https://www2.miami-dadeclerk.com/ocs/Search.aspx?type=premier)
Clerk's Home (http://www.miami-dadeclerk.com/home.asp)  |
Privacy Statement (https://www8.miamidade.gov/global/disclaimer/privacy-and-security.page)  |
Disclaimer (https://www8.miamidade.gov/global/disclaimer/disclaimer.page)  | (http://www.miamidade.gov)
Contact Us (http://www.miami-dadeclerk.com/contact.asp)  |  About Us (http://www.miami-dadeclerk.com/about.asp)
2015 Clerk of the Courts. All Rights reserved.

2 of 2                                                                         7/10/2019, 10:33 AM